POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVAN UZIEL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PINTEREST, INC., WILLIAM READY, and JULIA BRAU DONNELLY,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Ivan Uziel ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Pinterest, Inc. ("Pinterest" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that

1

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Pinterest securities between February 7, 2025 and February 12, 2026, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Pinterest is a visual social media platform on which users organize various kinds of content into "boards", which serve as inspiration for projects the user hopes to complete. Often, the content on these boards includes products or services that advertisers sell to Pinterest's users.

3. Pinterest purports to offer advertisers a unique value proposition due to the way in which users of the platform organize select and curate the content on their Pinterest boards. Whereas other social media platforms tend to prioritize social connection, Pinterest is oriented instead toward reflecting its users' interests in various products and services, with each user's board, in essence, presenting an aggregated list of products and services that the user is, presumably, more likely to spend money on.

4. Accordingly, Pinterest generates substantially all of its revenue from advertising, which offers brands the opportunity to put their products and services in front of the Company's users and subsequently measure how many of those users view or otherwise engage with the advertisements and eventually purchase the products or services advertised. A "substantial

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

portion" of Pinterest's revenue comes from "from a small number of advertisers", particularly retail and consumer packaged goods ("CPG") companies.

5.      During the Class Period, Defendants consistently assured investors of their confidence in Pinterest's ability to navigate uncertain or adverse macroeconomic ("macro") environments, including one in which its advertising partners faced increased margin pressure from tariffs, based on its offerings across advertisers' funnels, its past performance, and its status as a shopping destination for younger consumers.  Among other things, Defendants consistently emphasized the purported durability and resilience of Pinterest's business model, while reassuring investors that such practices had positioned Pinterest for long-term success (*i.e.*, over a period of multiple quarters or years).

6.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Pinterest was experiencing and/or was likely to experience reduced revenues from its advertising partners; (ii) Pinterest overstated its ability to manage the impact of U.S. tariffs on the macroeconomic environment in which the Company operated, including the foreseeable impact on its advertising partners; (iii) the impact of the foregoing on Pinterest's advertising revenues was significant enough that Pinterest was facing and/or likely to face an imminent restructuring; and (iv) as a result, Defendants' public statements were materially false and misleading at all times.

7.      The truth began to emerge on November 4, 2025, when Pinterest announced its financial results for the fiscal quarter ended September 30, 2025.  Among other items, Pinterest announced Q4 revenue guidance with a midpoint of $1.325 billion, below consensus expectations of $1.34 billion.  Pinterest advised that it "face[d] pockets of moderating ad spend . . . as larger U.S. retailers navigate tariff-related margin pressure in the current environment".

3

8. On this news, Pinterest's stock price fell $7.16 per share, or 21.76%, to close at $25.75 per share on November 5, 2025.

9. Then, on January 27, 2026, Pinterest announced a "board-approved global restructuring plan . . . that includes a reduction in force that is expected to affect less than 15% of the Company's workforce as well as office space reductions." Pinterest said that it "anticipates incurring total pre-tax restructuring charges of approximately $35 million to $45 million, which are expected to be primarily cash-related expenditures" and "is taking these actions to support its transformation initiatives, including but not limited to (i) reallocating resources to AI-focused roles and teams that drive AI adoption and execution, (ii) prioritizing AI-powered products and capabilities, and (iii) accelerating the transformation of its sales and go-to-market approach."

10. On this news, Pinterest's stock price fell $2.49 per share, or 9.61%, to close at $23.41 per share on January 27, 2026.

11. Then, on February 12, 2026, Pinterest announced its financial results for the fiscal quarter and year ended December 31, 2025. Among other items, Pinterest announced quarterly revenue of $1.32 billion, below the consensus estimate of $1.33 billion, and provided Q1 2026 revenue guidance of $951 million to $971 million, below the consensus estimate of $980.6 million. Chief Executive Officer ("CEO") William Ready attributed Pinterest's performance throughout 2025 to an "exogenous shock this year related to tariffs, which are disproportionately affecting ad spend from our top retail advertisers" and Chief Financial Officer ("CFO") Julia Donnelly reported that "we expect these [tariff] headwinds will continue and may become slightly more pronounced in Q1".

12. On this news, Pinterest's stock price fell $3.12 per share, or 16.83%, to close at $15.42 on February 13, 2026.

4

13.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

16.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pinterest is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

17.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

18.    Plaintiff, as set forth in the attached Certification, acquired Pinterest securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

19.    Defendant Pinterest is a Delaware corporation with principal executive offices located at 651 Brannan Street, San Francisco, California 94107.  The Company's Class A

5

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "PINS".

20.    Defendant William Ready ("Ready") has served as Pinterest's CEO at all relevant times.

21.    Defendant Julia Brau Donnelly ("Donnelly") has served as Pinterest's CFO at all relevant times.

22.    Defendants Ready and Donnelly are collectively referred to herein as the "Individual Defendants."

23.    The Individual Defendants possessed the power and authority to control the contents of Pinterest's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Pinterest's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Pinterest, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

24.    Pinterest and the Individual Defendants are collectively referred to herein as "Defendants."

6

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## SUBSTANTIVE ALLEGATIONS

### Background

25.    Pinterest is a visual social media platform on which users organize various kinds of content into "boards", which serve as inspiration for projects the user hopes to complete. Often, the content on these boards includes products or services that advertisers sell to Pinterest's users.

26.    Pinterest purports to offer advertisers a unique value proposition due to the way in which users of the platform organize select and curate the content on their Pinterest boards. Whereas other social media platforms tend to prioritize social connection, Pinterest is oriented instead toward reflecting its users' interests in various products and services, with each user's board, in essence, presenting an aggregated list of products and services that the user is, presumably, more likely to spend money on.

27.    Accordingly, Pinterest generates substantially all of its revenue from advertising, which offers brands the opportunity to put their products and services in front of the Company's users and subsequently measure how many of those users view or otherwise engage with the advertisements and eventually purchase the products or services advertised. A "substantial portion" of Pinterest's revenue comes from "from a small number of advertisers", particularly retail and CPG companies.

28.    During the Class Period, Defendants consistently assured investors of their confidence in Pinterest's ability to navigate uncertain or adverse macro environments, including one in which its advertising partners faced increased margin pressure from tariffs, based on its offerings across advertisers' funnels, its past performance, and its status as a shopping destination for younger consumers. Among other things, Defendants consistently emphasized the purported durability and resilience of Pinterest's business model, while reassuring investors that such

7

practices had positioned Pinterest for long-term success (*i.e.*, over a period of multiple quarters or years).

**Materially False and Misleading Statements Issued During the Class Period**

29.     The Class Period begins on February 7, 2025, the day after Pinterest filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the fiscal quarter and year ended December 31, 2024, and issued a press release to announce the same.  In this press release, Defendant Ready expressed confidence in Pinterest's "strategy", and that Pinterest's "focus on being a positive platform" gave the Company a "competitive advantage", stating, *inter alia*:

> ***Our strategy is paying off***. People are coming to Pinterest more often, the platform has never been more actionable, and our lower funnel[1] focus is driving results for users and advertisers. Looking ahead, ***I'm confident that our focus on being a positive platform is a competitive advantage in driving long-term success for the business and value for our advertisers*** and users.[2]

30.     Also on February 6, 2026, Pinterest held a conference call to discuss the financial results reported in the Form 10-K filed that day (the "Q4 2025 Earnings Call").  During this call, Defendants repeatedly represented that Pinterest's business model was sound and poised for success over both "multiple quarters" and "multiple years" – representations that would be belied by Pinterest's abrupt announcement of a significant corporate restructuring just one year later. For example, during the Q4 2024 Earnings Call, Defendant Ready stated, in relevant part:

> As I mentioned in my remarks, 2024 was quite transformative for us. . . .  Our lower funnel objectives being the strongest and we've been on a journey over the last 2.5.years to really make Pinterest a true performance advertising platform. ***And the things that we've done, as I said before, I wouldn't think of them like one-off launches.  They have compounding effects over not just multiple quarters, but multiple years.***  So, we created immense value for advertisers in 2024 through our

---

[1] The "funnel" refers to an advertiser's marketing funnel, where the "upper funnel" represents customers' awareness of a brand and the "lower funnel" represents the point at which a customer decides to purchase the advertiser's product or services.

[2] All emphases herein added unless otherwise indicated.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

lower funnel innovation, including direct links, mobile deep linking, conversion API.

31.    Also during the Q4 2024 Earnings Call, Defendant Donnelly similarly described Pinterest's business as "inherently profitabl[e]", stating *inter alia*: "Our ability to generate significant free cash flow which we define as cash flow from operating activities plus purchases of property and equipment speaks to **the inherent profitability of our business** and asset-light nature of our model."

32.    Later during the same call, Defendant Ready represented that Pinterest had little trouble generating advertiser demand for its products and capturing greater market share.  Among other representations, Defendant Ready emphasized the purported long-term benefits of Pinterest's "pipeline of value" for advertisers, claiming that the Company was "demonstrating that we can be a much larger portion of the overall ad market", stating *inter alia*:

> [W]e've created tremendous value through direct links, through mobile deep linking and really just the shoppability of our users to not just the format changes that as we made shopping better for users, we are seeing users engage more of the shopping, clicking more on the platform, taking action more on the platform.  ***And advertisers taking advantage of all that value creation.  Again, we see more of that value in front of us than behind us which is what gives us a lot of confidence in the pipeline ahead, not to say pipeline of strong products, it's a pipeline of value that we have created that we are giving advertisers better and better ability to take advantage of.  And again we are still in the relatively early days of that even though we see very clear signs of those years taking action to give you a tangible example of just how much action we see advertisers are taking.***  For some of our largest advertisers, the lower funnel revenue objective now accounts for over 80% of their spend with us, which is up significantly over the last two years and significantly higher than the overall mix of lower funnel that we see across the business.  So when you step back and say, 2.5 years ago we embarked on a mission to really turn Pinterest into a performance advertising platform ***for some of the largest most sophisticated advertisers, we are getting to 5% of their total ad budgets, 10% plus of their digital ad budgets demonstrating that we can be a much larger portion of the overall ad market even as we started first with those largest advertisers in doing that with focus on durable, low funnel budgets***.

33.    On March 6, 2025, Defendant Ready appeared on behalf of Pinterest at Morgan Stanley's Technology, Media & Telecom Conference.  In response to a question asking him to

"name [his] latest macro source of uncertainty" or "headwind to growth", "whether it's trade [or] tariffs", Defendant Ready merely emphasized Pinterest's purported resilience and ability to succeed "in any environment," because "people are still going to shop":

> First of all, you know, we don't have any better ability to predict what happens with, you know, terrorists or trade or things like that than anybody else.  ***But, you know, if you just look at what we have done, we have turned Pinterest into a shopping destination, right?  And in any environment, people are still going to shop.  And we've created really differentiated ways to do that, that advertisers are leaning into.***  But on the macro, I'd say, well, we have no better ability to predict than others, at least in terms of what we currently see.  ***We don't currently see advertisers overreacting or those kinds of things.  It's obviously a fluid environment.  So I'm sure like everybody else, everybody's watching every day to see what happens.  But we're not seeing signs of overreaction at the moment, but we've created a unique shopping destination*** . . .  ***And the last thing I'd say on this is that, again, no better ability than anybody else to predict the future.  But we played through an ad winter, and we were the only major ad platform that grew consistently every quarter through that ad downturn.***  So we've been growing faster than the market, taking share, especially in the places that we have invested in, shopping, lower funnel.  And so I think we have a real secular growth story here, where the fundamentals of the business have just never been better.  We're a unique destination for shoppers. Gen Z is our largest, fastest growing demographic, 40% plus the platform.  ***Pinterest is where Gen Z goes to shop, and we think that's, you know, that gives us lots of ways to go execute, you know, regardless of environment.***

34.    On May 8, 2025, Pinterest filed a quarterly report on Form 10-Q with the SEC, reporting its financial results for the fiscal quarter ended March 31, 2025, and issued a press release announcing the same.  The press release quoted Defendant Ready as stating, *inter alia*, that Pinterest's "strategy and consistent execution has made [it] more resilient than ever" even "[a]s the macroeconomic and digital ad landscape evolves":

> "Our strong results in the first quarter demonstrate continued momentum in revenue, user growth and engagement," said Bill Ready, CEO of Pinterest.  "***As the macroeconomic and digital ad landscape evolves, our strategy and consistent execution has made Pinterest more resilient than ever.  The fundamentals in the business are strong and we're continuing to see healthy growth.***  Our AI advancements are helping users take action and make more intentional shopping decisions. ***We're driving performance for advertisers and winning market share, giving us a solid foundation for long-term, sustainable growth***."

10

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

35.    Also on May 8, 2025, Pinterest conducted a conference call to discuss the financial results for the fiscal quarter ended March 31, 2025 (the "Q1 2025 Earnings Call").  During this call, Defendants repeatedly assured investors that Pinterest was well-equipped to navigate the "current macro environment", at times explicitly referencing the tariffs they would associate with disappointing results in several months' time.  For example, Defendant Ready stated, *inter alia*, that Pinterest "remains healthy" in "the current macro environment", and its "efforts to build . . . a more performant product for our advertisers are working":

> ***Before getting into the details of Q1, I'd like to discuss the current macro environment we're operating in.  Our business, including our top-line revenue growth remains healthy. This is an indication that our efforts to build a more engaging and actionable product for our users and a more performant product for our advertisers are working***. The strong fundamentals in our business are the result of the strategic priorities we've executed against taking Pinterest from a platform with declining users and modest revenue growth a few years ago into a secular share taker with a more resilient business than ever before. . . .  As we've made our platform more actionable and generated growing numbers of clicks and conversions, ***we've become a vital partner for advertisers across a range of categories seeking to reach our high intent users and drive sales. In turn, we are increasingly accessing always on performance budgets, which are larger and tend to be more durable.***

36.    Later during the Q1 2025 Earnings Call, while discussing guidance for the then-upcoming fiscal quarter, Defendant Donnelly similarly reassured investors that "we are confident" in "our ability to compete effectively across a number of scenarios", stating *inter alia*:

> Now I'll discuss our preliminary guidance for the second quarter. Before addressing specifics, I want to acknowledge the current evolving landscape. As Bill noted, our business trends remain healthy overall, and we feel good that the product investments we've made over the last 3 years are working. ***While we are not immune to the macro environment, we are confident in our multiple revenue initiatives, the steady ongoing execution of our plans and our ability to compete effectively across a number of scenarios***.

37.    Analysts specifically asked the whether "high tariff exposed categories in retail and CPG were "showing any softness", to which Defendant Donnelly responded, *inter alia*, that "small pockets of spend" had been "impacted by tariffs in recent weeks", and the guidance

Defendants provided the market "factors in both what we are seeing in quarter to date trends as well as what we are hearing from our advertising partners directly about their spend expectations":

> [A]s we noted in our prepared remarks, *we're seeing strength in our business, and trends remain healthy both in Q1 and the early signals on Q2. . . . To your specific question on the Q2 guide, given the situation remains somewhat fluid, our guidance reflects a slightly expanded revenue range. As always, our Q2 revenue outlook factors in both what we are seeing in quarter-to-date trends as well as what we are hearing from our advertising partners directly about their spend expectations for the remainder of the quarter as of today. There have been small pockets of spend that have been impacted by tariffs in recent weeks*. For example, like other platforms, we have observed a reduction in spend from Asia-based e-commerce retailers in the U.S. given the change in the de minimis exemption. However, we've also seen a geographic diversification from some of those Asia-based retailers to our European and Rest of World user regions. . . . So stepping back, the fundamentals of our business remain strong. Our investments over the past 3 years have -- against our multiple revenue levers have helped us build a more resilient platform, and that's a vital partner to advertisers more so than ever before, and we'll continue to execute on the key strategic initiatives within our control.

38.     Later during the Q1 Earnings Call, analysts asked about "the broader macro volatility impacting ad spend, particularly with the more brand-oriented advertisers", to which Defendant Ready responded, *inter alia*, that Pinterest had "unique offerings" that made it "long-term durable" and allowed Chief Marketing Officers ("CMOs") at Pinterests' advertising partners to advocate effectively to spend their advertising budgets at Pinterest:

> "*[A]s we go through periods of uncertainty, if you talk to CMOs about past times of uncertainty, when they get that call from the CFO to ask them to focus their spend . . . that would all rush to the low funnel, but then they'd feel like they had left something on the table* by not being able to tell their brand story, which is how they really ultimately connect with the customers to eventually get to that last click *with what we're doing in the full funnel, we're really giving them a twofer*. They can do upper funnel and lower funnel, but *then that CMO can turn to their CFO and say, see, when I did the upper funnel with the lower funnel on Pinterest, it was double a click-through rate*. So my upper funnel does perform. And therefore, that CMO can still tell our brand story even while driving lower-funnel last click on our platform. *So we think that is quite compelling and I think is, again, another example of how we've been building in a way that is long-term durable, but I think even in a moment of uncertainty where we have unique offerings that we can come forward with for both our users and our advertisers*.

12

39. Also during the Q1 2025 Earnings Call, analysts asked Defendants about "the receptivity across the advertising landscape" to the products Pinterest offered, to which Defendant Ready responded that Pinterest was "giving them great return on their ad spend" and "bringing in new sources of demand as well":

> [A]s advertisers have better and better tools, to easily take action on that, they're finding that not only can they come take action, Performance+ cutting campaign creation time and half, but also giving them great return on their ad spend and letting them meet users in a unique moment in their commercial journey where they clearly have intent but haven't yet decided what to buy, which is something really special about Pinterest that in the Western world, *we're the only platform that has on the surface, in the same app, the user at every stage of the funnel*. . . . *And we're bringing in new sources of demand as well. So we're making it so that we can meet advertisers where they are, both on measurement and the ability to bring in new demand*. . . . *And I would say we still have a lot more in front of us than behind us. We're early innings*. . . . I think *we are well down the path in demonstrating just how unique the value proposition is both for users and advertisers*.

40. On August 7, 2025, Pinterest filed a quarterly report on Form 10-Q, reporting its financial results for the fiscal quarter ended June 30, 2025, and held a conference call to discuss the same. During the associated earnings call, analysts again asked about "the broader macro environment", but this time, as it concerned "the current demand state for digital ads broadly" and "the potential for volatility in either direction or nuance around budgets as we progress deeper into the year". In response, Defendant Ready stated, *inter alia*, that Pinterest's "over delivery on revenue in Q2" showed "a more constructive environment than what we had expected and many others expected". Defendant Donnelly similarly stated *inter alia* that Pinterest had "a very strong Q2, and we see that continuing into Q3", specifically referencing "retail" as one of a couple areas that "continue to be sources of strength":

> [F]or Q2, *we saw areas that have been strong for several quarters now for us, such as retail and financial services, continue to be sources of strength*. . . . [W]e're also seeing continued gains through our investments in AI, which are driving user and engagement growth as well as compounding benefits from improvements to our ad tech stack as evidenced by outbound click growth and efficiency improvements for advertisers. *So while the tariff impact was certainly*

13

*smaller than we anticipated in Q2, we did still see some impact affecting our UCAN region*.  For example, Asia-based e-commerce retailers pulled back spend in the U.S. tied to the change in the de minimis exemption.  *But partially offsetting this headwind, we also continue to see really exciting ongoing geographic diversification from some of these and other retailers to our European and Rest of World regions*.  So outside of UCAN and in our international markets, we saw a nice acceleration in Q2 . . . in Europe and Rest of World. . . .  *So overall, a very strong Q2, and we see that continuing into Q3*.

41.     Defendant Donnelly continued to project confidence about the "macro environment" going forward, specifically referencing communications with advertisers as the basis for her view, and emphasizing that the announced guidance reflected Defendants' view that "the consistency of our revenue growth year-to-date really highlights the resilience of our business":

> *"[A]s we talk to advertisers about Q3, we do hear that some of that tariff-related and broader market uncertainty has continued* into how they're thinking about spend for Q3, though this varies by advertiser and *again, it's definitely a relatively more constructive environment than feared*.  So we're trying to provide an outlook for Q3 that is responsive to that overall environment and we'll have to see how the broader market backdrop plays out.  Stepping back, though, we're guiding to a revenue range that is similar to the 17% growth we just delivered in Q2.  So *we think the consistency of our revenue growth year-to-date really highlights the resilience of our business and more importantly, the durability of our many revenue growth drivers as we're continuing to execute on our strategy*.

42.     On September 9, 2025, Defendant Ready appeared on behalf of Pinterest at Goldman Sachs' Communacopia + Technology Conference.  When asked to describe "the key messages [Defendants were] receiving as a company broadly from advertisers about the operating environment today" and how "Pinterest's roll [sic] in that environment" was "continuing to evolve", Defendant Ready projected confidence in the Company's future, stating that its business had "a lot of runway ahead" due to "the unique nature of our consumer shopping experience[.]" Defendant Ready also said that "the macro[economic environment], particularly for advertising, is more constructive" than "at peak tariff uncertainty" and that Pinterest's performance during the preceding quarter showed it had "multiple ways to win":

14

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

[T]here are puts and takes in the market, right? And I think even since our earnings call, you've seen other earnings calls happen since then where you see some of these puts and takes playing out? Do you see some of the very largest retailers talking about margin pressure from cost of tariffs and things like that. But then you also hear those that cover small businesses . . . talking about how well the small businesses are able to be dynamic and ship supply chains or raise prices to cover these things. And so you see how different parts of the market are handling that differently. So we played through those puts and takes previously. And I think *[one] of the things that we've continued to demonstrate back to that consistent mid- to high teens growth is that we laid out at our Investor Day multiple ways to win. And so when we did face a bit of tariff uncertainty last quarter, you saw us play through that, I think, quite well coming in ahead of top of our guidance ahead of expectations or at least the analyst expectations* . . . . And a big part of that was because we have multiple levers there, where even with a little bit of pressure in the U.S. from tariffs, we saw advertisers redistributing spend to international and international really picking up steam for us. . . . *[W]e have some retailers feeling margin pressure. And so that means we're going to demand more performance than ever. And good news, we've been very focused on delivering performance for them*.

43.     The statements referenced in ¶¶ 29–42 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Pinterest was experiencing and/or was likely to experience reduced revenues from its advertising partners; (ii) Pinterest overstated its ability to manage the impact of U.S. tariffs on the macroeconomic environment in which the Company operated, including the foreseeable impact on its advertising partners; (iii) the impact of the foregoing on Pinterest's advertising revenues was significant enough that Pinterest was facing and/or likely to face an imminent restructuring; and (iv) as a result, Defendants' public statements were materially false and misleading at all times.

**The Truth Begins to Emerge**

44.     On November 4, 2025, Pinterest filed a quarterly report on Form 10-Q reporting its financial results for the fiscal quarter ended September 30, 2025 and held a conference call to discuss the same (the "Q3 2025 Earnings Call"). Among other items, Pinterest announced Q4

15

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

revenue guidance with a midpoint of $1.325 billion, below consensus expectations of $1.34 billion. During the Q3 2025 Earnings Call, Defendant Donnelly advised that Pinterest "face[d] pockets of moderating ad spend . . . as larger U.S. retailers navigate tariff-related margin pressure in the current environment".

45. On this news, Pinterest's stock price fell $7.16 per share, or 21.76%, to close at $25.75 per share on November 5, 2025.

46. In response to Pinterest's revelations, several analysts lowered their price targets for Pinterest's stock. For example, on November 4, 2025, RBC Capital Markets ("RBC") reduced its price target 15.56%, from $45.00 to $38.00, writing "[t]ariff-related weakness showed up for the first time . . . and will reinforce PINS' lack of customer diversity for the bears and higher macro sensitivity", and that "[w]hile tariffs was [sic] a known risk, intra-qtr communications on tariffs may drive some outsized reaction". On November 5, 2025, Citi reduced its price target 24%, from $50.00 to $38.00, writing "4Q guidance came in below expectations. At issue are headwinds from larger U.S. retailers moderating ad spend amid tariff-related margin pressures". Also on November 5, 2025, HSBC lowered its price target 22.12%, from $44.30 to $34.50, noting that "weak Q4 holiday season guidance . . . came in below street forecasts" and that "[m]anagement attributed the softness to 'tariff-related margin pressures disproportionately impacting larger US retailers'".

47. Notwithstanding the foregoing disclosures and resulting drop in Pinterest's share price, Pinterest's stock continued to trade at artificially inflated prices due to Defendants' continued false and misleading statements about the scope and severity of the risk that Pinterest continued to face due to reduced revenues from its advertising partners, Pinterest's purported ability to navigate the impact of U.S. tariffs on its advertising partners, and the increasing

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

likelihood that Pinterest would restructure its operations in response to the impact of the foregoing issues.

48.    For example, during the Q3 Earnings Call, Defendant Donnelly said that the revenue guidance Pinterest announced for the fourth fiscal quarter of 2025 reflected the anticipated impact of a new tariff that would be imposed in the quarter and "overall, we still feel really good about our . . . revenue growth targets over the medium and long term", *inter alia*:

> As we think about guidance for Q4, our Q4 guidance range is 1 point lower than our guidance range was for Q3 as we see these broader trends and market uncertainty continuing with the addition of a new tariff in Q4 impacting the home furnishings category.  So I think ***overall, we still feel really good about our mid- to high teens kind of revenue growth targets over the medium and long term and the durability of our revenue growth***.

49.    Later during the Q3 Earnings Call, when an analyst asked about the "broad[er] . . . digital ad environment" in Q3 and Q4, Defendant Ready said that even as "some of our largest retailers in [U.S. and Canada] pull back spend" given "tariff-related margin pressure", "***we continue to grow in other verticals and segments of the market in addition to those***":

> [I]t's also important to note that we grew 17% despite operating in an environment where some of our largest retailers in UCAN pull back spend across the industry, not specific to us, a pullback across the industry as a navigated tariff-related margin pressure.  And we think that's disproportionately impacting large retailers, but that is a segment that we have more exposure to than other platforms given our focus on shopping though we continue to grow in other verticals and segments of the market in addition to those.

50.    The statements referenced in ¶¶ 48–49 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Pinterest was experiencing and/or was likely to experience reduced revenues from its advertising partners; (ii) Pinterest overstated its ability to manage the impact of U.S. tariffs on the macroeconomic environment in which the Company operated, including the foreseeable impact on its advertising

17

partners; (iii) the impact of the foregoing on Pinterest's advertising revenues was significant enough that Pinterest was facing and/or likely to face an imminent restructuring; and (iv) as a result, Defendants' public statements were materially false and misleading at all times.

**The Truth Continues to Emerge**

51.    On January 27, 2026, Pinterest announced a "board-approved global restructuring plan . . . that includes a reduction in force that is expected to affect less than 15% of the Company's workforce as well as office space reductions."  Pinterest said that it "anticipates incurring total pre-tax restructuring charges of approximately $35 million to $45 million, which are expected to be primarily cash-related expenditures" and "is taking these actions to support its transformation initiatives, including but not limited to (i) reallocating resources to AI-focused roles and teams that drive AI adoption and execution, (ii) prioritizing AI powered products and capabilities, and (iii) accelerating the transformation of its sales and go-to-market approach."

52.    On this news, Pinterest's stock price fell $2.49 per share, or 9.61%, to close at $23.41 per share on January 27, 2026.

53.    Analysts viewed Pinterest's announcement with skepticism.  RBC viewed the restructuring as "foreshadowing a revenue shortfall", Wells Fargo stated its view that the announcement was a "cautious early read on '26 revenue outlook", and HSBC bluntly stated "[w]e hate to say it, but it's not working", in reference to Pinterest's near-term outlook and long-term strategy.

54.    Then, on February 12, 2026, Pinterest filed an annual report on Form 10-K reporting its financial results for the fiscal quarter and year ended December 31, 2025, and held a conference call to discuss the same (the "FY 2025 Earnings Call").  Among other items, Pinterest announced quarterly revenue of $1.32 billion, below the consensus estimate of $1.33 billion, and

Q1 2026 revenue guidance of $951 million to $971 million, below the consensus estimate of $980.6 million.

55.     During the FY 2025 Earnings Call, Defendant Ready attributed Pinterest's performance throughout 2025 to an "exogenous shock this year related to tariffs, which are disproportionately affecting ad spend from our top retail advertisers", stating *inter alia*:

> [W]e are not satisfied with our Q4 revenue performance and believe it does not reflect what Pinterest can deliver over time.  While we absorbed an exogenous shock this year related to tariffs, which are disproportionately affecting ad spend from our top retail advertisers, this quarter also underscored where we need to move faster. . . .  [W]e are moving with urgency to close the gap. Many of the largest retailers have been disproportionately impacted by tariffs and have been pulling back on advertising spend across the industry as they seek to protect their margins. Our higher mix of large retailers relative to some of our peers has resulted in us feeling more of an impact.

56.     During her prepared remarks on the FY 2025 Earnings Call, Defendant Donnelly also discussed the headwinds Pinterest faced from tariffs, reporting that "our largest retail advertisers created a more meaningful headwind than we expected", this pullback "***impacted our platform to a higher degree given our current revenue mix***," and that Defendants "***expect these headwinds will continue and may become slightly more pronounced in Q1***", stating *inter alia*:

> [I]n Q4, ***our largest retail advertisers created a more meaningful headwind than we expected*** as they sought to protect their margins in this dynamic environment and pulled back on ad spend.  ***We believe this pullback on ad spend from larger advertisers was felt across the industry, but impacted our platform to a higher degree given our current revenue mix***.  We also saw a second order effect of the same dynamic into Europe as well with some of these same large global retailers pulling back on spend in Europe as they rebalance across their global portfolio.  On the home category, where there was a new furniture tariff enacted last October, the home category remains challenged overall, but the performance there was generally in line with our expectations at the time of guidance.  ***Looking ahead to Q1, we expect these headwinds will continue and may become slightly more pronounced in Q1, including in UCAN and Europe***.

57.     On this news, Pinterest's stock price fell $3.12 per share, or 16.83%, to close at $15.42 on February 13, 2026.

19

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

58.    Again, analysts reacted negatively to Pinterest's announcement.  For example, on February 13, 2026, HSBC reduced its price target again, this time by 30%, from 24.90 to 17.40. HSBC wrote that Pinterest's restructuring announcement "had already set a low bar for earnings expectations, but the combinations of deaccelerating revenues . . . and margin pressure . . . in the 1Q26 guidance still caught us off-guard.  Management again flagged weakness amongst the large retailers segment as the main culprit . . . which it believes could 'prove more pronounced' in 26Q1."

59.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### Regulation S-K Item 303

60.    Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Pinterest to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants failed to disclose, *inter alia*, the true extent of the reduced revenues that Pinterest was receiving and/or likely to receive from its advertising partners, as well as the true scope and severity of the risk that such reduced revenues posed to its operations.  Defendants' failure to disclose the foregoing issues violated Item 303 because these issued represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

### SCIENTER ALLEGATIONS

61.    Defendants had both the motive and opportunity to commit fraud on investors in Pinterest's securities during the Class Period.  ***During the Class Period, the Individual***

20

*Defendants together sold approximately 421,903 shares of company stock for over $13.5 million in proceeds*. Defendant Ready sold 141,126 shares for over $4.3 million in proceeds; while Defendant Donnelly sold 280,777 shares for over $9.1 million in proceeds. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Defendants were aware of, and acknowledged, their reliance on large retailers for ad revenue as referenced in ¶¶ 40, 49, *supra*, and as a result, were aware of the risk that tariffs posed to Pinterest's operations through reduced revenues from advertising partners. Defendants also specifically referenced discussions about the macro environment in which they and their advertising partners operated, as referenced in ¶¶ 37, 41, *supra*, and as a result were aware of the risk that Pinterest faced from margin pressure their advertising partners faced from tariffs.

62.     Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Pinterest securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

64.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Pinterest securities were actively traded on the

21

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Pinterest or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

65.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

66.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

67.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Pinterest;

- whether the Individual Defendants caused Pinterest to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Pinterest securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Case 3:26-cv-02745    Document 1    Filed 03/30/26    Page 23 of 29

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

68.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

69.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Pinterest securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Pinterest securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

70.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

71.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State*

23

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

72.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

73.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

74.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Pinterest securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Pinterest securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

75.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly

24

and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Pinterest securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Pinterest's finances and business prospects.

76.    By virtue of their positions at Pinterest, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

77.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Pinterest, the Individual Defendants had knowledge of the details of Pinterest's internal affairs.

78.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Pinterest.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Pinterest's businesses, operations, future financial condition and future prospects.  As a result of the

25

dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Pinterest securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Pinterest's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Pinterest securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

79.    During the Class Period, Pinterest securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Pinterest securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Pinterest securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Pinterest securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

80.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

81.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

26

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

82.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.    During the Class Period, the Individual Defendants participated in the operation and management of Pinterest, and conducted and participated, directly and indirectly, in the conduct of Pinterest's business affairs.  Because of their senior positions, they knew the adverse non-public information about Pinterest's misstatement of income and expenses and false financial statements.

84.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Pinterest's financial condition and results of operations, and to correct promptly any public statements issued by Pinterest which had become materially false or misleading.

85.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Pinterest disseminated in the marketplace during the Class Period concerning Pinterest's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Pinterest to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Pinterest within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Pinterest securities.

86.     Each of the Individual Defendants, therefore, acted as a controlling person of Pinterest.  By reason of their senior management positions and/or being directors of Pinterest, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Pinterest to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Pinterest and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

87.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Pinterest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 30, 2026

Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024

28

Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS