**LABATON KELLER SUCHAROW LLP**
Lauren A. Ormsbee (*pro hac vice*)
Jesse L. Jensen (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
jjensen@labaton.com
aforgione@labaton.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Kenneth J. Black (Bar No. 291871)
Snehee Khandeshi (Bar No. 342654)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Tel: (415) 288-4545
kennyb@rgrdlaw.com
skhandeshi@rgrdlaw.com

*Liaison Counsel for Lead Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE PINTEREST, INC. SECURITIES LITIGATION | Case No. 3:26-cv-02745-RFL<br><br>**AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>CLASS ACTION</u>**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ........ 2

II. JURISDICTION AND VENUE ........ 7

III. THE PARTIES ........ 8

A. Lead Plaintiffs ........ 8

B. Defendants ........ 8

C. Relevant Third Parties ........ 10

IV. SUMMARY OF THE FRAUD ........ 13

A. Pinterest Depends On Advertising Revenue For Survival ........ 13

B. Before the Class Period, Defendants Quell Negative Investor Sentiment By Committing To Years Of Growth ........ 15

C. During the Class Period, Defendants Tout The Company's Durable And Resilient Growth In The Face Of "Macro" Uncertainty Driven By U.S. Tariffs ........ 19

D. In Reality, Pinterest's Growth Had Decelerated Due To Tariff-Related Headwinds And Inferior Advertising Product Offerings ........ 25

1. Pinterest's Advertiser Clients Reduced Ad Spend In Response to Tariffs ........ 26

2. Pinterest's Advertising Clients Pulled Back Ad Spend In Response To The Company's Underperforming Lower-Funnel And AI-Driven Products ........ 34

a. Pinterest's Lower-Funnel Advertising Products Underperformed And Advertisers Consequently Pulled Ad Spend ........ 35

b. Pinterest's AI Initiatives Failed To Deliver Meaningful Results and Failed To Retain Advertisers ........ 39

3. Pinterest Consistently Missed Internal Revenue Targets That Were Untethered To Achievable Advertising Spend ........ 41

V. THE TRUTH GRADUALLY EMERGES ........ 46

VI. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 56

A. Q4 2024 Earnings Call (February 6, 2025) ... 57

B. Morgan Stanley's Technology, Media & Telecom Conference (March 6, 2025) ... 62

C. Press Release (May 8, 2025) ... 67

D. Q1 2025 Earnings Call (May 8, 2025) ... 68

E. CNBC Interview (May 8, 2025) ... 74

F. CNBC - Pinterest CEO on the Ad Market, AI Usage and State of the Consumer (May 20, 2025) ... 76

G. Q2 2025 Earnings Call (August 7, 2025) ... 77

H. Goldman Sachs' Communacopia + Technology Conference (September 9, 2025) ... 85

I. Pinterest Press Release (November 4, 2025) ... 88

J. Q3 2025 Earnings Call (November 4, 2025) ... 89

K. Pinterest's False and Misleading Risk Factor Disclosures ... 93

VII. ADDITIONAL ALLEGATIONS OF SCIENTER ... 99

A. Defendants Knew Advertisers Were Pulling Back Ad Spend And Pinterest's Growth Was Decelerating ... 99

1. Defendants Knew, Or Had Access To Information, Contradicting Their Statements About Tariff Resiliency ... 99

a. Defendants Spoke Directly To Their Advertisers ... 100

b. FEs Confirmed That Information About The Negative And Substantial Impact Of Tariffs On Advertiser Spend Was Reported To Leadership ... 101

c. Reports, Reporting Platforms, And Meetings Addressed The Impact Of Tariffs ... 103

d. Tariffs Were So Pervasive That Pinterest Had Directives For How Employees Should Handle Discussing Them ... 105

e. Analysts' Frequent Interest In And Questions About The Impact Of Tariffs Meant That Defendants Were Informed ... 106

2. Defendants Knew, Or Had Access To Information, Contradicting Their Statements About Their Lower-Funnel And AI-Driven Capabilities, And Resulting Advertiser Demand ..... 107

a. FEs Corroborate That Management Knew That Advertisers Were Dissatisfied With Pinterest's AI Offerings ..... 108

b. Reports And Reporting Platforms Addressed Concerns About Pinterest's Underperforming AI, Performance+, And Its Impact On Advertiser Spend ..... 111

c. Analysts' Frequent Interest In And Questions About Performance+ and Customer Adaptation Meant That Defendants Were Informed That Pinterest's AI Was Incompatible with Advertisers' Needs And That Advertisers Were Leaving Pinterest For Other Social Media Platforms ..... 112

3. The Fraud Concerned The Company's Core Operations ..... 114

4. Defendants' Sarbanes-Oxley Certifications Corroborate That the Information Tracked by Pinterest's Reporting Infrastructure Was Made Known To Them ..... 115

a. The Certified Controls Were the Same Systems That Tracked Advertiser Pullback, Performance+ Adoption, and Tariff Impact in Real Time ..... 120

b. The Certifications Corroborate Defendants' Knowledge, Supporting a Strong Inference Of Scienter ..... 121

B. While Pinterest's Stock Price Was Artificially Inflated Due to Undisclosed Deterioration in Advertising Demand, Company Insiders Unloaded Their Pinterest Stock for Over $103 Million in Proceeds. ..... 123

C. Defendant Donnelly's Unexpected Departure Further Supports Scienter ..... 125

VIII. LOSS CAUSATION ..... 125

IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ..... 129

X. THE PRESUMPTION OF RELIANCE ..... 130

XI. CLASS ACTION ALLEGATIONS ..... 132

XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ..... 133

COUNT I For Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(b) Against Defendants Pinterest, Ready, and Donnelly ..... 133

COUNT II For Violation Of Section 20(a) Of The Exchange Act Against Defendants Ready and Donnelly ... 135

XIII. PRAYER FOR RELIEF ... 137

XIV. JURY DEMAND ... 137

Lead Plaintiffs Local 705 International Brotherhood of Teamsters Pension Fund, Northern California Glaziers, Architectural Metal and Glassworkers Pension Plan, and Bay Area Painters and Tapers Pension Trust Fund (collectively, "Lead Plaintiffs"), by their undersigned counsel ("Lead Counsel"), bring this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendant Pinterest, Inc. ("Pinterest" or the "Company"), as well as William Ready ("Ready"), Chief Executive Officer ("CEO") at all relevant times, and Julia Brau Donnelly ("Donnelly"), Chief Financial Officer ("CFO") at all relevant times (collectively, the "Defendants," and without Pinterest, the "Individual Defendants"). Lead Plaintiffs bring these claims on behalf of themselves and all other persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Pinterest during the period from after market close on February 6, 2025 until market close on February 12, 2026, both dates inclusive (the "Class Period"), and were damaged thereby (the "Class").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing investigation of Lead Counsel. This investigation includes review and analysis of, among other things: (i) public filings made by Pinterest with the SEC; (ii) transcripts of the Company's conference calls with analysts and investors; (iii) the Company's presentations, press releases, and other public statements; (iv) research reports issued by securities and financial analysts; (v) news and media reports and other publicly available information concerning the Company and Defendants (defined below); (vi) economic analyses of the movement and pricing of the Company's publicly traded securities; and (vii) interviews of former employees of the Company and its contracted employees (referred to herein as "FE-__")[1]. Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only

[1] In order to protect confidentiality, masculine ("he/him") pronouns will be used to describe the former employees ("FE") of Pinterest throughout this Complaint, regardless of identity.

by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. PRELIMINARY STATEMENT

1. Pinterest is an online platform that monetizes users' visual search and planning intent by selling promoted content to advertisers, deriving substantially all of its revenue from advertising and leaving it acutely sensitive to digital advertising cycles and advertiser demand. Throughout the Class Period—from after market close on February 6, 2025 through market close on February 12, 2026, both dates inclusive—Pinterest and its CEO Bill Ready and then-CFO Julia Donnelly made materially false and misleading statements and concealed material information about the condition and trajectory of Pinterest's advertising business.

2. Throughout the Class Period, Defendants portrayed Pinterest as a resilient, "full-funnel," AI-powered performance-advertising platform built for sustained growth. For example, Defendant Ready told investors that advertisers were shifting their ad budgets to Pinterest, including both continuous ("always-on") advertising budgets and lower-funnel sales advertising budgets for advertising ready to convert to sales. Ready likewise touted strong returns and engagement from the Company's AI-driven product suite, including in particular its flagship Performance+ product. Similarly, Defendant Donnelly described Performance+ as the beginning of a multi-year product cycle and spoke to the durability of Pinterest's revenue growth. And Defendants also assured investors that the business could withstand, and was withstanding, the long-discussed tariffs now being implemented by the new U.S. administration, advising only of merely hypothetical risk to the Company from the tariffs and other macroeconomic conditions. Defendants spoke on these subjects within their roles and direct responsibilities as Pinterest's CEO and CFO, and in turn the market responded positively to these and other similar assurances they made.

3. In reality, as revealed by the accounts of former employees and Defendants' own later admissions—but concealed from investors during the Class Period—advertisers reduced,

paused, or redirected their spending because Pinterest could not demonstrate sufficient value from ads and Pinterest's AI products—including Performance+—did not deliver the advertiser returns Defendants publicly claimed. Pinterest's inability to demonstrate measurable value consequently made the platform a target for advertisers to cut as tariffs pressured budgets. What's more, Pinterest faced particular exposure to such cuts because—unknown to investors—85% of its revenue depended on a small group of large advertisers concentrated in retail and consumer packaged goods ("CPG"), and as such the loss of ad revenue from just one or two of these advertising sources had a material impact on the Company.

4. Defendants did not disclose these facts to investors. Instead, Defendants advanced an artificial growth narrative to investors that inflated the price of Pinterest common stock during the Class Period. For example, after market close on February 6, 2025, Defendant Donnelly said Pinterest was "***at the beginning of a multi-year product cycle for Performance+***" and that ***"[w]e're seeing really good results, but more of the opportunity is in front of us than behind us***." Defendant Ready likewise claimed that Performance+ had "***compounding effects over not just multiple quarters, but multiple years***," and that Pinterest had "***created immense value for advertisers in 2024 through our lower funnel innovation***," and that its Performance+ platform was "delivering great return for advertisers."

5. As the Class Period continued, the impact from tariffs and related macroeconomic conditions increasingly emerged, yet Defendants continued to mislead investors, including for example on March 6, 2025, when Defendant Ready publicly stated, "***we don't currently see advertisers overreacting***" to the new administration's tariffs on foreign goods, that "***we're not seeing signs of overreaction***," and that Pinterest's large advertisers were a "***consistent source of strength***" that were "***really leaning in***."

6. Defendants reassured investors again on May 8, 2025, when Ready stated that Pinterest was "***more resilient than ever***," that "***the fundamentals in the business are strong***," and that the Company was "***driving performance for advertisers and winning market share***."

Donnelly added that the business and top-line growth remained healthy and that Defendants were confident in the "***long-term durability***" of their strategy.

7. As the year progressed and market conditions worsened, Defendants still continued to mislead investors about Pinterest's performance and exposure to risks. For example, on August 7, 2025, Defendant Donnelly touted the "***resilience***" and "***durability***" of Pinterest's growth drivers, while Defendant Ready said he had "never been more confident" in the Company's ability to deliver for advertisers, and championed AI-driven improvements and deeper lower-funnel actionability. Then, in intra-quarter public comments on September 9, 2025, Defendant Ready responded to a request to comment on "the advertising environment" and the "key messages [Pinterest] [is] receiving as a company broadly from advertisers about the operating environment today" by stating that Pinterest was "***able to drive performance increasingly through AI-enabled tools like Pinterest Performance+***" and further continued that "***the macro, particularly for advertising is more constructive than it was at sort of peak tariff uncertainty***," and that, while Pinterest had "***face[d] a bit of tariff uncertainty last quarter***," Pinterest had "***play[ed] through that, I think, quite well*** . . . ***And a big part of that was because we have multiple levers [], where even with a little bit of pressure in the US from tariffs, we saw advertisers redistributing spend to international and international really picking up steam for us***."

8. Analysts repeated and credited Defendants' representations throughout the Class Period. For example, in February 2025, Guggenheim reported that Pinterest's "Strong Guide Inspires Optimism" and that AI investments would fuel the "Next Leg of Growth." Goldman Sachs cited momentum around platform-growth initiatives, healthy revenue growth, lower-funnel ad revenue, and positive Performance+ trends. In May 2025, Citi reported that Pinterest's AI and ad investments were capturing "a larger share of durable, always-on, performance ad budgets"; and Morningstar wrote the same day that ad spending was "remaining quite resilient."

9. The truth gradually emerged through a series of disclosures beginning near the end of 2025. On November 4, 2025, Pinterest disclosed weaker-than-expected fourth-quarter guidance, which Defendant Donnelly attributed to Pinterest's exposure to "pockets of moderating ad spend

in [United States and Canada ("UCAN")] in Q3, as larger U.S. retailers navigate tariff-related margin pressure." Defendant Donnelly further disclosed a "pullback from some US retailers," year-over-year declines in spending by Asia-based e-commerce players, and—for the first time—revealed to investors that smaller and mid-market advertisers represented only "15% of our revenue," a concentration risk that analysts tied directly to Pinterest's inability to withstand tariff headwinds.

10. Pinterest's stock fell $7.16 per share, or 21.76%, to close at $25.75 per share on November 5, 2025. Analysts tied the decline to the concealed concentration and tariff exposure. RBC wrote that tariff-related weakness "showed up for the first time in our digital ads universe" and that pullbacks by large advertisers drove the lower guidance. RBC acknowledged that Defendants' prior "intra-qtr communications on tariffs" had driven market reaction, as Defendants had "***intentionally provided additional color regarding the impact of tariffs***, emphasizing that they ***were not updating guidance***." Separately, Wells Fargo concluded based on the disclosure that Pinterest lacked the advertiser breadth and depth to overcome weakness in its endemic categories; and Morgan Stanley wrote, "We were wrong about PINS' ability to drive durable, faster than expected revenue growth" and "PINS failed to deliver," explaining that Pinterest could not fully backfill revenue when tariffs disrupted its large CPG and retail advertisers.

11. Even then, however, Defendants continued to misleadingly assure investors, with Defendant Ready softening the bad news revealed that day by claiming to investors that "***advertisers are increasingly counting on Pinterest***," and Pinterest was seeing "***good results***" with return on ad spend ***"bidding from Performance+***." Defendant Donnelly reaffirmed the mid-to-high-teens revenue-growth targets. However, Defendants could not continue misrepresenting the facts and concealing the truth.

12. Next, on January 27, 2026, Pinterest filed an SEC Form 8-K disclosing a "global restructuring plan" to support its AI transformation, including a reduction in force affecting 15% of its workforce and a reallocation of resources to AI-focused roles and products. The news caused the price of Pinterest common stock to fall $2.49 per share, or 9.61%, to close at $23.41 that day.

Despite Defendants' spin, analysts viewed the announcement as an indication of previously unrevealed deteriorating revenue trends, continuing tariff pressure, and weakness in Pinterest's AI initiatives. For example, in analyst reports issued in response to the disclosure, RBC interpreted the disclosure as foreshadowing a 2026 revenue shortfall "potentially stemming from customer concentration and/or tariff-related headwinds"; BofA said tariff-related pressure on ad spend had likely continued into the first quarter, and Jefferies wrote that the reallocation signaled that Performance+ was "underperforming expectations."

13. The truth was finally fully revealed when, after market close on February 12, 2026, Pinterest reported disappointing fourth-quarter and full-year results, decelerating revenue growth, and issued guidance implying continued margin pressure. In the accompanying earnings call, Defendant Ready admitted that Pinterest had "absorbed an exogenous shock this year related to tariffs, disproportionately affecting ad spend from our top retail advertisers," that large retailers were pulling back spend to protect margins, and that Pinterest's "higher mix of large retailers" caused it to feel more negative impact than peers. On the same call, Defendant Donnelly stated that the Company's "largest retail advertisers created a more meaningful headwind than we expected" and that the pullback "impacted our platform to a higher degree, given our current revenue mix." Ready also now admitted that the Company needed to accelerate growth with a broader set of advertisers given Pinterest's outsized and risky dependence on a few large retailers. For example, he conceded that growth from Pinterest's mid-market, small and medium business ("SMB"), and international advertisers was "not enough to offset the headwinds" facing the largest retailers and that Pinterest remained "a long way from having bids and budgets against advertisers' full product catalogs."

14. This final corrective disclosure revealing the truth concealed by Defendants' fraud caused the price of Pinterest's common stock to fall another $3.12 per share, or 16.83%, to close at $15.42 on February 13, 2026. Analysts concluded that Pinterest's growth thesis had broken down. Evercore wrote that "[f]undamentals are clearly deteriorating"; RBC called the results emblematic of "a more consistent pattern of adverse concentration" and said the Performance+

"inflection has not followed suit"; HSBC said the decelerating revenue and margin pressure caught it off guard; and BofA acknowledged that the thesis that "Performance+ would translate into better performance has not played out."

15. This case does not rest on Defendants' failure to *predict* macroeconomic conditions. Rather, Defendants made knowing affirmative misrepresentations and half-truths about the Company's resistance to tariffs and other known macroeconomic headwinds, about the resilience and durability of its revenue growth, and about the performance of and returns delivered by their AI-driven products, such as Performance+. These false statements caused the stock to trade at artificially inflated prices—enabling Pinterest executives and insiders, including Defendant Donnelly, to unload roughly 2.8 million shares of common stock for proceeds of nearly $96 million; Donnelly herself sold 143,449 shares—82.9% of her Pinterest holdings—for more than $4.7 million, at prices as high as $34.85 per share.

## II. JURISDICTION AND VENUE

16. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated under the Exchange Act.

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act (15 U.S.C. § 78aa). At all relevant times, Pinterest's principal executive offices were located in this District, and Pinterest conducts substantial business here.

19. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone and internet communications, and the facilities of the national securities exchanges and markets.

## III. THE PARTIES

### A. Lead Plaintiffs

20. Lead Plaintiff Local 705 International Brotherhood of Teamsters Pension Fund ("Teamsters Local 705") is a defined benefit plan headquartered in Chicago, Illinois, with more than $1.8 billion in assets under management for the benefit of its members and beneficiaries. As set forth in the certifications submitted with its motion for appointment of Lead Plaintiff (*see* ECF No. 19-4), incorporated by reference herein, Teamsters Local 705 purchased Pinterest common stock during the Class Period and suffered substantial losses as a result of the violations of the federal securities laws alleged in this action.

21. Lead Plaintiff Northern California Glaziers, Architectural Metal and Glassworkers Pension Plan ("Northern California Glaziers") is a multiemployer pension plan headquartered in Dublin, California, with more than $550 million in assets under management for the benefit of its members and beneficiaries. As set forth in the certifications submitted with its motion for appointment of Lead Plaintiff (*see* ECF No. 19-4), incorporated by reference herein, Northern California Glaziers purchased a significant amount of Pinterest common stock during the Class Period and suffered substantial losses as a result of the violations of the federal securities laws alleged in this action.

22. Lead Plaintiff Bay Area Painters and Tapers Pension Trust Fund ("Bay Area Painters & Tapers") is a multiemployer pension plan headquartered in Dublin, California, with more than $779 million in assets under management for the benefit of its members and beneficiaries. As set forth in the certifications submitted with its motion for appointment of Lead Plaintiff (*see* ECF No. 19-4), incorporated by reference herein, Bay Area Painters & Tapers purchased a significant amount of Pinterest common stock during the Class Period and suffered substantial losses as a result of the violations of the federal securities laws alleged in this action.

### B. Defendants

23. Defendant Pinterest is a Delaware corporation with principal executive offices located at 651 Brannan Street, San Francisco, California 94107. Founded in 2009, Pinterest went

public on April 18, 2019, and its Class A common stock began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "PINS." Pinterest common stock trades in an efficient market. Pinterest had 584,866,000 shares of Class A common stock issued and outstanding as of December 31, 2025.

24. Defendant William Ready ("Ready") has served as Pinterest's CEO and as a member of the Board of Directors throughout the Class Period, joining in those capacities on June 29, 2022. Ready succeeded Pinterest co-founder Ben Silbermann, who transitioned to the role of Executive Chairman. Before joining Pinterest, Ready served in a series of leadership roles with other online platforms, most recently serving as President of Commerce, Payments & Next Billion Users at Google, where he oversaw the company's vision, strategy, and delivery of its commerce products. Ready also previously served as Executive Vice President and Chief Operating Officer of PayPal, after leading Braintree and Venmo, before their acquisitions by PayPal. When announcing Ready's appointment, Pinterest described him as an "online commerce expert" and emphasized his extensive experience in commerce, product development, and payment platforms.

25. Defendant Julia Brau Donnelly ("Donnelly") joined Pinterest as CFO in 2023 and remained in that position throughout the Class Period until her resignation was announced on August 26, 2026. Previously, Donnelly served as Vice President and Global Head of Finance & Accounting at Wayfair Inc. When announced as Pinterest's new CFO, Defendant Donnelly stated that she was "thrilled to join the team and help drive Pinterest's next phase of growth."

26. Defendants Ready and Donnelly are collectively referred to herein as the "Individual Defendants." Because of their positions with Pinterest, Ready and Donnelly possessed the power and authority to control the contents of Pinterest's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew and/or was

reckless in not knowing that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

**C. Relevant Third Parties**

27. FE-1 worked at Pinterest from August 2022 through October 2025, and held several titles during his tenure. FE-1 concluded his tenure as Manager of Technical Program Management.

28. FE-2 worked at Pinterest from September 2023 through February 2026 as a lead data scientist on the ads delivery team and the ads ranking model team. He also worked with the marketplace team, which balanced the number of ads shown with user and advertiser considerations. FE-2 resigned in February 2026, shortly before layoffs occurred.

29. FE-3 was employed by Pinterest as Senior Partner Manager from August 2022 through February 2026 and as Partner Manager, Travel from February 2020 through August 2022. FE-3 explained that he worked exclusively in the travel verticals, and explained that his clients were all in the travel space.

30. FE-4 was employed by Pinterest as a Client Account Manager – US Enterprise from April 2021 until April 2023 before transitioning to a Client Account Manager II – US Enterprise from that point until his departure in May 2026. FE-4 explained that he was a member of a "pod" within CPG that focused on Food advertisers. FE-4 further explained that he and his colleagues were responsible for three to four clients at a time.

31. FE-5 was employed by Pinterest as a senior member of the sales team from before the Class Period until the end of 2025. FE-5 was responsible for a selection of advertisers that were responsible for millions of dollars in revenue.

32. FE-6 was an Account Manager at Pinterest from before the Class Period and transitioned to the Senior Client Account Manager at Pinterest during the Class Period. He held that position until he departed Pinterest in October 2025.

33. FE-7 was employed by Pinterest from January 2022 until July 2026, initially as an Account Manager until he was promoted in March 2026 to Senior Account Manager, a role he

occupied until his departure from the Company in July 2026. FE-7 explained that he was focused on advertisers in the "Tech and Telco" space until the end of 2025 when he transitioned to omni retail. According to FE-7, teams at Pinterest are arranged into "pods," and there were pods for the various advertiser groups, such as Retail, Financial Services, Tech, and Telco, and so on. FE-7 explained that each pod consisted of four Account Managers and four Client Partners that reported to a manager. FE-7 continued to say that the pods reported to an industry manager, who reported to a managing director that oversaw multiple pods. FE-7 further recalled that managing directors reported to a Vice President who then reported to current Chief Business Officer Lee Brown, who reported to current CEO Bill Ready.

34. FE-8 was employed by Pinterest from March 2021 through March 2024 as Product Designer I, Growth and from March 2024 through December 2025 as Product Designer II, Growth.

35. FE-9 was employed by Pinterest, through Accenture, as a Digital Advertising Analyst from Spring 2023 through Summer 2025. FE-9 explained that his role was that of an Account Manager and he was responsible for approximately 30 SMB accounts that varied across industries. According to FE-9 he reported to a direct manager at Accenture and senior employees at Accenture spoke directly with their counterparts at Pinterest. FE-9 recalled a head from Pinterest did periodically visit Accenture and had conversations with employees, himself included.

36. FE-10 was employed by Pinterest, through Accenture, as Account Manager from September 2023 through April 2026.[2] FE-10 recalled that there was one Pinterest executive who acted as the main correspondent between Accenture and Pinterest that would be present in the office named JJ Greco.

37. FE-11 was employed by Pinterest through Accenture as Global Agency Account Manager from May 2023 through July 2026.

---

[2] Accenture is an outside consulting firm that acts as an outsourced sales and account-management arm for Pinterest's ads business, assisting with advertising and marketing needs. According to an "Expert Insights" posted on the Alphasense website in October 2025, in 2024, Pinterest "moved their entire mid-market sales team to be outsourced through Accenture."

38. FE-12 was employed by Pinterest, through Accenture. FE-12's last role was as Senior Partner Manager from July 2024 through March 2026. Prior to that role, FE-12 was Partner Manager from May 2023 through July 2024. FE-12 explained that Pinterest used Accenture to handle all its advertising and marketing needs.

39. FE-13 was employed by Pinterest via Accenture from May 2023 until June 2026 and held several roles including Direct Partner Manager (05/23 – 06/24); Agency Partner Manager (06/24 – 08/25); and Agency Partner Manager – Priority Accounts (09/25 – 06/26). FE-13 explained that as an Agency Partner Manager, he was responsible for at most 75 agencies and their respective clients before changing teams and becoming an Agency Partner Manager – Priority Accounts in September 2025, at which time he was responsible for 23 agencies that consisted of clients with a higher average spend.

40. FE-14 was employed as a Partner Manager by Accenture and worked as a contractor for Pinterest from December 2023 until April 2025 when he voluntarily left Accenture. He worked remotely and at Pinterest's office in Atlanta, Georgia two or three days each week. FE-14 advised that Accenture employees were tasked with a project aimed at getting more advertisers and increasing revenue on the Pinterest platform. He recalled that there were hundreds of Accenture salespeople in the Atlanta office and his leads were received from Sales Development Representatives who handled the cold calls. He reported to two managers, Sagar Thakker, Accenture's Sales Lead, and Alicia Pendry. FE-14's role was to manage an established book of business in the United States and sell Pinterest to creative agencies. He sold the full suite of Pinterest products and assisted the agencies with their client's social media content including advertising space and campaigns. He would also advise on new offerings, budget allocations, and what types of creative content to run.

41. FE-14 further advised that there were several teams which consisted of Pinterest and Accenture employees and that each team lead would report to upper management. He identified "Eric" as the Accenture Manager responsible for Pinterest sales and stated that there was also a Pinterest Manager who was collaborating with "Eric" and leading the project. FE-14 stated that

both managers reported to Pinterest executives. According to FE-14, the majority of Pinterest's revenue was generated from advertising. He stated that "Eric," the Pinterest Manager, Thakker, and Pendry had access to revenue projections based on KPI reporting.

42. FE-15 was employed by Pinterest in a contracted position through Accenture as a US Team Lead, Scaled Performance Team and then a Global Team Lead, Scaled Performance Team from October 2023 until January 2026.

## IV. SUMMARY OF THE FRAUD

### A. Pinterest Depends On Advertising Revenue For Survival

43. Pinterest reports more than 600 million monthly active users worldwide who, according to the Company's SEC filings, "come to Pinterest to find new ideas, curate and refine their tastes, and turn those ideas into reality." Users save and organize visual content, called "Pins," on "boards" that serve as digital scrapbooks or mood boards for interests including home design, fashion, food, travel, and hobbies. Because Pinterest charges no user or membership fees, it earns substantially all of its revenue from advertisements in various formats across the platform.

44. Pinterest promotes its platform as a space where users discover new products and brands and therefore describes "commercial content from brands, retailers, and advertisers" as "central" to the platform. Pinterest explains that because "consumers on Pinterest tend to be early in their journey toward a purchase decision and do not yet know exactly what they want to purchase," the platform provides a space where users "are open to discovering new products and brands on Pinterest rather than merely navigating to brands they already know," setting it apart from "traditional search engines and e-commerce platforms." Essentially, Pinterest's business model is to monetize what the Company calls the user's "inspiration to action journey."

45. As Pinterest explains, it generates revenue by "delivering ads on our website and mobile application. Advertisers purchase ads directly with us or through their relationships with advertising agencies." According to the Company, the nature of Pinterest's users "creates a unique flywheel where relevant ads can not only enhance the user experience but also drive more value for advertisers in the form of increased views, clicks and conversions."

46. Pinterest markets itself as a "full-funnel" advertising platform. In the digital advertising industry, a consumer's path is tracked from initial awareness of a product to ultimate purchase through a framework known as the "funnel." The metaphor reflects the progressively narrowing pool of consumers at each stage: many may become aware of a product, but only a fraction will take a purchasing action. The funnel is divided into "upper-funnel," "mid-funnel," and "lower funnel." Upper-funnel advertising focuses on building brand awareness and generating interest; mid-funnel advertising aims to deepen consideration and engagement; and lower-funnel advertising is performance-oriented, in that its success is measured by direct, quantifiable outcomes like clicks, conversions, and return on ad spend ("ROAS"). A "full funnel" advertising platform is one that can serve advertisers at every stage of the customer journey—from first awareness all the way down to the actual purchase.

47. Pinterest disclosed to investors that a "substantial portion of [its] revenue is derived from a small number of advertisers and is currently concentrated in certain verticals, particularly retail and CPG." On November 4, 2025, towards the end of the Class Period, Pinterest disclosed that mid-market and smaller advertisers represented "approximately 15% of our revenue," revealing that roughly 85% of the Company's revenue derived from these largest advertiser accounts.

48. Pinterest's advertiser base was built, by design, around large CPG and retail advertisers. The Company stated in its annual filings that "[w]e initially built our business with large consumer packaged goods ('CPG') and retail advertisers in the United States." Retail advertisers sell goods directly to consumers and used Pinterest primarily to drive product discovery, clicks, and direct purchase conversions through shopping ads, direct links, and mobile deep links. CPG refers to consumer packaged goods, i.e., household brands in food, beverage, personal care and similar product categories. CPG advertisers do not sell directly to consumers but instead through third-party retail channels and use Pinterest primarily for brand awareness, product consideration, and upper-funnel marketing objectives.

49. Retail and CPG are, by a wide margin, the most important verticals for Pinterest's advertising business. Bernstein Research estimated that U.S. retail alone constituted approximately 50-60% of Pinterest's global revenue. Within Bernstein's coverage, which includes Pinterest's competitors—Google, Meta, Snapchat, and Reddit— Pinterest has the largest exposure to the retail vertical. Barclays estimated that Pinterest derived "upwards of 2/3rd of its revenue from retails and CPG" combined.

50. The Company's former employees confirm the identities of some of Pinterest's largest customers. FE-5, employed by Pinterest as a senior member of the sales team from before the Class Period until the end of 2025, described Pinterest as having a "very top heavy" advertiser base that lacks diversity. FE-5 further stated that the Company's top five advertisers are responsible for the majority of the revenue and all are within the retail sector, including Temu, Amazon, Wal-Mart, and Target. FE-7, employed by Pinterest from January 2022 until July 2026, initially as an Account Manager until he was promoted in March 2026 to Senior Account Manager, recalled that Walmart, Amazon, Chase, and Wayfair were some of Pinterest's largest advertisers.

**B. Before the Class Period, Defendants Quell Negative Investor Sentiment By Committing To Years Of Growth**

51. On September 19, 2023, Pinterest hosted its first-ever Investor Day since becoming a publicly traded company ("2023 Investor Day"). The 2023 Investor Day served in part as an introduction to the Company's new executive leadership, with Defendant Ready having just finished his first year as CEO, and Defendant Donnelly having just joined the Company as CFO months earlier.

52. In the months leading up to Pinterest's 2023 Investor Day, investors' prevailing view of the Company was one of cautious skepticism. Specifically, although analysts recognized Pinterest's attempts at operational improvements, they consistently observed that these improvements had not yet translated into meaningful revenue acceleration. For example, on August 2, 2023, Bernstein Research observed that Pinterest's results amounted to a "[g]reat story" but "OK fundamentals… again," noting that while the Company could "[m]ark down another quarter of

improvements across the board," Bernstein Research questioned: "the progress is there, but when will the shoppable inflection happen?" Additionally, J.P. Morgan reported on September 14, 2023, that Pinterest shares were only "+8% YTD, underperforming [] the S&P 500 +16%," and the bank acknowledged "investor frustration that these improvements are not yet translating into more material revenue growth."

53. The market's tempered expectations for Pinterest's business were further reflected in the preponderance of neutral or hold-equivalent ratings from major analysts. On August 2, 2023, J.P. Morgan maintained a Neutral rating with a December 2024 price target of $30, writing that it would "continue to look for stronger Revenue acceleration & consistent execution from the new mgmt team to get more constructive on shares." Roth Capital Partners likewise rated the stock Neutral, characterizing the second quarter as a "small beat & small raise" and describing Pinterest's trajectory as "Progress in Baby Steps." D.A. Davidson similarly reiterated a Neutral rating, increasing its price target modestly to $25, which was notably still below the stock's then-current trading price of $28.96.

54. Against this backdrop of muted analyst expectations, Pinterest's 2023 Investor Day was widely anticipated as a significant impetus for the Company's growth. On August 2, 2023, Roth Capital Partners specifically characterized the Company's 2023 Investor Day as a potential "catalyst." Also on August 2, 2023, D.A. Davidson published its report titled "Pinning an *Investor Day* for September," in which the analyst firm wrote that "we were encouraged by the company's announcing of a date for a much-anticipated analyst day, September 19th." D.A. Davidson flagged its anticipation for: "1) hearing from senior management (including its new CFO), 2) learning more about its third-party ad partnerships plans . . . 3) receiving additional details on its AI-related efforts, 4) getting an update on its ad-measurement tools…"

55. Over the course of several hours during the 2023 Investor Day, the Individual Defendants and other senior executives of Pinterest gave investors what they wanted: a sweeping narrative of transformation, growth, and durability. In particular, Defendants provided a 3–5-year outlook that projected mid-to-high teens revenue Compound Annual Growth Rate ("CAGR") and

adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") margin improvement to the low-30s percent range, plus a raised Q3 2023 outlook (revenue growth now expected at the high end of the prior range rather than the midpoint), confirmation of 4 points of EBITDA margin expansion for 2023, and a new $1 billion share buyback authorization.

56. In revealing its guidance, Defendant Ready described a new Company focus, declaring that "[o]ver the last 15 months since I joined, our team has changed the trajectory of our business." Ready characterized Pinterest as "uniquely positioned at the intersection of search, social, and commerce, unlike any of our competitors," and asserted that the Company had "the potential to reaccelerate growth and monetization." Ready added: "[L]et me be clear, while that's what we are committing to today and what we have confidence and conviction in today, our aspirations are beyond that. We see this as a business that clearly has the potential for 20%-plus growth as we go forward, but this is what we have confidence in today and what we're committing to today even as our internal aspirations are much higher than that."

57. Defendant Donnelly reinforced these targets, telling investors: "We are a growth company. We believe we can grow revenue faster than the overall market with multiple ways to get there, resulting in mid to high-teens revenue CAGR over the next three to five years." Donnelly specified that "the low end of that range" was "roughly 15%."

58. Defendants tethered their guidance heavily to lower-funnel ad initiatives, referring to marketing efforts targeted at consumers who are near the end of their purchasing journey, that is, those who are ready to take an action such as clicking through to a retailer's website, adding an item to a cart, or completing a purchase. Unlike upper funnel advertising, which focuses on building brand awareness and generating broad interest, or mid-funnel efforts aimed at deepening consideration and engagement, lower funnel advertising is performance-oriented: its success is measured by direct, quantifiable outcomes like clicks, conversions, and return on ad spend.

59. Pinterest had historically been strong at the top of the funnel—inspiration and discovery—but weak at converting that intent into measurable purchases, which limited its share of performance ad budgets. At the 2023 Investor Day, however, lower-funnel ad initiatives

emerged as a central strategic pillar, featured in multiple presentations and discussed by several senior executives. Defendant Ready framed lower funnel capability as a previously missing "puzzle piece" that had prevented Pinterest from delivering on its promise as a full funnel advertising platform but noted that "[n]ow, lower funnel solutions are our fastest-growing products[.]" All told, the Company's lower-funnel monetization provided the load-bearing argument for the mid-to-high-teens revenue CAGR target.

60. The 2023 Investor Day precipitated a wave of market enthusiasm and high analyst expectations that would persist well into the start of the Class Period at the beginning of 2025, converting fence-sitters and repositioning the Company's narrative from one of stagnation to one of reaccelerating growth. Immediately following the event, the market quickly embraced Pinterest's growth story. The market was under the impression that the Company's approach to advertising was working to improve monetization and adjusted EBITDA margins would continue to rise. For example, on September 20, 2023, Hedgeye came away "more confident in Pinterest's ability to accelerate growth," praising management's focus on lower-funnel ad formats and viewing the long-term revenue target as "realistic and attainable with room for upside," and that "we think the model has potential to support revenue growth well above even the +20% aspirational/internal goal discussed." Similarly, D.A. Davidson raised its rating from Neutral to Buy and its price target from $25 to $35 (about 34% above the prior close), writing "our upgrade is a reflection of our confidence in management's ability to achieve those financial targets" by increasing engagement on the platform, improving its monetization and "sustaining financial discipline."

61. Over the coming months and throughout 2024, Pinterest continued to affirm its 2023 Investor Day guidance. For example, on the Company's Q3 2024 Earnings Call, held on November 7, 2024—its last earnings release prior to the start of the Class Period—Defendant Ready told investors that Pinterest was "driving progress against the strategy we laid out at Investor Day."

62. These and other reaffirmations of the Company's outlook throughout 2024 occurred against a notable backdrop: the United States presidential election, including in particular the campaign promises throughout the year by then-candidate Donald J. Trump to impose substantial

tariffs, including tariffs exceeding 60% on goods from China and universal increases of 10%-20% on other imports from trading partner countries, including Canada and Mexico.

63. Immediately following the presidential inauguration, President Trump issued a series of Executive Orders under the International Emergency Economic Powers Act (50 U.S.C. § 1701 *et seq.*) ("IEEPA") imposing, among other things, a 25% tariff on imports from Canada and Mexico and a 10% tariff on all goods from China, effective February 4, 2025. These tariffs were the subject of intense media coverage throughout 2025.

64. In anticipation of these tariffs (and, later, in the wake of their execution), companies across the United States—including the CPG and retail companies on which Pinterest depended for advertising revenue—decreased ad spending to hedge for anticipated (and later actual) increases in costs of manufacturing and importing.[3]

### C. During the Class Period, Defendants Tout The Company's Durable And Resilient Growth In The Face Of "Macro" Uncertainty Driven By U.S. Tariffs

65. The Class Period begins on February 6, 2025, just days after the new U.S. administration assumed control and implemented its first sweeping series of tariffs. Throughout the Class Period, Defendants repeatedly assured investors that the tariffs now being imposed by the new administration had not—and would not—derail the Company's projected growth, and that, even in the face of macroeconomic uncertainty, Performance+ and the Company's other AI-driven initiatives delivered quality results that would attract and retain advertisers and grow advertising revenue. Defendants emphasized the purported durability and resilience of Pinterest's business

[3] *See* Megan Poinski, *How Tariffs Could Impact Advertising Budgets*, FORBES (Apr. 9, 2025), https://www.forbes.com/sites/cmo/2025/04/09/how-tariffs-could-impact-advertising-budgets (As President Trump's tariffs went into effect, "companies are preparing to pay more for products and components that are imported. Some of those costs will be passed on to consumers, but some will be internalized by companies—and many fear it will take a bite out of marketing dollars." A study in March 2025 from the Interactive Advertising Bureau found that "94% of advertisers are worried about the impact tariffs will have on ad spending. More than one in five expected an 11% to 20% drop, and 60% anticipate budget cuts of 6% to 10%. Advisory firm Madison and Wall cut its projection for U.S. advertising revenue growth this year to 3.6%, down from 4.5% predicted in December.")

model, asserting that these qualities positioned the Company for long-term success despite macroeconomic conditions.

66. After the close of the market on February 6, 2025, the first day of the Class Period, Defendants issued the Company's Q4 and year-end 2024 earnings release, which quoted Defendant Ready as stating that "***[o]ur strategy is paying off***. People are coming to Pinterest more often, the platform has never been more actionable, and ***our lower funnel focus is driving results for users and advertisers***."

67. Likewise, during the Q4 2024 earnings call on the same day, Defendant Ready again reaffirmed the Investor Day guidance, stating that the Company's Investor Day 2023 "pillars . . . remain unchanged" and that Pinterest's results represented "considerable progress against our stated longer-term goals"—i.e. the 2023 Investor Day outlook. Defendant Ready stated that Pinterest "feel[s] good about sustainability of the revenue growth we've been driving." Defendant Donnelly echoed this sentiment during this same call, stating that "[w]e continue to feel confident in the sustainability of our current trajectory and the steady ongoing execution of our plans." Notably, during this same call, Defendant Ready promised investors that "***there's tremendous benefit yet to come and more benefit in front of us than behind us***."

68. Defendants compounded their assurances by describing the Company's purportedly AI-powered advertising automation suite, branded "Performance+," as a transformative driver of Pinterest's growth and advertiser value. First introduced in 2024, Performance+ was Pinterest's signature AI-driven advertising product, an automated campaign suite encompassing bidding, budgeting, targeting, and creative optimization tools designed to simplify campaign creation and improve advertiser returns, and Defendants expressed sustained and emphatic optimism about Performance+ and Pinterest's use of AI throughout the Class Period. According to FE-3, employed by Pinterest as Senior Partner Manager from August 2022 through February 2026 and as Partner Manager, Travel from February 2020 through August 2022, Performance+ was directly linked to lower funnel solutions.

69. Also, during the Q4 2024 earnings call on February 6, 2025, Defendant Ready characterized Performance+ as having "compounding effects over not just multiple quarters, but multiple years." Ready further stated that "we created immense value for advertisers in 2024 through our lower funnel innovation" and that the Company had achieved "our first $1 billion quarter in Q4." In a CNBC interview the following day, Defendant Ready stated that "2024 was a really transformative year for our business" given "the advancement of our ad platform as a performance ads platform that's delivering great return for advertisers."

70. Likewise, speaking at the Morgan Stanley Technology, Media & Telecom Conference just weeks later, on March 6, 2025, Defendant Ready responded to a question about a "macro source of uncertainty . . . whether it's trade [or] tariffs," by stating that "[w]e don't currently see advertisers overreacting or those kinds of things" and "we're not seeing signs of overreaction." Instead, Ready claimed that the Company's large advertisers are a "consistent source of strength for us," and further stated that Pinterest has "seen them really leaning in."

71. As the year continued, the U.S. administration continued to implement and expand tariffs over the following months, and observers noted that the tariffs seemed to be impacting advertising spend in the U.S.[4] For example, effective May 2, 2025, the U.S. ended the duty-free *de minimis* treatment for covered goods from China. Previously, goods valued at $800 or less could enter the U.S. without customs duties, a provision that benefited retailers shipping inexpensive products directly from China to U.S. consumers. Under the new policy, all goods that would otherwise qualify for the *de minimis* exemptions became subject to a duty rate of either 30% of their value or $25 per item. The U.S. administration subsequently expanded this policy to all countries effective August 29, 2025, meaning qualifying low-value imports generally became

[4] *See* Arriana McLymore, *Temu, Shein slash digital ads as tariffs end cheap shipping from China, data show*, REUTERS (Apr. 16, 2025), https://www.reuters.com/business/retail-consumer/Temu-shein-slash-digital-ads-tariffs-end-cheap-shipping-china-data-show-2025-04-16 (As of April 16, 2025, "Temu's daily average U.S. ad spend on Facebook, Instagram, TikTok, Snap, X and YouTube declined a collective average of 31% in the two weeks from March 31 to April 13 compared with the previous 30 days" and "Shein's daily average U.S. ad spend on Facebook, Instagram, TikTok, YouTube and Pinterest [] fell a collective average of 19% over the same period, it added.")

subject to applicable duties rather than automatically receiving duty-free treatment. This change in policy mattered to Pinterest because many Asia-based e-commerce retailers ship inexpensive products directly to U.S. consumers. Removing the exemption raises the cost of those sales, potentially making U.S. customer acquisition less profitable and causing those retailers to reduce U.S. advertising spend.

72. While the removal of the *de minimis* exception and other macroeconomic developments prompted some analysts to consider whether Pinterest was particularly vulnerable to tariff-related disruptions given its known concentration in retail advertising, Defendants continued to repeatedly assuage and minimize such risks.

73. For example, on May 8, 2025, in Pinterest's Q1 2025 earnings press release, Defendant Ready stated that Pinterest had "continued momentum in revenue," and added that "[a]s the macroeconomic and digital ad landscape evolves, our strategy and consistent execution has made Pinterest more resilient than ever." He added that Pinterest is "driving performance for advertisers and winning market share, giving us a solid foundation for long-term sustainable growth." On the earnings call, Ready described Performance+ as "giving [advertisers] great return on their ad spend" and noted "we consistently see that Performance+ outperforms traditional campaigns."

74. Defendants particularly assured investors about the tariffs, with Defendant Ready stating that day that Pinterest's "strategy and consistent execution has made Pinterest more resilient than ever" even as "the macroeconomic and digital ad landscape evolves"—which the market understood referred to tariffs. Defendant Donnelly even more directly minimized the impact from tariffs later during the call, stating that "[t]here have been small pockets of spend that have been impacted by tariffs in recent weeks. For example, like other platforms, we have observed a reduction in spend from Asia-based e-commerce retailers in the US given the change in the de minimis exemption," but the Company nonetheless has "also seen a geographic diversification from some of those Asia-based retailers to our European and Rest of World user regions. And that's a theme that has continued to play out over multiple quarters now and continues today." As such,

Donnelly reassured investors that even during "the current macro environment we're operating in," Pinterest's "business, including our top-line revenue growth remains healthy." Donnelly also represented to investors that Defendants "are confident in the long-term durability of our strategy and the continuation of our steady execution of that strategy," and emphasized that "the fundamentals of our business remain strong."

75. In the following months, the U.S. continued to implement and expand its tariff policies, including significant increases on goods made effective on August 1.[5] Nonetheless, in their earnings announcement just days later, on August 7, 2025, Defendants again doubled down and continued to steadfastly assure investors of the Company's continued growth and durability despite the tariffs.

76. That day, Defendant Donnelly confidently assured investors that Pinterest's business was resilient and durable even in the face of "tariff-related and broader market uncertainty," stating, "[W]e think the consistency of our revenue growth year-to-date really highlights ***the resilience of our business and more importantly, the durability of our many revenue growth drivers*** as we're continuing to execute on our strategy."

77. Likewise, that same day, Defendant Ready referenced "countless discussions that I have had directly with the CEOs and CMOs of our top advertisers," and stated that "[t]hree years into our business transformation, I've never been more confident in Pinterest's ability to deliver for our users and advertisers. We've found our best product fit ever by becoming a personalized shopping destination for users and an AI-powered performance platform for advertisers. With this focus, we believe we're well-positioned to further capture market share." Ready further asserted that the Company was "seeing continued revenue growth from our efforts to drive greater performance through AI-driven ad stack improvements and automation, ***along with deeper actionability through our lower funnel ad formats***."

---

[5] *See generally* Donald J. Trump, TRUTH SOCIAL (July 31, 2025, 11:03 AM), https://truthsocial.com/@realDonaldTrump/posts/114948452793702817.

78. In a report issued the following day (August 8), analysts at Barclays took note that Defendants' disclosures had "reflect[ed] a slight deceleration as some large accounts face tariff pressure"—but, given Defendants' assurances, nonetheless concluded that "***[t]his doesn't seem to be a near term headwind***" and further noted that "PINS is doing a solid job of growing faster than the digital ad industry," including in particular that "Performance+ is driving a doubling of ad revenue among mid-sized and smaller accounts."

79. Just weeks later, Defendant Ready expressly reemphasized Defendants' minimization of tariff impact during their August earnings call and even further affirmatively assuaged investor concerns around tariffs. During the Goldman Sachs' Communacopia+ Technology Conference on September 9, 2025, Ready was asked to comment on "the advertising environment" and the "key messages [Pinterest] [is] receiving as a company broadly from advertisers about the operating environment today?" In response, Ready stated that Pinterest was "able to drive performance increasingly through AI-enabled tools like Pinterest Performance+ that's making it so that we cut their campaign creation time in half, make it easier for them to come on board, those things are working well," and further continuing:

> . . . I think some of what was embedded in your question also was just you talked about the operating environment, sort of the macro and those things. And my comments here will be very consistent with what Julia and I talked about on our most recent earnings call, which is, ***I think, the macro, particularly for advertising is more constructive than it was at sort of peak tariff uncertainty***… And I think one of the things that we've continued to demonstrate back to that consistent mid-to high teens growth is that we laid out at our Investor Day multiple ways to win. ***And so when we did face a bit of tariff uncertainty last quarter, you saw us play through that, I think, quite well*** coming in ahead of top of our guidance ahead of expectations or at least the analyst expectations anyway it doesn't mean everybody's expectations. ***And a big part of that was because we have multiple levers there, where even with a little bit of pressure in the US from tariffs, we saw advertisers redistributing spend to international and international really picking up steam for us***.

80. The market took note of Defendant Ready's assurances, particularly with respect to his statements that the Company could "play through" tariff uncertainty and that the Company had in fact already done so. For example, in an RBC Capital Markets report issued on November 4, 2025, an analyst noted Ready's "intra-qtr communications on tariffs" (i.e. his comments at the

Goldman Sachs conference). Similarly, a UBS analyst report issued on October 9, 2025 quoted an "advertising expert" as saying that "[l]ast quarter was bad for Pinterest because of the tariff drama but that has now calmed down and it seems to be helping."

81. Then, in connection with the Company's Q3 2025 earnings release on November 4, 2025, Defendant Ready highlighted Pinterest's strong quarter, noting that "advertisers are increasingly counting on Pinterest." Defendant Ready also referred back to the Company's 2023 Investor Day outlook, emphasizing to investors that Pinterest has "been quite consistent in our growth and in line with the long-term targets for revenue and margin." Similarly, Defendant Donnelly reinforced management's confidence in the Company's ability to sustain the momentum of its growth, and reaffirmed that the Company "still feel[s] really good about our mid to high teens kind of revenue growth targets over the medium and long term and the durability of our revenue growth."

### D. In Reality, Pinterest's Growth Had Decelerated Due To Tariff-Related Headwinds And Inferior Advertising Product Offerings

82. Contrary to Defendants' assurances throughout the Class Period, first-hand accounts from several former employees of both Pinterest and Accenture—the entity to which Pinterest outsourced much of its sales operations—reveal that the Company was neither as durable nor resilient as it claimed. In reality: (1) throughout the Class Period, Pinterest experienced a sharp pullback in client advertising spend in response to tariffs, undermining Defendants' growth narrative; (2) the Company's advertising offerings, including its AI-driven products, failed to deliver the lower-funnel capabilities needed to drive durable advertising spend and to retain customers; and (3) the Company repeatedly missed internal revenue targets that were wholly untethered to achievable advertising spend.

83. These facts—known to Defendants but concealed from investors until Defendants were forced gradually to reveal the truth over three corrective disclosures at the end of the Class Period—left Pinterest particularly vulnerable to tariff-related headwinds, as tariffs forced the large advertisers on whom Pinterest depended to scrutinize margins and cut discretionary advertising,

and Pinterest's lower-funnel offerings, including its AI products, could not demonstrate the measurable results to justify continued allocation among those clients' advertising budgets.

### 1. Pinterest's Advertiser Clients Reduced Ad Spend In Response To Tariffs

84. Multiple former employees of both Pinterest and Accenture independently corroborate the same central fact: throughout the Class Period, Pinterest's advertising clients pulled back their spending in response to tariffs. These accounts span different levels of the Company, advertising verticals, and client-facing roles, yet describe a consistent sequence of events: advertisers reduced spend, revenue pressure intensified, and information concerning the tariff-related revenue decline reached Pinterest's management.

85. The experience of FE-1, who worked at Pinterest from August 2022 through October 2025, and held several titles during his tenure, concluding his tenure as Manager of Technical Program Management, illustrates both the speed and magnitude of the spending reductions. FE-1 stated that a handful of the Company's advertisers, particularly those based in Asia, entirely or nearly entirely cut advertising spend due to tariffs. FE-1 identified Temu[6] as being the notable one, as they were previously one of Pinterest's biggest advertising clients, before reducing advertising spend to very low levels of spending over a very short period. FE-1 further explained that these advertisers went from being top of near top advertisers to negligible, and that it was a significant change. FE-1 stated that the impression conveyed to him by members of the sales team was that the abrupt reduction in advertising spending was directly attributed to the tariffs.

86. Other Pinterest employees independently corroborated the loss of spending from Temu and other major advertisers. For example, FE-2 worked at Pinterest from September 2023 through February 2026 as a lead data scientist on the ads delivery team and the ads ranking model team. He also worked with the marketplace team, which balanced the number of ads shown with

[6] Temu is a discount retailer owned by PDD Holdings, Inc., one of China's largest e-commerce companies. Temu launched in the United States in late 2022 and grew rapidly by offering a wide variety of consumer goods—primarily manufactured in China—at deeply discounted prices.

user and advertiser considerations. Like FE-1, FE-2 noted that when Temu pulled its U.S. advertising spend, the impact was significant, being that it was one of Pinterest's top advertisers. He estimated that Temu U.S. spent somewhere between 1-2% of their overall revenue to the U.S.

87. FE-5, as a senior member of Pinterest's sales team from before the Class Period until the end of 2025, likewise traced the acceleration in advertiser pullbacks to the imposition of tariffs. According to FE-5, retailers began reducing advertising spend in approximately Q1 2025, coinciding with the introduction of tariffs. FE-5 noted that this particularly impacted Temu. FE-5 explained that Pinterest was an "easy target" for advertisers to reduce spending with because it did not provide the same value as other platforms such as Google, TikTok, and Meta.[7] FE-5 continued to say that Pinterest's performance versus other platforms was a "very common" reason for advertisers to reduce spend prior to the implementation of tariffs, but spend reduction was "accelerated" once tariffs were imposed.

88. These tariff-based reductions were not isolated. FE-5 recalled observing tariff-related cuts to advertiser spending amongst the cohort he was directly responsible for and noted that reduction in spend beyond his cohort, including amongst Pinterest's top 5 advertisers, was "widely known" amongst the sales team. FE-5 further recalled being aware of advertisers outside of his direct responsibility reducing spend through conversations with coworkers and discussions during All Hands Meetings for Pinterest's sales personnel. FE-5 noted that these meetings occurred once or twice per quarter and there was a global version led by former Chief Revenue Officer Bill Watkins and a U.S. version led by VP, North America Enterprise Sales Katie Hamill. FE-5 added that tariffs were discussed at both meetings given how important the U.S. market was to Pinterest.

89. The decline in ad spend also extended to the travel vertical, where economic and tariff-related uncertainty translated to further spending reductions. According to FE-3, who was employed by Pinterest as Senior Partner Manager from August 2022 through February 2026 and

[7] Pinterest's SEC filings state that it primarily competes with "consumer internet companies that are either tools (search, e-commerce, creator tools) or media (newsfeeds, video social networks)" including Amazon, Facebook/Meta (including Instagram), Google (including YouTube) and Snap, TikTok, and X.

as Partner Manager, Travel from February 2020 through August 2022, there was a decline in ad spending happening in 2025 because of the tariffs and the overall economy. FE-3 explained that he worked exclusively in the travel vertical, which decreased their ad spending. FE-3 explained that his clients were all in the travel space, and they got "skittish" around economic concerns because the first thing people stop spending money on in an economic downturn is travelling.

90. Some of FE-3's clients included Delta Airlines, Royal Caribbean, Carnival Cruise Line, and IHG. He recalled noticing a decline in his clients' ad spending around summer 2025. He recalled that Delta Airlines decreased their ad spending for the entirety of the 2025 calendar year, and he estimated around a one million dollar reduction in annual spend by Delta. FE-3 also recalled IHG did not spend with Pinterest at all during 2026. According to FE-3, other verticals like CPG were also impacted by the tariffs.

91. The spending decline within the travel vertical was discussed internally, and management issued directives concerning how sales personnel should address reluctant clients. FE-3 recalled having meetings about the decline in ad spending, and according to FE-3, "management definitely knew" about the issue. FE-3 recalled Katie Porter, former Senior Industry Manager, US Enterprise, Travel, and Jenny Callen, Managing Director, US Enterprise Sales, Travel being present during the meetings. According to FE-3, Callen reported directly to the C-Suite.

92. FE-3 described 2025 as "a challenging year." He recalled directives from Porter about how to handle conversations with clients about ad spending and how to push clients to continue spending.

93. Pinterest employees dealing with advertisers in the CPG industry observed the same pattern. Their accounts experienced tariff-related spending declines, while the resulting shortfalls left employees unable to meet growth targets.

94. FE-4 was employed by Pinterest as a Client Account Manager - US Enterprise from April 2021 until April 2023 before transitioning to a Client Account Manager II - US Enterprise from that point until his departure in May 2026. FE-4 explained that he was a member of a "pod"

within CPG that focused on Food advertisers. FE-4 further explained that he and his colleagues were responsible for three to four clients at a time.

95. FE-4 recalled that there were conversations taking place internally about the impact of tariffs in CPG and Food specific All Hands Meetings. According to FE-4, leadership tried to be "sales positive," but when there was acknowledgement that targets were not being achieved, employees were aware that the impact tariffs were having was a contributing factor. FE-4 further recalled seeing a dip in spend by his accounts due to tariffs.

96. FE-4 explained that specifically pertaining to CPG that in 2025 "most people" were not hitting their quotas. FE-4 explained that there was "no science" behind the quotas that employees were provided and they were primarily based on the performance during the same quarter during the previous year and conversations that had taken place with clients regarding future spend.

97. According to FE-4, he hit his quota in approximately two out of four quarters in 2025. FE-4 explained that the quarters that he failed to hit his quotas were "near misses." However, other employees "definitely" missed their quotas by a "wide margin."

98. Pinterest made information concerning these shortfalls available internally, first with CPG and later across North American verticals. FE-4 recalled that employees had access to a Google Doc which included employees in CPG and how close they were to goal. FE-4 explained that this document was available to employees. According to FE-4, beginning in early 2026 a document was made available to employees to see the performance across all verticals in North America.

99. Advertisers themselves repeatedly identified tariffs as a reason for reducing their budgets. Indeed, according to FE-6, an Account manager at Pinterest from before the Class Period, who transitioned to the Senior Client Account Manager at Pinterest during the Class Period, and held that position until he departed Pinterest in October 2025, Pinterest's advertisers often expressed concerns about tariffs, and many reduced advertising budgets because of tariff-related

business conditions, while Pinterest management simultaneously increased pressure on the sales organization to secure additional spending.

100. FE-6 explained that advertisers often initially attributed budget reductions to general business needs, but after management instructed sales representatives to seek additional explanations, many disclosed that tariff-related conditions contributed to the reductions. As one example, FE-6 identified a specific home improvement advertiser, explaining that certain imported products from Canada were affected by tariffs, which in turn impacted the company's marketing expenditures. According to FE-6, this was one of several accounts where tariff-related business conditions influenced advertising spending decisions.

101. Pinterest was aware of the effects that tariffs had on its business. Indeed, according to FE-6, Pinterest regularly circulated internal reports on tariffs discussing their impact on advertiser spending and the broader business environment. He believed these reports were prepared by a specialized task force within the sales organization dedicated to monitoring tariff-related issues.

102. Notably, the tariff-related pullbacks occurred against a broader backdrop in which advertisers increasingly questioned the value of spending on Pinterest compared with other platforms. Indeed, FE-7 recalled that advertisers in general are "very finicky" and when the market is good there is a willingness to spend and when it is not advertisers need to become more strategic. FE-7 further recalled that the market was not in a place where it was seeing the value with Pinterest.

103. Regarding tariffs, FE-7 explained that he was aware of the impact for advertisers such as Samsung and Apple. FE-7 further explained that advertisers also used tariffs as an excuse to reduce spending with Pinterest. FE-7 recalled that another excuse regularly used by advertisers was that it was "just not a good time to be spending" and "constantly" saying they did not have enough money to advertise with Pinterest when in reality the advertisers just were not seeing the results they wanted.

104. The same conditions were visible to employees of Accenture, the outside consulting firm through which Pinterest staffed portions of its advertising operation. Those employees

described tariff-related spending reductions as a pervasive subject within the workplace and confirmed that information flowed between Pinterest executives, Accenture managers, and client-facing personnel.

105. FE-9, employed by Pinterest, through Accenture, as a Digital Advertising Analyst from Spring 2023 through Summer 2025, explained that spending across his cohort was not consistent throughout his tenure but noted that the implementation of tariffs did not help. FE-9 recalled tariffs coming up in conversations with advertisers on several occasions, including with one advertiser who expressed that they were going to preemptively decrease their spending due to the expectation of tariff-related impacts on their business. FE-9 added that it was his perspective that tariffs also served as a convenient excuse for Accenture to explain a lack of advertising spending to Pinterest.

106. Additionally, FE-10 was employed by Pinterest through Accenture as Account Manager from September 2023 through April 2026. FE-10 recalled that there was one Pinterest executive who acted as the main correspondent between Accenture and Pinterest that would be present in the office named JJ Greco.

107. According to FE-10, Pinterest was "hit hard" by the tariffs. FE-10 recalled how the subject of advertisers pulling back their ad spending due to the tariffs was "talked about a lot around the office." According to FE-10, managers at Accenture never offered any solutions to the advertisers pulling back but recalled managers discussing how they were losing a lot of money.

108. FE-10 explained that Pinterest executives would meet and discuss the issues, and the information would make its way to the managers at Accenture, and then to the Accenture employees. According to FE-10, "everyone knew the tariffs were affecting business." In his opinion, Pinterest created a toxic work environment and put a lot of pressure on Accenture employees.

109. FE-11, employed by Pinterest through Accenture as Global Agency Account Manager from May 2023 through July 2026, similarly described tariffs and declining revenue as prominent subjects within the organization. During FE-11's time at the company, he reported to

Cynthia Pruitt, Molly McLeod, and Rob Turcic at Accenture. FE-11 explained that the points of contact at Pinterest were JJ Greco, Emma Herling, and Madi McClenney.

110. According to FE-11, the tariffs were a "very big conversation" at the Company. FE-11 explained that he noticed advertisers decreasing their spending around the second half of 2025. In his opinion, many advertisers pulled back on ad spending because of the introduction of AI along with the state of the economy.

111. Pinterest also supplied Accenture personnel with materials and directives for responding to advertisers' tariff concerns. FE-11 recalled having meetings to discuss the tariffs more frequently when the tariffs were first introduced. He also recalled a presentation deck being sent to all the employees by either Molly McLeod or Rob Turcic. FE-11 recalled the deck providing information about how to handle conversations with clients about the tariffs. FE-11 explained that while the information was sent by his managers at Accenture, all materials and directives came from Pinterest and contained the same information that direct employees of Pinterest received.

112. At the same time, Pinterest intensified the pressure on Accenture personnel to preserve advertiser spending and achieve revenue targets that employees viewed as unattainable. FE-11 explained that there was a lot of pressure from management at Pinterest for employees to reach revenue goals and to make sure advertisers kept spending up. According to FE-11, employees were encouraged to find other ways to ensure revenue goals were reached and were expected to keep clients active by setting up different campaign strategies and presenting different opportunities for them. According to FE-11, revenue decline was a big conversation. FE-11 explained that revenue goals were "unattainable."

113. FE-11 recalled bringing up concerns about revenue goals and advertisers cutting back to his managers at Accenture - Molly McLeod and Cynthia Pruitt. McLeod and Pruitt reported to Pinterest directly and FE-11 believes they relayed employee concerns to JJ Greco at Pinterest. According to FE-11, concerns were met with optimistic outlook and encouragement to continue pushing to get clients to remain active.

114. FE-12 provided a consistent account of the reporting structure through which Accenture employees communicated advertiser feedback to Pinterest. FE-12 was employed by Pinterest through Accenture. His last role was as Senior Partner Manager from July 2024 through March 2026. Prior to that role, FE-12 was Partner Manager from May 2023 through July 2024. FE-12 explained that Pinterest used Accenture to handle all their advertising and marketing needs. In his role, FE-12 reported to a Team Lead at Accenture. FE-12 then explained that the Team Lead reported to the Head of Projects at Accenture, who reported directly to Pinterest's Head of New Business, Heather Haney. According to FE-12, Heather Haney was the contact at Pinterest who oversaw advertising and marketing.

115. According to FE-12, as soon as the tariffs were announced in early 2025, he began to hear from advertisers about pulling back their ad spending. FE-12 recalled that the advertisers specifically said they were reducing their advertising spending because of the tariffs. FE-12 recalled giving feedback to Pinterest through his direct report at Accenture about this being an issue, but according to FE-12, it was not taken seriously. According to FE-12, Pinterest wanted him and his colleagues to push advertisers to spend $500 per day in what FE-12 described as a "corporate tactic."

116. Indeed, Pinterest executives were directly confronted with concerns that tariffs would reduce advertiser spending. Rather than acknowledge the risk, they minimized it—even as advertisers began reducing, pausing, or terminating their spending.

117. FE-12 recalled attending a meeting in early 2025 where a co-worker brought up concerns about the tariffs impacting advertiser spend. According to FE-12, the concern was "brushed off" and Pinterest executives tried to downplay the potential impact by comparing the tariffs to the Covid pandemic, saying that they were not impacted by the pandemic, so they were not concerned about the tariffs. FE-12 recalled that Heather Haney was in attendance along with other executives from Pinterest. According to FE-12, advertisers began to reduce their ad spending as soon as the tariffs were announced and some advertisers were leaving Pinterest altogether, but in his opinion that was not just because of the tariffs, but because other platforms like Meta, Google,

and TikTok were outperforming Pinterest. According to FE-12, advertisers did not have a contract with Pinterest and could pause, reduce, or end their advertising with Pinterest at any time.

118. Taken together, these accounts demonstrate that the tariff-related deterioration in advertiser spending was neither isolated nor concealed from Pinterest. The decline affected major advertisers across multiple verticals; was discussed in sales meetings, All Hands Meetings, and internal reports; and prompted management to intensify pressure on both Pinterest and Accenture personnel to preserve revenue.

119. Finally, as Defendants ultimately admitted near the end of the Class Period (*infra* ¶¶173, 194–95), tariffs had an outsized impact on the Company given its reliance on a concentrated customer base of large enterprise advertisers in the retail verticals. Consequently, even ad spend reduction from a single major client could, and did, have a meaningful impact on the Company's revenue. In fact, Pinterest knew that its high customer concentration, and its resulting dependence on a small number of large advertisers, posed a significant risk: FE-7 explained that he attended an All-Hands meeting in approximately February or March 2026 in which a new leadership hire stated that it was "so concerning" that the Company's approximate top 10 advertisers were responsible for a disproportionate portion of the Company's advertising revenue, potentially as high as 90%.

### 2. Pinterest's Advertising Clients Pulled Back Ad Spend In Response To The Company's Underperforming Lower-Funnel And AI-Driven Products

120. While Defendants claimed that the Company's performance was durable and resilient even in the face of "macro" tariff headwinds due to success in its advertising products, including its AI-driven efforts at lower-funnel advertising, former employees reveal that these products were consistently underperforming and driving away advertisers. As detailed below, multiple former employees of Pinterest and Accenture corroborated a pervasive pattern of advertiser dissatisfaction and competitive losses that resulted in a reduction of ad spend on Pinterest's platform.

**a. Pinterest's Lower-Funnel Advertising Products Underperformed And Advertisers Consequently Pulled Ad Spend**

121. FE-6 explained that Pinterest provided sales employees with internal measurement studies and marketing resources intended to demonstrate the effectiveness of its lower-funnel advertising capabilities. However, FE-6 stated that many advertisers did not believe these studies accurately reflected the performance metrics they used to evaluate advertising success.

122. FE-6 explained that one of his clients, a consumer electronic advertiser, focused primarily on last-click attribution, measuring advertising effectiveness based on whether a consumer clicked an advertisement and immediately completed a purchase. According to FE-6, Pinterest repeatedly failed to demonstrate meaningful last-click conversions, making it difficult to increase advertiser spending. Campaigns were often reduced or terminated early because Pinterest could not demonstrate sufficient return on investment, a pattern FE-6 observed with this specific consumer electronic advertiser and numerous other accounts.

123. FE-6 reported receiving frequent feedback that advertisers were reallocating budgets from Pinterest to competing platforms because those platforms produced stronger measurable results. Using a consumer electronic advertiser as an example, FE-6 explained that Pinterest could not demonstrate successful last-click conversions, while platforms such as Instagram and TikTok were reportedly able to show measurable purchases resulting directly from advertising campaigns. FE-6 stated that if competing platforms could demonstrate dozens of purchases, while Pinterest could not verify even a single purchase after a two-week campaign, advertisers would understandably reduce or eliminate Pinterest's advertising budget. According to FE-6, this occurred not only with the consumer electronic advertiser, but with numerous other advertiser accounts.

124. According to FE-6, rather than changing strategy, management increased pressure on the sales organization by instructing employees to "double down," raising sales quotas, expanding incentive programs, encouraging greater reliance on alternative measurement tools, and directing representatives to spend more time meeting with clients to preserve advertising budgets.

125. Other former employees confirmed the same pattern of lower-funnel underperformance. FE-3 explained that advertisers were more interested in lower funnel solutions, which FE-3 described as a user being able to click on an ad and make a purchase, rather than upper funnel solutions, which FE-3 described as an ad like a video that just promotes awareness without the ability to make a purchase. According to FE-3, clients prefer lower funnel solutions to be able to "prove their ROI" and platforms like TikTok, Google, and Meta performed much better when it came to lower funnel solutions. In his opinion, Pinterest was "struggling to stay on par" with competitors in terms of performance.

126. FE-3 recalled his client, IHG leaving Pinterest completely in 2026 and estimated around a one million reduction in annual ad spending by Delta Airlines. FE-3 further recalled that Delta pulled back to move to other platforms that were outperforming Pinterest.

127. FE-7 noted that Pinterest's data was "always skewed," and advertisers were aware of this. FE-7 recalled that discussions of advertisers seeing more value in advertising with Google and Meta was a "constant conversation." FE-7 further recalled that over time "more and more" allocated more spend to platforms such as Meta and Google rather than Pinterest.

128. FE-7 recalled that advertisers in general are "very finnicky" and when the market is good there is a willingness to spend and when it is not advertisers need to become more strategic. FE-7 further recalled that the market was not in a place where it was seeing the value with Pinterest.

129. According to FE-7, Pinterest wanted to know where these advertisers were spending their budgets and that was available through Pathmatics, a third-party platform that tracked where advertisers were spending their marketing budgets. FE-7 recalled that when an account reduced or pulled spending that leadership reviewed the advertisers' spending in Pathmatics. According to FE-7, the use of Pathmatics was a "big push" by leadership.

130. Other former employees similarly confirmed persistent advertiser dissatisfaction. FE-2 explained that competing in the industry was challenging because it was difficult to attract advertisers to the platform and, once there, to demonstrate sufficient value against competitors like Facebook and Google. Specifically, FE-2 described two broad campaign approaches: cost-based

bidding, in which an advertiser establishes a bid or cost control, and automatic bidding, in which the advertiser provides a budget and Pinterest's algorithms determine how to bid. FE-2 further stated that advertisers complained about automated bidding performance and that data science teams and engineers conducted continual investigations based on advertiser feedback. Investigations included studies, root-cause analyses, campaign migrations, or restructuring. FE-2 recalled a specific instance involving Wayfair, where the company considered leaving due to automatic bidding issues. FE-2 believes this occurred in the fourth quarter of 2024 or 2025, and that Wayfair had multiple issues that were escalated within Pinterest. FE-2 also recalled that, during this period, a principal engineer was assessing similar escalations for the client, Walmart. FE-2 clarified that advertiser investigations were relatively continuous. He recalled that this occurred at the beginning of 2025.

131. Additionally, former employees of Accenture confirmed advertiser dissatisfaction with Pinterest. For example, FE-13 was employed by Pinterest through Accenture as Account Manager from September 2023 through April 2026. FE-13 explained that as an Agency Partner Manager he was responsible for at most 75 agencies and their respective clients before changing teams and becoming an Agency Partner Manager – Priority Accounts in September 2025, at which time he was responsible for 23 agencies that consisted of advertising clients with a higher average spend.

132. According to FE-13, Pinterest existed "constantly in a state of delusion" that advertisers wanted to spend money on Pinterest. According to FE-13, throughout his tenure it was a "huge uphill battle" to convince advertisers to spend with Pinterest while competing with Meta, Google, YouTube, and TikTok. FE-13 noted that it was a "huge challenge," and agencies were routinely telling him that advertisers were pulling spending or turning off campaigns altogether. According to FE-13, once an advertiser had stopped running campaigns entirely, they were a lost cause and at best may come back to Pinterest during the holiday season or for a special promotion.

133. According to FE-13, Pinterest was viewed more as an "upper funnel" advertising platform rather than being about ROAS and being a means to generate sales. FE-13 noted that

Pinterest "never really cared" about the feedback contracted employees were receiving from agencies and advertisers.

134. FE-13 went on to say that internally Pinterest used Tableau as its database for insights and benchmarks to report to advertisers or prospective advertisers. FE-13 explained that the numbers "made no sense," were "so far off," and "not realistic." FE-13 continued to say that ultimately, he did not feel comfortable using Pinterest's internal metrics in conversations with accounts and "almost no one was using them" as employees knew they were not accurate. FE-13 explained that when accounts asked where the numbers came from it was a "really hard question" to answer because employees themselves did not know.

135. FE-13 recalled that there was some metric related to account health included in Salesforce but it was broadly ignored because it had never been explained or made a point of focus for employees.

136. According to FE-9, advertisers most commonly decreased advertising spend because they did not see the value of advertising on Pinterest. FE-9 continued to say that there were lots of other platforms, specifically TikTok and Meta, which were "progressing quicker" and "offered more" to advertisers than Pinterest did. FE-9 explained that advertisers struggled to get conversions on Pinterest and used the website more as a "testing ground."

137. FE-9 recalled that when his book of business experienced turnover or loss of advertisers that it was "very rare" to get new advertisers to replace them. FE-9 recalled one or two customers that stopped spending altogether in 2025 and were not replaced with new accounts.

138. According to FE-9, leadership, including those from Pinterest, offered solutions that were not viewed as helpful or realistic. According to FE-9 the top spender in his book of business had told him multiple times not to contact them with other promotions or opportunities but he continued to receive pressure to get them to increase their spending. FE-9 recalled a conversation with the head from Pinterest during one of their periodic visits where he was instructed to e-mail his top spender every week. FE-9 continued to say that Pinterest's approach was to "just hassle people repeatedly" and when that did not work employees were told that they were not trying.

**b. Pinterest's AI Initiatives Failed To Deliver Meaningful Results and Failed To Retain Advertisers**

139. In addition to lower-funnel advertising failures, Defendants described AI-driven products that former employees described as ineffective and poorly received. Regarding Pinterest's AI initiatives, FE-6 stated that the company introduced several AI-powered advertising tools but did not believe they generated meaningful advertiser interest. FE-6 described one AI product that automatically generated backgrounds for advertiser product images, however advertisers frequently criticized the results as unrealistic or "wonky," requiring manual editing before use. FE-6 did not observe AI increasing advertiser participation or platform usage.

140. FE-14, who was employed as a Partner Manager by Accenture and worked as a contractor for Pinterest from December 2023 until April 2025 when he voluntarily left Accenture, stated that Pinterest built AI into its platforms in October 2024. FE-14 recalled that Pinterest was in a rush to get AI to market before its competitors and began heavily pushing AI to advertisers but carelessly rolled out a "sloppy" product. Furthermore, the salespeople were not properly trained and were selling a product they knew very little about.

141. FE-14 identified the two main features as AI background generation tools and Performance+. The AI background generation tools automatically generated backgrounds to uploaded images whereas Performance+ utilized AI to set up and package campaigns for different marketing efforts such as opening a new office, releasing new products, etc.

142. FE-14 went on to say that salespeople also promoted AI to advertisers as part of the campaign and presented it as a new tool that could improve results. FE-14 recalled that advertisers were told that using the AI tool could lead to a 20% increase in ROI and increase the number of clicks for the product.

143. According to FE-14, he began seeing a decline in his sales and user engagement in February 2025 and knew the decline was connected to AI-related features and led to advertisers going elsewhere because AI was growing and becoming available on other platforms. When asked what basis there was, if any, for Defendants to describe a "pipeline of value" for advertisers and

"more of that value in front of us than behind us," FE-14 advised that that statement sounded "like complete bullshit" because Pinterest was clearly losing advertisers to AI.

144. FE-7 corroborated the failings of Pinterest's AI products. According to FE-7, the Company was heavily pushing AI, but it was "not good at all." FE-7 explained the Company had not invested well when it came to AI. FE-7 recalled that the Company was pushing Performance+ or P+ campaigns as a part of its AI push. According to FE-7, P+ campaigns removed customization options and was a "set it and forget it" campaign, which was not dissimilar to how some campaigns had been previously run. FE-7 added that internally Pinterest's AI offerings were jokingly referred to as "AI slop."

145. According to FE-7, Pinterest did not care about its advertisers. FE-7 explained that an example of this was the way the Company pushed the use of AI campaigns even when they were not the best option for the client. FE-7 continued to say that the Company was "all about sales goals."

146. The failures of Pinterest's AI strategy were most pronounced in its flagship AI product, Performance+. According to FE-15, who was employed by Pinterest in a contracted position through Accenture as a US Team Lead, Scaled Performance Team and then a Global Team Lead, Scaled Performance Team from October 2023 until January 2026, Pinterest rolled out Performance+ in approximately early 2025 and "a lot" of clients were not happy with it. FE-15 explained that there were drops in return on investment for advertisers when comparing Performance+ campaigns to campaigns run previously without it. FE-15 added that lack of return on investment was the primary theme amongst advertisers and "a lot" were moving to competitors as a result.

147. FE-4 explained that Pinterest's internal AI tools were "overkill" in how it tracked how much employees were using them. FE-4 further explained that at the beginning of 2025, the use of Performance+, a suite of tools for AI campaigns, was being pushed by the Company. According to FE-4, for the Food segment this was stopped very quickly in the first half of 2025 as the Company was not happy with the performance of these campaigns. FE-4 added that it was his

understanding that the Retail segment was being pushed to use the full suite of offerings of Performance+.

148. As the foregoing allegations demonstrate, multiple former employees with direct, contemporaneous knowledge of Pinterest's advertising operations and AI product rollouts independently confirmed that the Company's lower-funnel advertising products consistently underperformed relative to competitors, and that the Company's AI initiatives, including Performance+, were poorly received by advertisers and internally recognized as deficient.

### 3. Pinterest Consistently Missed Internal Revenue Targets That Were Untethered To Achievable Advertising Spend

149. Further contradicting Defendants' narrative of Pinterest's durable and resilient performance, the accounts of multiple former employees reveal that the Company imposed unrealistic internal revenue targets untethered to achievable advertising spend, even as employees repeatedly failed to meet those targets. These accounts set forth a consistent pattern where Pinterest imposed increasingly aggressive growth expectations without regard to advertiser demand and intensified pressures on employees as revenue shortfalls persisted.

150. According to FE-7, teams at Pinterest are arranged into "pods" and there were pods for the various advertiser groups, such as Retail, Financial Services, Tech and Telco. FE-7 explained that Defendant Ready determined the revenue targets for the year and then made determinations on how to split that target up amongst the pods. FE-7 recalled that the growth goals at Pinterest were "so extreme." FE-7 explained that during the final portions of his tenure it became difficult to achieve growth targets especially considering that they were typically set at 20% growth year-over-year. FE-7 added that every pod was expected to come in at over goal each quarter.

151. FE-7 explained that managers determined expected advertising spend by each account based on conversations with advertisers and brought that figure to leadership. FE-7 continued to say that he could not recall a situation where there was not a gap in what his manager brought to leadership and what leadership returned with in terms of revenue targets. FE-7 recalled

that he failed to meet his revenue target during the final quarter of his tenure and barely hit them the quarter prior to that after having always done so during his early years at the Company.

152. Other former employees independently described the same disconnect between Pinterest's internal targets and achievable advertiser spend. Indeed, FE-13 explained that the growth goals at Pinterest were "astronomical" and "so unobtainable" and that this contributed to a very stressful environment. FE-13 further recalled that his revenue target in Q1 2026 was approximately $140,000 per team member and that increased in Q2 2026 to $190,000. FE-13 added that Q2 is a notoriously slow quarter which made this goal even more difficult to achieve.

153. Pinterest did not meaningfully adjust internal goals even when advertisers declined to increase their spending and employees fell materially short of their targets. FE-9 recalled that overall, Pinterest had "very little" success in getting advertisers to increase their ad spend, and for his book of business specifically he had "none." FE-9 noted that despite difficulties in generating additional ad spend that goals were never revised downward and remained "very unobtainable." FE-9 continued to say that it did not appear that goals were based on forecasts of previous performance and felt "made up." FE-9 added that goals were not negotiated or explained to employees.

154. FE-9 explained that conversations around goals not being met or advertising spend levels were not taken seriously by employees. Thus, rather than recalibrating its expectations to reflect actual advertiser demand, Pinterest continued to impose goals that its employees viewed as detached from the realities of the market.

155. As employees struggled to meet these targets, Pinterest escalated the duration and intensity of its efforts to extract additional revenue before the close of each quarter. FE-1 stated that management held "code red war rooms" or recurring meetings focused on driving any last drop of revenue by identifying ways to increase advertiser spending before quarter-end. FE-1 described these meetings as a revenue push near the end of each quarter, which gradually increased in

duration and intensity. FE-1 noted that these efforts intensified throughout 2025.[8] During his last nine to twelve months of employment, the company spent approximately two out of three months every quarter operating in what he described as "code red war rooms." According to FE-1, these meetings became more and more dire and were looked at as a perpetual thing that never went away.

156. This escalating pressure extended to senior management. FE-1 further explained that these meetings often occurred daily and involved the Chief Technology Officer ("CTO") and Chief Revenue Officer ("CRO"). Although FE-1 does not believe the meetings were recorded, he stated that related materials—including spreadsheets, slide decks, meeting agendas and notes—were created and maintained. FE-1 further stated that these materials were accessible to VP level executives and managers, including himself.

157. Pinterest imposed performance expectations that placed unrealistic pressure on employees to meet revenue and account-engagement goals, even after advertisers already expressed resistance to the platform. According to FE-13, his superiors were "hounded" by Pinterest asking what is coming next for various accounts in terms of spend. FE-13 explained that in addition to revenue, employee goals also included a contact component. FE-13 further explained that employees were expected to have five calls with accounts per week and have 50% engagement, i.e. having a call or getting an e-mail response from at least half of the accounts they were responsible for. FE-13 recalled that this goal increased beginning in April 2026 and employees were now expected to have 12 calls per week with accounts.

158. FE-13 explained that agencies and advertisers informed him that they were seeing better results elsewhere. FE-13 continued to say that when this was brought up to leadership and he asked how to counteract those points, he was told to suggest a "Brand Lift Study," which was a way for advertisers to see the impact Pinterest was having and cost at minimum $100,000. FE-13 explained that it was a difficult sell to convince advertisers to spend that sum of money to find out

[8] Notably, Pinterest's efforts to drive for additional revenue at the end of each quarter intensified precisely as tariffs were introduced and took effect.

information they were already seeing through their return on investment and internal metrics, which was that Pinterest was not the best option for their advertising spending.

159. Pinterest further attempted to overcome advertiser resistance by incentivizing both its sales force and its customers to increase lower-funnel advertising spend. According to FE-6, Pinterest's management consistently encouraged the sales organization to "double down" on selling Pinterest's lower-funnel advertising products despite widespread resistance from advertisers. To incentivize the sales team, Pinterest implemented several compensation programs. For example, members of the sales pod generating the highest amount of lower-funnel revenue were eligible to receive a $2,000 bonus for both the sales representative and their manager.

160. FE-14 advised that Accenture employees were tasked with a project aimed at getting more advertisers and increasing revenue on the Pinterest platform. FE-14's role was to manage an established book of business in the United States and sell Pinterest to creative agencies. He sold the full suite of Pinterest products and assisted the agencies with their client's social media content including advertising space and campaigns. FE-14 would also advise on new offerings, budget allocations, and what types of creative content to run.

161. FE-14 went on to say that selling advertising became more difficult, revenue seemed to be going down, and employees were not performing as well and getting laid off. FE-14 noticed that management seemed stressed, became stricter about sales targets and that the office environment "became more panicked" as time went on likely due to leadership realizing that AI was negatively impacting the Company.

162. According to FE-14, the lower-funnel demand was measured by closed deals, and there was low demand for the product, it was becoming more difficult to sell and there were less inbound leads coming in. He recalled that customers ultimately went to a competitor.

163. FE-14 said that it seems Pinterest is trying to "rig the system and the outcome of the ads" by making customers campaigns seem more successful than they actually were. FE-14 advised that he would not be surprised because there was "a lot of [expletive] that went on" at Pinterest.

164. Pinterest also offered advertisers incentives designed to encourage additional spending, including complimentary measurement studies, prioritized reporting, and added value referred to as "cash-on-the-dollar" promotions. FE-6 explained that under these promotions, an advertiser committing approximately $1 million in advertising spend would receive an additional $1 million in advertising credits, effectively doubling its lower-funnel advertising budget. While some advertisers accepted these offers, FE-6 estimated that only about one in ten did so. According to FE-6, even with these incentives, many advertisers maintained that executive leadership evaluated advertising performance primarily through last-click attribution. As a result, according to FE-6, the additional incentives often failed to persuade advertisers to increase their advertising investments.

165. Despite Pinterest's escalating efforts to retain advertisers and increase their spend, some employees resorted to improperly recording ad spend to appease management's unrealistic goals.

166. FE-14 stated that there were hundreds of Accenture employees working for Pinterest, many of whom did not know what they were doing and were not properly vetted. He recalled that several Accenture employees were getting fired for reporting sales that were not actually being made and entering fake opportunities into the pipeline. FE-14 recalled that one of the Accenture employees showed him how the false entries were being done.

167. FE-14 stated that the "fraudulent reporting" was easy for both Pinterest and Accenture employees because Pinterest was extremely disorganized and there were no checks and balances in place. FE-14 recalled that the fake numbers pertained to both the sales and pipeline numbers that were reported up the management chain and ultimately to leadership.

168. FE-14 advised that revenue would be recognized on the day that the campaign launched and then projected forward. FE-14 recalled that revenue would be pushed out for three to four months if an advertiser launched a campaign intended to run for several months. FE-14 explained that the advertiser would keep a credit card on file and would only pay for when the

campaign was active. They were not responsible for the remaining months if a campaign was shut down early.

169. According to FE-14, Pinterest's operation "was bogus" and the Company would continue to report projected revenue even though the revenue did not come in because advertisers stopped the campaigns after two or three months.

170. Ultimately, these former employees' accounts depict a Company confronting weakening advertiser demand while imposing increasingly higher revenue targets and intensifying pressure on its sales force. Far from demonstrating durable and resilient performance, these allegations reveal mounting internal strain and an increasingly strained effort to sustain the appearance of continued advertising growth during the Class Period.

## V. THE TRUTH GRADUALLY EMERGED

171. The facts concerning Defendants' false and misleading statements and omissions were gradually revealed to the market through a series of three partial corrective disclosures on November 4, 2025, January 27, 2026, and February 12, 2026, each of which caused the price of Pinterest common stock to decline significantly as the artificial inflation created by Defendants' misrepresentations was removed from the stock price. Throughout this period, Defendants continued to misrepresent and/or omit the full truth concealed by their fraud—and thus the price of Pinterest common stock continued to be artificially inflated—until the truth was fully revealed by the final disclosure on February 12, 2026. These disclosures revealed that Pinterest's advertiser demand was deteriorating due to tariff-driven pullbacks by the Company's concentrated base of large retail advertisers, and that Pinterest's lower-funnel and AI-powered advertising capabilities failed to retain these advertisers or mitigate the resulting decline in demand.

172. ***First***, on November 4, 2025, after market close, Pinterest issued a press release announcing 3Q 2025 financial results, including weaker-than-expected fourth-quarter guidance that projected a sequential deceleration in year-over-year revenue growth. Specifically, Pinterest announced Q4 revenue guidance of between \$1.313 billion and \$1.338 billion, or 14%-16% year-

over-year growth, falling below the Company's assurances of growth in the mid-to-high-teens[9], and a slowdown from the company's 17% growth in Q3. The midpoint of that range, approximately $1.326 billion, fell below the analyst consensus of approximately $1.337 billion.

173. On the Company's earnings call that same day, Defendants revealed that the disappointing disclosures were directly related to tariffs, explaining that tariffs disproportionately impacted Pinterest because of its high customer concentration of large retail advertisers. Contrary to Defendants' statements throughout the Class Period that Pinterest revenue was "durable" and "resilient" in the face of macroeconomic pressures, Defendant Donnelly admitted that Pinterest "face[d] pockets of moderating ad spend in UCAN in Q3, as larger U.S. retailers navigate tariff-related margin pressure in the current environment." Likewise, in response to an analyst question regarding the macro advertising environment, Defendant Ready admitted that tariffs were affecting Pinterest disproportionately relative to its peers because of the Company's greater exposure to large retailers. Ready explained that:

> some of our largest retailers in UCAN pulled back spend across the industry [as] they navigated tariff-related margin pressure. ***And we think that's disproportionately impacting large retailers, but that is a segment that we have more exposure to than other platforms, given our focus on shopping***.

174. Further, in response to a question from a Citigroup analyst asking whether the tariff-related effects had "continued" or "normalized," Defendant Donnelly disclosed a "pullback from some US retailers" and that "spend from Asia-based e-commerce players was down year-over-year again in Q3." Donnelly also disclosed that "smaller and mid-market advertisers [] represent[ed] only 15% of [Pinterest's] revenue," as the Company's "priority ha[d] been to solve the needs of larger enterprise advertisers first." Donnelly, however, continued to falsely assure investors of the "durability of [Pinterest's] revenue growth."

---

[9] Donnelly confirmed that when Pinterest said that it expected mid-to-high teens percent growth, it meant a low range of approximately 15%. *Supra* ¶57.

175. On this news, Pinterest's stock price declined 21.76%, declining $7.16 per share to close at $25.75 per share on November 5, 2025, on unusually high trading volume of nearly 75.5 million shares.

176. Analysts directly linked the precipitous decline in Pinterest's stock price to Defendants' disclosure of the Company's exposure to tariff-related impacts, including in particular that tariffs prompted a pull-back in ad spend among U.S. large retailers, a category of advertisers on which Pinterest was disproportionately dependent. The analyst reaction underscored a central theme of this action: Defendants had long downplayed a known concentration risk, and when that risk materialized, the market was blindsided.

177. For example, on November 4, 2025, RBC Capital Markets ("RBC Capital") issued an analyst report titled "Tariffs illuminate problematic customer concentration; lowering estimates & targets." In the report, the analyst observed that "***[t]ariff-related weakness showed up for the first time in our digital ads universe***" and would "reinforce PINS' lack of customer diversity for the bears and higher macro sensitivity . . . Pullbacks from some large advertisers owed to home furnishing-related tariffs drove the Q4 guide down."

178. Notably, the RBC analyst specifically attributed the outsized market reaction to the fact that Defendants' prior reassurances had misled investors about the true magnitude of tariff risk. The analyst report stated: "While tariffs was a known risk, intra-qtr communications on tariffs may drive some outsized reaction here." In other words, the market had previously priced in the risk of tariffs based on Defendants' prior false and misleading statements—and when the reality of the situation proved worse, the correction was correspondingly severe. The report further highlighted Pinterest's lack of advertiser size diversity as compared to its peers, contrasting it against "platforms like Meta and Google that have significant exposure to SMBs" showcasing company-specific, rather than industry-wide impact.

179. RBC went on to identify Defendants' earlier statements as deliberate efforts to shape market perception. The report noted that Defendant Ready's statements during the September 9, 2025 Goldman Sachs conference had "***intentionally provided additional color regarding the***

***impact of tariffs***, emphasizing that they ***were not updating guidance*** but offering context regarding the current business environment." The analyst concluded, "***[t]hese comments were deliberate***; they gave more color on it for a reason." In other words, while the market had known that tariffs posed some risk to Pinterest, Defendants' repeated assurances had concealed from investors the full extent of the risk. After all, Defendant Ready had made "***intentional[]" and "deliberate[]"*** comments in September that the macro environment was "more constructive" around tariffs than before, that Pinterest had withstood tariff pressure and would continue to do so based on the Company's "multiple levers . . . where even with a little bit of pressure in the U.S. from tariffs, [Pinterest] saw advertisers redistributing spend to international."

180. Wells Fargo's November 4, 2025 report similarly remarked on Pinterest's disclosures, concluding that, "US & Canada growth is the primary culprit of weakness, softening in 3Q to single-digit growth for first quarter since 4Q:23," and that "[w]hile the advertiser count has expanded materially in the last 24 mos, PINS does not have the breadth or depth of advertisers on the platform to overcome weakness in its endemic categories." Wells Fargo also back-tracked its previous guidance, noting "We previewed retail ads weakness, but guide suggests more caution was warranted."

181. On November 5, 2025, BofA Global Research reiterated Pinterest's vulnerability due to its customer concentration, writing that "[r]esults once again, underscore lack of ad category diversification," noting that "[l]ast year CPG spend pressure impacted revenues, and this year reduced ad spend by large retailers impacted results," and quantifying that "SMB spend represents about 15% of total Pinterest ad spend, well below larger peers."

182. Bernstein's November 4, 2025 report, aptly titled "Trough of disillusionment," named some of the pulling-back advertisers: "Pinterest saw pullbacks from some larger US retailers such as Amazon, Wayfair, and Walmart as these companies navigate tariff-related pressures — note that Pinterest remains heavily exposed to large retail." Similarly, J.P. Morgan added the home-furnishings tariff as an incremental driver, noting that the pullback "has continued into 4Q and weighs on the 4Q revenue growth outlook of +14%-16%."

183. Other securities analysts similarly linked the disclosures to previously misapprehended risk exposures. For example, on November 5, 2025, Morgan Stanley issued an analyst report titled "Putting a Pin in Growth," in which the firm expressed confusion that "PINS' revenue outlook came in ***softer than expected*** as the company has been unable to close the gap between product/engagement improvements and top-line re-acceleration." Morgan Stanley wrote candidly that it "honestly [didn't] fully understand" the negative news, but surmised explanations could include that Defendants had not revealed the extent of Pinterest's risk exposures, including "lack of advertiser diversity and bid density" because "when PINS sees disruptions to its large advertiser base (e.g. from tariffs), it is unable to fully backfill revenue." Morgan Stanley also questioned whether "[i]nnovation lagging peers results in limited ability to capture incremental ad dollars…as advertising dollars still follow transactions." Finally, Morgan Stanley listed as another undisclosed risk exposure the possibility of "[a]d pricing/ad load that is still high, putting a limit on ROAS and advertisers' willingness to scale up budgets."

184. These analyst reports underscore that during the Class Period Defendants chose again and again to soft-pedal the impact of tariffs to Pinterest—a decision which misled the market and prompted it to react so strongly once Defendants ultimately revealed that the tariffs were, in fact, disproportionately impacting the Company.

185. Nonetheless, Defendants continued to conceal the full truth about Pinterest's condition and performance. For example, in the Company's November 4, 2025 earnings release, Defendants told investors that their "investments in AI and product innovation are paying off. We've become a leader in visual search and have effectively turned our platform into an AI-powered shopping assistant for 600 million consumers. In turn, ***global advertisers are increasingly counting on Pinterest as a go-to search platform to reach their customers and drive sales***."

186. Further, while Defendants acknowledged during the November 4, 2025 earnings call that Pinterest "ha[s] more exposure to [largest retailers in UCAN navigating tariff-related margin pressure] than other platforms, given our focus on shopping," Defendant Ready nonetheless minimized the full extent of the Company's tariff-exposure by claiming that the issues are "not

specific to us" but instead "a pullback across the industry as a navigated tariff-related margin pressure."

187. ***Second***, the truth gradually continued to emerge on January 27, 2026, when Pinterest issued an unscheduled, off-calendar press release disclosing publicly that the Company was implementing a "global restructuring plan" to support its AI transformation, pursuant to which the Company planned to reallocate resources to AI-focused roles and teams, prioritize AI-powered products and capabilities, accelerate the transformation of its sales and go-to-market approach, and reinvest in key development areas and strategic opportunities. In connection, the Company stated it would eliminate 15% of Pinterest's global workforce (or approximately 780 jobs, according to the Company's reported workforce as of September 2025) and incur anticipated restructuring charges of $35 million to $45 million.

188. On the news, Pinterest's stock price declined $2.49 per share, or 9.61%, to close at $23.41 on January 27, 2026, on unusually high trading volume of more than 39 million shares.

189. Analysts and investors interpreted the announcement as an indication of weak performance and financial outlook, with several analysts specifically linking the announcement to deteriorating revenue trends from continuing tariff pressure and the failure of Pinterest's AI-powered advertising initiatives and other "levers" to overcome such headwinds, as Defendants had previously assured investors. For example, RBC Capital reported on January 27, 2026 that the "[b]usiness update doesn't indicate well for 2026 top line . . . [t]he Street is likely to perceive this as foreshadowing a revenue shortfall in 2026, potentially stemming from customer concentration and/or tariff-related headwinds." RBC also flagged the inconsistency with Pinterest's 8-K, such that "the most curious part in the announcement is in spite of the layoff, the 8k emphasized greater focus on its S&M approach which has been aiming to grow its agency partnerships," and observed that "the announcement likely furthers the decline in investor confidence in management where investors continue to wonder what the next leg of the story is in terms of either product, platform or go-to-market." Likewise, BofA Global Research's analyst report issued that day similarly

concluded that the "[a]nnouncement suggests tariff related pressure on ad spend has likely continued into 1Q."

190. Critically, analysts also connected the restructuring announcement directly to the failure of Pinterest's AI-powered advertising initiatives—the very initiatives Defendants had publicly described as catalysts for sustained growth. Jefferies wrote in a January 27, 2026 analyst report that "the spend re-allocation signals certain initiatives, such as Performance+ [,] are underperforming expectations." Jefferies added that, "the move signals that the current model is not generating enough growth or margin to justify the existing cost base, making this feel defensive rather than offensive." Most pointedly, on January 30, 2026, HSBC bluntly stated "[w]e hate to say it, but it's not working," explaining that: "PINS' renewed AI push, coming without any indication of cost savings or revenue acceleration, and requiring a trade-off in resources, reflects a tier-2 player struggling to keep up with larger and better resourced peers that are running ahead, in our view." HSBC's assessment—that the AI strategy was simply "not working"—directly contradicted Defendants' repeated Class Period assurances that Performance+ was delivering "really good results," that "more of the opportunity is in front of us than behind us," and that Pinterest's AI tools were "driving performance for advertisers and winning market share."

191. The January 27, 2026 disclosure thus partially revealed facts that Defendants had concealed: that the AI initiatives Defendants repeatedly described as the engine of Pinterest's growth—and as evidence of its resilience to macroeconomic headwinds—were not delivering the promised results, and that the Company's existing cost structure and business model could not sustain the growth trajectory Defendants had publicly committed to. Nonetheless, the market still remained unaware of the full truth concealed by Defendants' fraud.

192. ***Finally***, the truth was fully revealed when, after the close of the market on February 12, 2026, Pinterest disclosed deeply disappointing financial results for Q4 and year-end 2025 that fell short of consensus expectations, and forecasted Q1 2026 performance that not only fell short of expectations, but which further fell below the performance that Defendants had guided since the 2023 Investor Day and which they continued to reaffirm throughout the Class Period. *See, e.g.,*

*supra* ¶¶ 55–59, 67, 79, 81. This final disclosure removed the remaining artificial inflation from Pinterest's stock price by revealing the full scope of the deterioration that Defendants had concealed.

193. Specifically, on February 12, 2026, Pinterest announced Q4 2025 revenue of $1.319 billion—below the analyst consensus estimate of approximately $1.331 billion. Pinterest also issued Q1 2026 revenue guidance of $951 million to $971 million, which fell materially short of the $980.6 million consensus midpoint. The Q4 2025 result marked a stark deceleration in year-over-year revenue growth: Pinterest had reported 18% growth in Q4 2024, 16% in Q1 2025, 17% in each of Q2 and Q3 2025, and then just 14% in Q4 2025. Pinterest's Q1 2026 guidance signaled a further slowdown to 11%-14% growth. Additionally, Q4 2025 was the first quarter during the Class Period in which Pinterest failed to meet analyst consensus.[10]

194. Defendants candidly blamed tariffs—and the Company's disproportionate exposure to tariffs relative to its peers—for the Company's disappointing news, with Ready stating:

> ***While we absorbed an exogenous shock this year related to tariffs***, disproportionately affecting ad spend from our top retail advertisers, this quarter also underscored where we need to move faster. . . . Many of the largest retailers have been disproportionately impacted by tariffs and have been pulling back on advertising spend across the industry as they seek to protect their margins. ***Our higher mix of large retailers relative to some of our peers has resulted in us feeling more of an impact. This highlights the need for us to further accelerate our growth with a broader set of mid-market, SMB, and international advertisers with less than $30 billion of GMV***.

195. Later during the Company's February 12, 2026 earnings call, Defendant Ready further admitted that Pinterest's progress growing its business with mid-market, SMB, and international advertisers in 2025 was "not enough to offset the headwinds that the largest retailers

[10] Analyst consensus refers to the aggregated earnings and revenue estimates published by research analysts who cover a particular traded company. These analysts issue their estimates of a company's expected financial performance based on their independent analysis of a company's business, public disclosures, guidance, industry trends, and macroeconomic conditions. The consensus figure represents the mean or median of these individual estimates and serves as the market's benchmark expectation for the company's performance. When a company's reported results meet or exceed the consensus, it generally signals to the market that the company is performing in line with or better than expectations. Conversely, when a company's results fall below consensus, it signals underperformance relative to market expectations based on management's representations.

faced." In response to a question from a JPMorgan analyst regarding drivers of Q4 revenue, Defendant Donnelly disclosed that Pinterest's "largest retail advertisers created a more meaningful headwind than we expected" and that the "pullback on ad spend from larger advertisers [] impacted [Pinterest's] platform to a higher degree, given [the Company's] current revenue mix." Donnelly further stated that Pinterest "expect[s] these headwinds will continue and [that they] may become slightly more pronounced in Q1."

196. Defendants also admitted that Pinterest had not moved quickly enough to develop the lower-funnel measurement and attribution capabilities necessary to demonstrate value to advertisers, while competing platforms had become increasingly aggressive in claiming credit for conversions. Notably, as noted *supra* ¶68, included in Pinterest's lower-funnel capabilities is its Performance+ tool. On the February 12, 2026 earnings call, Ready disclosed that the gap between monetization and user engagement was "quite significant," in part because "we haven't moved fast enough" to advance measurement and attribution, including "modeled conversions," as had competing platforms:

> We need to adapt more quickly to grow within the fastest-growing parts of the market that we see contributing more significantly to the overall growth of competing platforms. So we are also doubling down on measurement and technical capabilities within our sales team. . . . [W]e know there is significant opportunity in driving greater performance selling capability across our sales organization and across the segments of the business beyond large advertisers. This is actually really important as the industry has advanced measurement and attribution with large platforms becoming more aggressive and claiming credit for outcomes even when they do not own the click or conversion. You would see this reflected in others talking about "modeled conversions." This is an area where we know we have not moved fast enough.

197. In other words, Defendants acknowledged that Pinterest had fallen behind competing platforms in developing the measurement and attribution tools needed to demonstrate advertising results, leaving a significant gap between user engagement and Pinterest's ability to monetize that engagement.

198. Defendant Ready also acknowledged the Company needed to "accelerate [its] growth," and get to a point where Pinterest's monetization reflects the value of its "full-funnel and performance marketing." Ready disclosed on the call that "the next step is optimizing our bidding

system to become more tightly aligned with the advertiser's measurement source of truth," admitting that measurement and attribution were competitive shortcomings that had constrained Pinterest's ability to retain and grow advertiser spend:

> This quarter made it clear that ***capturing this opportunity requires a higher level of sales and go-to-market sophistication***, with globally scaled selling motions as well as deeper technical expertise, ***particularly around measurement and attribution***.

199. Although Pinterest had previously presented Performance+ as a significant driver of growth, Defendant Ready admitted on the call that Pinterest's AI-driven advertising software was "a long way from having bids and budgets against advertisers' full product catalogs." Ready further acknowledged that Pinterest's lack of advertiser diversity rendered Pinterest's AI models less effective, noting that "[m]ore diverse advertiser demand allows our models to serve more relevant, highly personalized ads to users. This relevancy not only improves the user experience but drives superior performance for our advertisers and higher yield for Pinterest."

200. The market reacted sharply, as these disclosures contradicted Defendants' repeated assurances throughout the Class Period, including: that "peak tariff uncertainty" was behind the Company (*see, e.g., infra* ¶283); that the Company could and would weather tariffs due to its "resilient" and "durabl[e]" business model (*see, e.g., infra* ¶¶235, 237, 266, 271); and that—notwithstanding Defendant Ready's assurances during the prior earnings call—in November 2025, the tariff headwinds were "not specific to us" and merely "a pullback across the industry as a navigated tariff-related margin pressure." (*see infra* ¶292).

201. Analysts expressed surprise and specifically connected the news to the full revelation of the Company's tariff-exposure and shortcomings in Pinterest's AI-powered advertising capabilities. For example, HSBC Global Research published an analyst report on February 13, 2026, stating that while Pinterest's "restructuring operations [announced in January 2026] had already set a low bar for earnings expectations . . . the combination of deaccelerating revenues (+13% in 1Q y-o-y) and margin pressure (flat y-o-y in 26Q1) in the 1Q26 guidance ***still caught us off guard***. Management again flagged weakness amongst the large retailers segment as the main culprit . . . which it believes could 'prove more pronounced' in 26Q1."

202. Likewise, in its report dated February 13, 2026, RBC Capital downgraded the Company's stock and self-deprecatingly described the Company's performance as "a bullish growth thesis gone awry," writing that "tariffs were the culprit this qtr" and that Pinterest's results are "emblematic of a more consistent pattern of adverse concentration," and further that Performance+ and Pinterest's "product cycle & improving conversion-based thesis is just not panning out."

203. BofA Global Research published an analyst report on February 13, 2026, titled "Decelerating while big caps accelerate; Downgrade to Neutral." The report stated that "AI driven ROAS improvements at larger platforms appear to be impacting Pinterest's ability to capture incremental ad budgets" and acknowledged that its thesis that "Performance+ would translate into better performance has not played out."

204. On this news, Pinterest's stock price fell $3.12 per share, or 16.83%, to close at $15.42 on February 13, 2026, the next trading day, on massive trading volume of more than 69 million shares.

205. The decline reflected the market's reaction to the company-specific revelations about Pinterest's deteriorating advertiser relationships, failed AI strategy, and structural inability to offset the loss of its concentrated large-retailer base.

## VI. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS[11]

206. Throughout the Class Period, Defendants Pinterest, Ready, and Donnelly made materially false and misleading statements, omissions, and half-truths about Pinterest's ability to withstand tariff headwinds and the performance of Pinterest's lower-funnel and AI-Driven capabilities. The following identifies each of Defendants' materially false and misleading

[11] In this section, Lead Plaintiffs present the entirety of Defendants' false and misleading statements, omissions, and half-truths in their full context, and highlight the portions of the statements that are primarily false and/or misleading. In accordance with this Court's practices (*see* Judge Lin's Civil Standing Order at 13: https://cand.uscourts.gov/sites/default/files/standing-orders/RFL-Civil-Standing-Order-%282026-09-04%29_0.pdf), within 14 days of service of this complaint (by October 2, 2026), Lead Plaintiffs shall file a chart summarizing the information required by 15 U.S.C. § 78u-4(b)(1) and (2), specifically identifying the allegations in the operative complaint.

statements and the reasons why each statement was false and/or misleading. Each statement identified below caused or maintained artificial inflation in Pinterest's stock price.

**A. Q4 2024 Earnings Call (February 6, 2025)**

207. On February 6, 2025, after the close of trading, Pinterest held its fourth-quarter and full-year 2024 earnings call. Defendants Ready and Donnelly each spoke on the call and each responded to analyst questions. Because the call began after the market closed on February 6, 2025, the statements made on that call were first absorbed by the market (and impounded into the price of Pinterest common stock) when trading opened on February 7, 2025. Pinterest common stock traded as high as $40.90 per share on February 7, 2025, the highest intraday price during the Class Period.

208. During her prepared remarks on February 6, 2025, Defendant Donnelly stated that Pinterest was "***at the beginning of a multi-year product cycle for Performance+***," and represented as to then-existing results: **"*We're seeing really good results, but more of the opportunity is in front of us than behind us*."**

209. Defendant Donnelly's representation that Pinterest was then "***seeing really good results***" from Performance+ was false and misleading when made because Pinterest was experiencing decelerating demand and a recurring pattern of flat or below-target growth, reduced or paused campaigns, and material pullbacks by important accounts. Indeed, advertisers pulled back ad spend because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1). Among other things, as of February 6, 2025, Performance+ was not producing "***really good results***," but rather was degrading advertiser performance and driving advertisers to competing platforms:

(a) Pinterest had built AI into its advertising platform in October 2024 and, in a rush to reach market ahead of competitors, had carelessly rolled out a "sloppy" product, with

salespeople selling a product they knew very little about. For example, FE-14 states that he began seeing a decline in his sales and in user engagement in February 2025—the same month this statement was made. FE-14 also explained that the decline was connected to the AI-related features and led to advertisers going elsewhere because AI was growing and becoming available on other platforms. *See supra* ¶143; *see also supra* Section IV.D.2.

(b) According to FE-15, Pinterest rolled out Performance+ in approximately early 2025 and "a lot" of clients were not happy with it. FE-15 explained that there were drops in return on investment for advertisers when comparing Performance+ campaigns to campaigns run previously without it. FE-15 added that lack of return on investment was the primary theme amongst advertisers and "a lot" were moving to competitors as a result.

(c) Within Pinterest's Food vertical, at the beginning of 2025, the use of Performance+ was being pushed by the Company and for the Food segment this was stopped very quickly in the first half of 2025 as the Company was not happy with the performance of these campaigns, as described by FE-4. *Supra* ¶147.

(d) As described by FE-7, Pinterest's AI offerings were internally referred to as "AI slop," and Performance+ campaigns removed customization options and was a "set it and forget it" campaign, and was "not good at all." *Supra* ¶144.

210. Defendant Donnelly further stated on February 6, 2025: **"*We still have more value capture to go as advertisers increasingly turn to Pinterest to drive performance*,"** and that Pinterest was **"*seeing nice adoption of newer ad formats and capabilities*."**

211. Defendant Donnelly's representation that advertisers were "***increasingly turn[ing] to Pinterest to drive performance***" was false and misleading when made because Pinterest was experiencing decelerating demand and a recurring pattern of flat or below-target growth, reduced or paused campaigns, and material pullbacks by important accounts. Instead of "turning to Pinterest," advertisers pulled away and cut their ad spend on the platform because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and

tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

212. Specifically, as of February 6, 2025, advertisers were moving in the opposite direction—reducing spend and reallocating budgets to competitors—because Pinterest could not demonstrate the performance it claimed to be delivering:

(a) As described by FE-6 (*supra* ¶122), Pinterest repeatedly failed to demonstrate meaningful last-click conversions and campaigns were often reduced or terminated early because Pinterest could not demonstrate sufficient return on investment, a pattern observed with a consumer electronic advertiser and numerous other accounts. Where competing platforms could demonstrate dozens of purchases and Pinterest could not verify even a single purchase after a two-week campaign, advertisers reduced or eliminated their Pinterest budgets. *Supra* ¶123.

(b) As described by FE-7, "more and more" advertisers allocated more spend to Meta and Google rather than to Pinterest, and discussions of advertisers seeing greater value on those platforms were a "constant conversation." *Supra* ¶127.

(c) Agencies were "routinely telling" Pinterest personnel that advertisers were "pulling spending or turning off campaigns altogether," and it was a "huge uphill battle" to convince advertisers to spend with Pinterest while competing with Meta, Google, YouTube, and TikTok, as described by FE-13. *Supra* ¶¶132.

(d) Rather than "increasingly turn[ing]" to Pinterest, advertisers were being pursued: management consistently encouraged the sales organization to "double down" on selling Pinterest's lower-funnel advertising products despite widespread resistance from advertisers, as described by FE-6 (*supra* ¶¶123–24).

213. Later in the call, in response to a question about advertisers from Citigroup analyst Ronald Josey, Defendant Ready made three discrete quantified representations about Pinterest's then-existing position with its largest advertisers:

- that Pinterest was "***getting to 5% of their total ad budgets, 10%-plus of their digital ad budgets***" for "some of the largest, most sophisticated advertisers";

- that Pinterest was doing so "***with focus on durable low funnel budgets . . . getting to 80%-plus of their spend in that lower funnel***"; and
- that the "next tranche" of advertisers in the "$1 billion to $30 billion range" was "***recogniz[ing] the immense value creation that we've driven***," such that Pinterest "***continue[s] to see room to grow share of wallet with both of these cohorts***."

214. These representations were false and misleading when made because Pinterest was experiencing decelerating demand and a recurring pattern of flat or below-target growth, reduced or paused campaigns, and material pullbacks by important accounts. Indeed, advertisers pulled back ad spend because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

215. Specifically, while Defendant Ready described Pinterest's position with its largest advertisers as secure, deepening, and anchored in "durable" budgets, in fact, as of February 6, 2025, that same concentrated cohort was the Company's acute vulnerability and had already begun to withdraw:

(a) Pinterest's advertiser base was "very top heavy" and "lack[ed] diversity," with the top five advertisers responsible for the majority of revenue and all within the retail sector, including Temu, Amazon, Walmart, and Target, as described by FE-5. *Supra* ¶50. Pinterest later confirmed that approximately 85% of its revenue came from its largest advertiser accounts. *Supra* ¶47.

(b) Retailers—the cohort Defendant Ready described—began reducing advertising spend in approximately Q1 2025, coinciding with the introduction of tariffs, with Temu particularly affected. FE-5 observed tariff-related cuts to advertiser spend amongst the cohort he was directly responsible for and noted that reduction in spend beyond his cohort, including amongst Pinterest's top 5 advertisers, was "widely known" among Pinterest's sales personnel. *Supra* ¶88.

As described by FE-1 (*supra* ¶85), Temu was previously one of Pinterest's biggest advertising clients, before reducing advertising spend to very low levels of spending over a very short period.

(c) Far from budgets being "durable," Pinterest was already operating in recurring internal "code red war rooms" convened to identify ways to extract "any last drop of revenue" before quarter-end, with management concerned that they would miss earnings each quarter. As described by FE-1, beginning in approximately October 2024, Pinterest spent approximately two of every three months every quarter in those meetings, which occurred often daily and involved the Chief Technology Officer and Chief Revenue Officer. *Supra* ¶¶155–59.

216. Pinterest's own internal revenue targets, which Defendant Ready personally set and allocated among the sales "pods," were untethered to achievable advertiser spend, and, according to FE-7, he could not recall a situation where there was not a gap in what his manager brought to leadership and what leadership returned with in terms of revenue targets. *Supra* ¶¶150–51.

217. Defendant Ready's statement was further misleading because he described Pinterest's concentration in a small number of very large retail advertisers as a source of strength and a runway for growth, while omitting that the same concentration exposed Pinterest disproportionately to a tariff-driven pullback by those advertisers—an exposure Defendants later admitted. *Supra* ¶¶173, 194–95.

218. Analysts believed Defendants' misrepresentations, as evidenced by their reactions to the Defendants' statements. As to the statements concerning AI, on February 6, 2025, Guggenheim published a report titled "Strong Guide Inspires Optimism; AI Investments to Fuel Next Leg of Growth," noting that Q1 2025 revenue guidance of 13%-15% was above consensus at the midpoint, raising its price target to $39. On February 7, 2025, TD Securities recited that "PINS Performance+ ad suite, which launched in Oct. '24 and should have a multi-year adoption cycle, with mgmt. noting strong initial performance gains for advertisers alongside plans to roll out new features throughout '25." Wedbush Securities recited that "management expects a multi-quarter product adoption curve similar to previous lower funnel product launches." Benchmark Equity Research noted that "Net-net, PINS' AI initiatives are steadily *fully* monetizing its billions of

unique 1P data," and that "developed market engagement is clearly improving, which of course has a more direct line to monetization."

219. On February 7, 2025, Goldman Sachs published a reported titled "Q4'24 Review: Entering 2025 With Momentum Around Platform Growth Initiatives," describing the quarter as an overall solid result driven by healthy revenue growth, lower-funnel ad revenue, early positive Performance+ trends, and a Q1 outlook above investor expectations; Goldman raised its price target to $47. These reports reflected the market's reliance on Defendants' depiction of AI, lower-funnel tools, and advertiser demand as the next leg of durable growth.

220. As to Donnelly's statements that advertisers were "***increasingly turn[ing] to Pinterest to drive performance***," J.P. Morgan parroted the theme that "Performance+ is delivering improvements for advertisers through lower CPAs/CPCs & campaign setup automation" and that PINS was "tightening the value creation to value capture gap." Citi titled a report "Expanding Engagement and ROAS as PINS' Emerging Lower Funnel Ad Product Benefits Compound" and highlighted that "Ad Innovations like Direct Links, Performance Plus, & ROAS Bidding Create Platforms for LT Growth . . . each of these ad products create a multi-year runway for continued growth as PINS operationalizes newer functionality." BofA Global Research echoed that "CEO highlighted growing traction of Pinterest's DR capabilities and noted advertisers are allocating a higher percentage of their performance budget to the platform."

221. Analyst reports confirm the market reacted strongly and positively to Defendants' statements and raised their price targets following the February 6, 2025 earnings call. For example: Bernstein raised its price target from $34 to $47, an upward adjustment of +38%; Wells Fargo similarly raised its target from $39 to $47; Oppenheimer raised its target from $40 to $50; J.P. Morgan raised its target from $35 to $42; and HSBC raised its target from $36.30 to $46.30.

**B. Morgan Stanley's Technology, Media & Telecom Conference (March 6, 2025)**

222. On March 6, 2025, Defendant Ready appeared at the Morgan Stanley Technology, Media & Telecom Conference. Defendant Ready was asked directly about macroeconomic headwinds, in a question that expressly identified "trade tariffs" as the source of uncertainty: "[A]re

there areas either from a micro execution perspective or from a macro perspective, whether it's trade tariffs, name your latest macro sources of uncertainty that are sort of behind where you thought they'd be or holding back growth[?]" The truth of Defendant Ready's answer is challenged below. Because the question paired "macro" with "trade tariffs," Defendant Ready's responsive use of "macro" and "the environment" is properly understood as addressing the tariff environment specifically.

223. Responding to that question, Defendant Ready made two present-tense representations about what Pinterest was then observing in advertiser behavior: (a) ***"[A]t least in terms of what we currently see, we don't currently see advertisers overreacting or those kinds of things"***; and (b) ***"But we're not seeing signs of overreaction at the moment."***

224. These statements were false and misleading when made because Pinterest was experiencing decelerating demand and a recurring pattern of flat or below-target growth, reduced or paused campaigns, and material pullbacks by important accounts. Indeed, advertisers pulled back ad spend because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

225. Specifically, as of March 6, 2025, Pinterest was experiencing—and knew about—precisely the advertiser retrenchment Defendant Ready denied observing:

(a) According to former employees, specifically FE-5 and FE-1, retailers—the cohort from which Pinterest derived the overwhelming majority of its revenue—began reducing advertising spend in approximately Q1 2025, coinciding with the introduction of tariffs, and the reduction in spend among Pinterest's top five advertisers was "widely known" among Pinterest's sales personnel. *Supra* ¶88. According to FE-1, Temu, previously one of Pinterest's largest advertising clients, reduced spend with Pinterest and characterized it as a significant pullback to very low levels of spending over a very short period. *Supra* ¶85. Indeed, it was an abrupt cut the

sales team attributed directly to tariffs. *See also supra* ¶87 (FE-5 explaining, among other things, that Pinterest was an "easy target" for advertisers to reduce spending with because it did not provide the same value as other platforms such as Google, TikTok, and Meta).

(b) According to FE-12, as soon as the tariffs were announced in early 2025, he began to hear from advertisers about pulling back their ad spending, and recalled that advertisers specifically said they were reducing their advertising spending because of the tariffs. FE-12 described how a co-worker brought up those concerns at an early-2025 meeting attended by Pinterest executives and were "brushed off," with executives comparing tariffs to the COVID-19 pandemic and stating they were not concerned. *Supra* ¶¶115, 117.

(c) According to former employees, specifically FE-6, Pinterest circulated internal reports on tariffs and their impact on advertiser spending, prepared by a specialized task force within the sales organization dedicated to monitoring tariff-related issues. *Supra* ¶101. Former employees also reported receiving directives on how to handle advertisers seeking to reduce spend because of tariffs. *See supra* ¶¶92, 111.

(d) According to FE-11, tariffs were a "very big conversation" at the Company (*supra* ¶110) and, according to FE-10, "everyone knew the tariffs were affecting business." *Supra* ¶108.

226. Defendant Ready's statements were also misleading by omission. Having elected to characterize what Pinterest "***currently see***[***s***]" from advertisers in response to a question expressly about tariffs, Defendant Ready was obligated to disclose the pullback Pinterest was in fact then observing among the concentrated retail cohort that generated the substantial majority of the Company's revenue. *See generally* Section IV.D.1.

227. Later during the same March 6, 2025 Morgan Stanley Technology, Media & Telecom conference, Defendant Ready represented as to then-existing advertiser behavior: **"*[W*]*e do see consistently that as advertisers are able to see and measure the clicks, it's easy to take action. They shift share of wallet to us, and we think there's a lot more of that to go.*"** Ready

made the same representation earlier, stating that ***"as people can measure it, they shift share of wallet to us."***

228. These statements were false and misleading when made because Pinterest was experiencing decelerating demand and a recurring pattern of flat or below-target growth, reduced or paused campaigns, and material pullbacks by important accounts. Indeed, advertisers pulled back ad spend because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

229. Specifically, Defendant Ready's representation that measurement drove advertisers to increase their allocation to Pinterest was false and misleading because, in fact, as of March 6, 2025, measurement was a primary reason advertisers were reducing their allocation to Pinterest:

(a) According to FE-6, Pinterest repeatedly failed to demonstrate meaningful last-click conversions, and where competing platforms could demonstrate dozens of purchases from a campaign, Pinterest could not verify a single purchase after a two-week campaign—causing advertisers to reduce or eliminate their Pinterest budgets. Advertisers did not believe Pinterest's internal measurement studies accurately reflected the performance metrics they used to evaluate advertising success. *Supra* ¶¶121–23.

(b) Pinterest's own measurement data was unreliable and known internally to be so: according to FE-13, Pinterest's numbers "made no sense," were "so far off," and were "not realistic," such that "almost no one was using them," and employees could not answer advertisers who asked where the figures came from. *Supra* ¶134. FE-7 explained that Pinterest's data was "always skewed," and advertisers were aware of this. *Supra* ¶127.

(c) Indeed, FE-13 described how when advertisers pressed to measure Pinterest's value, Pinterest's response was to propose a "Brand Lift Study" costing at least $100,000 for the advertiser—a "difficult sell" because it asked advertisers to pay to learn what their own

return-on-investment data already showed them, namely "that Pinterest was not the best option for their advertising spending." *Supra* ¶158.

(d) Agencies were "routinely telling" Pinterest personnel that advertisers were "pulling spending or turning off campaigns altogether," and it was a "huge uphill battle" to convince advertisers to spend with Pinterest while competing with Meta, Google, YouTube, and TikTok, as described by FE-13. *Supra* ¶¶132.

230. Also during the same March 6, 2025 conference, in response to a question about progress with advertisers by vertical, Defendant Ready represented as to Pinterest's largest advertisers: ***"And we've seen them really leaning in. They've been a consistent source of strength for us."***

231. This statement was false and misleading when made because Pinterest was experiencing decelerating demand and a recurring pattern of flat or below-target growth, reduced or paused campaigns, and material pullbacks by important accounts. Indeed, advertisers pulled back ad spend because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

232. Specifically, as of March 6, 2025, Pinterest's largest advertisers were not a "***consistent source of strength***"; they were the locus of the pullback:

(a) Pinterest's top five advertisers were all retail—including Temu, Amazon, Walmart, and Target—and were responsible for the majority of Pinterest's revenue, in an advertiser base that was "very top heavy" and "lack[ed] diversity," with the top five advertisers responsible for the majority of revenue and all within the retail sector, including Temu, Amazon, Walmart, and Target, as described by FE-5. *Supra* ¶50. Pinterest later confirmed that approximately 85% of its revenue came from its largest advertiser accounts. *Supra* ¶47.

(b) According to FE-5, reduction in spend among that top five cohort was "widely known" among Pinterest's sales personnel by the first quarter of 2025 (*supra* ¶88), and according to FE-1, Temu had reduced spend to "very low levels." *Supra* ¶85.

(c) According to FE-1, Pinterest was contemporaneously operating in daily "code red war rooms"—consuming approximately two of every three months per quarter beginning in October 2024—convened to extract "any last drop of revenue" before quarter-end and which gradually increased in duration and intensity. *Supra* ¶¶155–59.

233. Defendant Ready's characterization of Pinterest's largest advertisers as a "consistent source of strength" was further misleading because it presented Pinterest's concentration in that cohort as an asset while omitting that the concentration exposed Pinterest disproportionately to the tariff-driven retail pullback then under way—an exposure to which Defendant Ready himself later admitted, conceding that tariff pressure was "disproportionately impacting large retailers" and that this "is a segment that we have more exposure to than other platforms." *Supra* ¶¶173, 194–95.

234. Analysts believed Defendants' misrepresentations, as evidenced by their reactions to Defendants' statements in the following weeks. On March 24, 2025, Guggenheim credited that Pinterest was "relatively well-positioned for macro uncertainty" and upgraded Pinterest to a "BUY" rating. Meanwhile, other analysts maintained bullish ratings including TD ($46), Loop Capital ($47), and Goldman Sachs ($47), thereby preserving the artificial inflation of Pinterest's stock price.

**C. Press Release (May 8, 2025)**

235. On May 8, 2025, Pinterest published a press release titled "Pinterest Announces First Quarter 2025 Results, Delivers 16% Revenue Growth and Record Users." The press release quoted Defendant Ready as stating: "Our strong results in the first quarter demonstrate continued momentum in revenue, user growth and engagement." He continued:

> ***As the macroeconomic and digital ad landscape evolves, our strategy and consistent execution has made Pinterest more resilient than ever. The fundamentals in the business are strong and we're continuing to see healthy growth. Our AI advancements are helping users take action and make more intentional shopping decisions. We're driving***

> ***performance for advertisers and winning market share, giving us a solid foundation for long-term, sustainable growth.***

236. Defendant Ready's representation that Pinterest's "***strategy and consistent execution has made [it] more resilient than ever***" even "[***a***]***s the macroeconomic and digital ad landscape evolves***" was false and misleading when made because Pinterest was experiencing decelerating demand and a recurring pattern of flat or below-target growth, reduced or paused campaigns, and material pullbacks by important accounts. Indeed, advertisers pulled back ad spend because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

**D. Q1 2025 Earnings Call (May 8, 2025)**

237. On May 8, 2025, Pinterest held its Q1 2025 earnings call. During this earnings call, Defendant Ready stated the following to investors:

> Before getting into the details of Q1, ***I'd like to discuss the current macro environment we're operating in. Our business, including our top-line revenue growth, remains healthy***. This is an indication that our efforts to build a more engaging and actionable product for our users and a more performant product for our advertisers are working. ***The strong fundamentals in our business are the result of the strategic priorities we've executed against, taking Pinterest from a platform with declining users and modest revenue growth a few years ago into a secular share taker with a more resilient business than ever before***.
>
> [. . .]
>
> As we've made our platform more actionable and generated growing numbers of clicks and conversions, ***we've become a vital partner for advertisers*** across a range of categories, seeking to reach our high-intent users and drive sales. ***In turn, we are increasingly accessing always on performance budgets, which are larger and tend to be more durable***. Furthermore, an uncertain macro environment where consumers are more intentional and discerning with their spend presents an opportunity for Pinterest to deliver differentiated utility for our users. Our users are planners and often coming to us for their most considered purchases.

238. Defendant Ready's statements were materially false and misleading because, contrary to his representations, Pinterest's business was not "healthy" in the then-current

macroeconomic environment. Instead, Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

239. Additionally, Pinterest was neither a "vital partner" to its advertisers nor increasingly gaining access to their advertising budgets. The opposite was true: advertisers were abandoning the platform for its competitors and withdrawing their advertising spend. Specifically:

(a) FE-6 reported that Pinterest repeatedly failed to demonstrate meaningful last-click conversions, making it difficult to increase advertiser spending. Campaigns were often reduced or terminated early because Pinterest could not demonstrate sufficient return on investment, a pattern he observed with a specific consumer electronic advertiser and numerous other accounts. *Supra* ¶¶121–23.

(b) Pinterest's customers were frequently pulling ad spend from Pinterest and spending it instead with Pinterest's competitors. According to FE-3, Pinterest was "struggling to stay on par" with competitors in terms of performance. *Supra* ¶¶125.

(c) FE-6 reported receiving frequent feedback that advertisers were reallocating budgets from Pinterest to competing platforms because those platforms produced stronger measurable results. *Supra* ¶¶123.

(d) FE-7 recalled that discussions of advertisers seeing more value in advertising with Google and Meta was a "constant conversation." FE-7 recalled that over time "more and more" allocated more spend to platforms such as Meta and Google rather than Pinterest. *Supra* ¶127.

(e) According to FE-13, throughout his tenure it was a "huge uphill battle" to convince advertisers to spend with Pinterest while competing with Meta, Google, YouTube, and TikTok. FE-13 noted that it was a "huge challenge," and agencies were routinely telling him that advertisers were pulling spending or turning off campaigns altogether. *Supra* ¶¶132.

(f) According to FE-9, advertisers most commonly decreased advertising spend because they did not see the value of advertising on Pinterest. FE-9 continued to say that there were lots of other platforms, specifically TikTok and Meta, which were "progressing quicker" and "offered more" to advertisers than Pinterest did. FE-9 explained that advertisers struggled to get conversions on Pinterest and used the website more as a "testing ground." *Supra* ¶136.

240. Later during the same Q1 2025 earnings call, Defendant Donnelly went on to discuss the "current evolving landscape":

> Before addressing specifics, I want to acknowledge the current evolving landscape. As Bill noted, ***our business trends remain healthy overall***, and we feel good that the product investments we've made over the last 3 years are working. ***While we are not immune to the macro environment, we are confident in our multiple revenue initiatives, the steady ongoing execution of our plans, and our ability to compete effectively across a number of scenarios***.

241. Defendant Donnelly's characterization of Pinterest's "business trends" as "healthy" and her purported "confidence" in the Company ran contrary to its internal reality, making her statements to investors materially false and misleading. In reality, Pinterest's "business trends" were suffering because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

242. Later in the call, analyst Ross Sandler ("Sandler") with Barclays asked Defendants:

> [J]ust starting with like the guidance, 2Q looks pretty solid, all things considered, just a very modest decel. We know you have Easter in the second quarter this year, which may help a little bit. But just curious what you're seeing in the pipeline, and are any of the kind of high tariff exposed categories in retail and CPG showing any softness thus far? How do you see this playing out throughout the year?

243. In response, Defendant Donnelly reassured investors that,

> ***So first and foremost, as we noted in our prepared remarks, we're seeing strengths in our business, and trends remain healthy both in Q1 and the early signals on Q2. Our products are really working well as we leverage AI to*** drive gains in relevance, personalization, and actionability for users, and ***drive increasing performance gains for our advertisers across a range of verticals.***

244. Defendant Donnelly's statements touting Pinterest's "strength" and "healthy" trends were materially false and misleading when made. Instead, Pinterest's clients were pulling back their ad spend on Pinterest as evidenced by the fact that Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

245. Additionally, Defendant Donnelly's statements championing Pinterest's AI products are also false and misleading because, at the time these statements were made, in reality, Pinterest's AI products were "sloppy" and failed to impress or retain advertiser customers:

(a) Pinterest had built AI into its advertising platform in October 2024 and, in a rush to reach market ahead of competitors, had carelessly rolled out a "sloppy" product, with salespeople selling a product they knew very little about. For example, FE-14 states that he began seeing a decline in his sales and in user engagement in February 2025—the same month this statement was made. FE-14 also explained that the decline was connected to the AI-related features and led to advertisers going elsewhere because AI was growing and becoming available on other platforms. *See supra* ¶143; *see also supra* Section IV.D.2.

(b) According to FE-15, Pinterest rolled out Performance+ in approximately early 2025 and "a lot" of clients were not happy with it. FE-15 explained that there were drops in return on investment for advertisers when comparing Performance+ campaigns to campaigns run previously without it. FE-15 added that lack of return on investment was the primary theme amongst advertisers and "a lot" were moving to competitors as a result.

(c) Within Pinterest's Food vertical, at the beginning of 2025, the use of Performance+ was being pushed by the Company and for the Food segment this was stopped very quickly in the first half of 2025 as the Company was not happy with the performance of these campaigns, as described by FE-4. *Supra* ¶147.

(d) As described by FE-7, Pinterest's AI offerings were internally referred to as "AI slop," and Performance+ campaigns removed customization options and was a "set it and forget it" campaign, and was "not good at all." *Supra* ¶144.

246. Continuing her response to the same question from Sandler about tariff exposure, Defendant Donnelly attempted to minimize the impact of tariffs on Pinterest's business:

> ***There have been small pockets of spend that have been impacted by tariffs in recent weeks***. For example, like other platforms, we have observed a reduction in spend from Asia-based e-commerce retailers in the US given the change in the de minimis exemption. However, we've also seen a geographic diversification from some of those Asia-based retailers to our European and Rest of World user regions. And that's a theme that has continued to playout over multiple quarters now and continues today.

247. However, Donnelly's attempt at minimizing the impact of tariffs on Pinterest by characterizing it as affecting only "small pockets of spend," failed to disclose the full extent to which tariffs were harming Pinterest's advertising business. Specifically, Defendant Donnelly failed to disclose that:

(a) According to former employees, specifically FE-5 and FE-1, retailers—the cohort from which Pinterest derived the overwhelming majority of its revenue—began reducing advertising spend in approximately Q1 2025, coinciding with the introduction of tariffs, and the reduction in spend among Pinterest's top five advertisers was "widely known" among Pinterest's sales personnel. *Supra* ¶88. According to FE-1, Temu, previously one of Pinterest's largest advertising clients, reduced spend with Pinterest and characterized it as a significant pullback to very low levels of spending over a very short period. *Supra* ¶85. Indeed, it was an abrupt cut the sales team attributed directly to tariffs. *See also supra* ¶87 (FE-5 explaining, among other things, that Pinterest was an "easy target" for advertisers to reduce spending with because it did not provide the same value as other platforms such as Google, TikTok, and Meta).

(b) According to FE-12, as soon as the tariffs were announced in early 2025, he began to hear from advertisers about pulling back their ad spending, and recalled that advertisers specifically said they were reducing their advertising spending because of the tariffs. FE-12 described how a co-worker brought up those concerns at an early-2025 meeting attended by

Pinterest executives and were "brushed off," with executives comparing tariffs to the COVID-19 pandemic and stating they were not concerned. *Supra* ¶¶115, 117.

(c) According to former employees, specifically FE-6, Pinterest circulated internal reports on tariffs and their impact on advertiser spending, prepared by a specialized task force within the sales organization dedicated to monitoring tariff-related issues. *Supra* ¶101. Former employees also reported receiving directives on how to handle advertisers seeking to reduce spend because of tariffs. *See supra* ¶¶92, 111.

(d) According to FE-11, tariffs were a "very big conversation" at the Company (*supra* ¶110) and, according to FE-10, "everyone knew the tariffs were affecting business." *Supra* ¶108.

248. The next day, May 9, 2025, analysts parroted Defendants' remarks regarding the "healthy" and "resilient" business. J.P. Morgan directly echoed Defendant Ready's language that "PINS believes trends remain healthy" and repeated his claim about capturing "greater share of wallet among the next tranche of advertisers ($1B-$30B sales range)." The same report also noted that Pinterest "believes improved relevancy, deeper engagement, & improved actionability should provide resilience, w/full-funnel capabilities enabling the company to capture market share." Deutsche Bank parroted Defendant Ready's framing that "despite macro concerns, underlying fundamentals are strong," and described Pinterest as "[d]emonstrating [d]urability." The report highlighted that "PINS progress in driving durable lower-funnel performance advertising outweighed what was perceived as vulnerable category exposure." Oppenheimer directly quoted Defendant Donnelly that "trends remain healthy both in 1Q and the early signals of 2Q" and raised its price target from $36 to $40, stating results were "better than feared."

249. Analysts also latched onto Defendants' statements regarding Pinterest's AI capabilities. On May 8, 2025, RBC Capital reported that "mid-sized UCAN advertisers in the $1-30B sales range are also scaling their investments, driven by results from Performance+, direct links, and CAPI adoption." Similarly, on May 9, 2025, a Citi report stated that "PINS' investments

in AI and ad products are capturing a larger share of more durable, always-on, performance ad budgets across verticals."

250. Across the board, analysts raised their price targets following the earnings call. For example, Goldman Sachs raised its price target from $40 to $42; UBS from $39 to $44; Oppenheimer from $36 to $40; Morgan Stanley from $28 to $37; and Citi from $38 to $41—reflecting that the market credited the misleading statements made by Defendants Ready and Donnelly regarding the health of Pinterest's business and the resilience of its advertising platform.

**E. CNBC Interview (May 8, 2025)**

251. On May 8, 2025, after the market closed, Defendant Ready was interviewed on CNBC by CNBC's Julia Boorstin ("Boorstin"). During the interview, Boorstin and Defendant Ready had the following question and answer exchange:

> Q: On the call just now, there was a brief mention of some pullback in spending from Asian retailers on ads. How concerned are you about weakness in the ad market should these tariffs go forward?
>
> A (Ready): Well, one of the things we noted as others did that, you know, China or Asia, cross-border sellers, you know, there's been, you know, some adjustment there, but we've also seen them start to sell into other markets. And even with consumers here in the U.S., you know, we went through a major supply chain disruption just a few years ago with the pandemic. Consumers were resilient. ***They'll find other things to shop for, and Pinterest is the place that they go to do it. And as users get more intentional and more considered about their purchases, Pinterest is a platform for those considered purchases. It's not about impulse purchases. It's about things that you go buy when you're being really intentional and planful about what you're doing. And again, I think that lets us just shine through even more in that moment***.

252. Notably, Defendant Ready evaded Boorstin's question on "weakness in the ad market" and redirected the conversation to consumer behavior to avoid giving a direct response. In doing this, Defendant Ready's statement constitutes an actionable half-truth. Even if his statements about consumer resilience were true, they omitted material information necessary to prevent those statements from misleading investors. Specifically, in response to the question about "weakness in the ad market," Defendant Ready failed to disclose that Pinterest was experiencing decelerating advertiser demand and a recurring pattern of flat or below-target growth, reduced or paused

campaigns, and material pullbacks by important accounts in direct response to the announcement of tariffs. *See generally* Section IV.D.1.

253. Analysts parroted Defendant Ready's statement about the impact of cross-border sellers. On May 9, 2025, Deutsche Bank recited that "tariffs have resulted in a reduction in spend from Asia-based e-commerce retailers in the US, but Pinterest appears to be recapturing some of that spend across Europe and ROW" while Jefferies recapped that "[t]he change in the de minimis exception was called out as a headwind from Asia retailers in the US, but those same retailers are now allocating ad dollars to different regions." Similarly, UBS echoed "Pinterest continues to see strength in retail offset by policy-change-driven dropoff among APAC-based e-commerce operators, offset by strength in financial services." Analysts broadly raised price targets following the May 8, Q1 2025 earnings call and CNBC Interview—reflecting that the market credited Ready's CNBC statements that the Asia pullback was limited and offset, that consumers were "resilient," and that Pinterest would "shine through" the macro uncertainty.

254. As another example, on May 9, 2025, Citi published "Engagement Gains & Ad Innovations Underscore Healthy Ad Demand as Always-On Ad Budgets Ramp," stating that the Q1 results supported its view that Pinterest's AI and ad-product investments were capturing "a larger share of durable, always-on, performance ad budgets"; Citi maintained a Buy/High Risk rating and raised its price target to $41. Morningstar likewise wrote that Pinterest had reported "solid first-quarter earnings" and that, despite a volatile macro environment, "we believe ad spending on Pinterest is remaining quite resilient." Deutsche Bank titled its report "Demonstrating Durability" and concluded that Pinterest's progress in driving durable lower-funnel performance advertising outweighed perceived category exposure. Loop Capital similarly observed that many investors had assumed Pinterest would be among the first platforms to lose budget during macro uncertainty because it was smaller and perceived as brand-oriented, but that the strong results and outlook could change that view. These reactions show that analysts understood Defendants' statements as evidence that Pinterest had crossed into durable, measurable performance budgets.

### F. CNBC - Pinterest CEO On The Ad Market, AI Usage And State Of The Consumer (May 20, 2025)

255. On May 20, 2025, after the market opened, CNBC posted an interview with Defendant Ready. During the interview, CNBC's Boorstin and Defendant Ready discussed the ad market in context of the macro environment:

> Q: Well, I was going to ask what you're seeing from the advertisers right now, given the spike in uncertainty in corporate America right now, has that actually been reflected in terms of decisions and spending?
>
> A (Ready): Well, you know, consumers. Consumers do shift behaviors quickly. And so advertisers are looking for that insight. And so we're engaging with advertisers on exactly that to help plug them in.
>
> Q: But are advertisers pulling back?
>
> A (Ready): Well, you know, we just recently gave guidance and we gave guidance stronger than what people expected. And I think that's really about our platform being a performance oriented platform. So I think advertisers are demanding more performance, but that's been part of the transformation of our platform over the last three years is to make it really a performance advertising platform.

256. Defendant Ready's response to Boorstin's question about advertisers pulling back ad spend is an actionable half-truth. Even if Ready's statement setting forth Pinterest's stronger than expected guidance can be considered technically true, it omitted material information necessary to prevent misleading investors, namely that advertisers were pulling back ad spend because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1). Additionally, Defendant Ready's statements touting advertiser's "demand[]" for "performance" and the "transformation" of Pinterest to a "performance advertising platform" were false and misleading when made for the reasons listed above.

257. Later in the call, Boorstin asked about Pinterest's exposure to volatility. Defendant Ready responded by attempting to dissuade any concerns: "So if you look at us over the last few years, we've grown much faster than the ad market overall. ***So we've been a share taker in the***

***market.*** So as a smaller player in that market, even if the market maybe feels some contraction, ***we think we can still continue to be a share taker even if the market does tighten a bit***."

258. Defendant Ready's assertion that Pinterest is a "share taker" in the ad market, and can "continue to be a share taker even if the market does tighten a bit" was false and misleading when made because Pinterest was currently losing customers, and consequently revenue, because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

**G. Q2 2025 Earnings Call (August 7, 2025)**

259. Pinterest held its Q2 2025 earnings call, after market close, on August 7, 2025. During this call, Defendant Ready stated:

> We ended the quarter of 578 million MAUs, an 11% increase year-over-year, marking yet another quarter of record high users. At the same time, we generated Q2 revenue of $998 million, up 17% year-over-year as ***we continue to be a vital partner for advertisers across a range of verticals seeking to reach our leaned-in users. Our consistent performance and ability to take market share demonstrate the effectiveness of our long-term strategy and laser focus on delivering value for our users and advertisers***.

260. Defendant Ready's above statement was materially false and misleading when made for multiple purposes. First, Pinterest was not a vital partner for its advertisers. Instead, advertisers were actively pulling ad spend during the Class Period because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).Finally, Pinterest's long-term strategy was not "effective[]," because, for the reasons listed above, Pinterest's growth was decelerating.

261. Later during the call, Defendant Ready continued to say that:

> Through countless discussions that I have had directly with the CEOs and CMOs of our top advertisers, ***I am more convinced than ever that Pinterest is offering unique value as a platform within the ads ecosystem.*** Advertisers are increasingly recognizing our speed of execution and our consistent ability to deliver on promises with differentiated, data-driven insights, and expanding global scale. ***More than ever before, advertisers now view Pinterest as a powerful search platform, capable of driving significant lower funnel performance.***

262. Defendant Ready's statement that "advertisers now view Pinterest as a powerful search platform, capable of driving significant lower funnel performance" was materially false and misleading when made. Rather than seeing Pinterest as a "powerful" platform driving "lower funnel performance," Pinterest's customers were disappointed in the platform to the point that they were cutting back their ad spend on Pinterest because the Company failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

263. Later during the Q2 2025 earnings call, Defendant Donnelly told investors that Pinterest was:

> continuing to execute on our multiple ways to win, which are growing users, deepening engagement while simultaneously increasing ad load with relevant ads as content, ***driving performance for advertisers with lower funnel product innovations***, and complementing our first-party business with new sources of demand. In doing so, ***we're taking share in a competitive, but growing end market by building a strong business with sustainable revenue growth, profitability, and free cash flow generation***.

264. Defendant Donnelly's statement that Pinterest was "driving performance for advertisers with lower funnel product innovations," was false and misleading when made because, according to FE-6, Pinterest repeatedly failed to demonstrate meaningful last-click conversions, making it difficult to increase advertiser spending. Campaigns were often reduced or terminated early because Pinterest could not demonstrate sufficient return on investment, a pattern he observed with this specific consumer electronic advertiser and numerous other accounts. Notably, FE-6 reported receiving frequent feedback that advertisers were reallocating budgets from Pinterest to competing platforms because those platforms produced stronger measurable results. FE-6

explained that Pinterest could not demonstrate successful last-click conversions, while platforms such as Instagram and TikTok were reportedly able to show measurable purchases resulting directly from advertising campaigns. FE-6 stated that if competing platforms could demonstrate dozens of purchases, while Pinterest could not verify even a single purchase after a two-week campaign, advertisers would understandably reduce or eliminate Pinterest's advertising budget. According to FE-6, this occurred with numerous other advertiser accounts. *Supra* 122-23; s*ee also* Section IV.D.2.

265. Defendant Donnelly's statement that Pinterest was "***taking share in a competitive, but growing end market by building a strong business with sustainable revenue growth, profitability, and free cash flow generation***," was similarly false and misleading when made. Rather than "taking share in a competitive" market, Pinterest was consistently losing its customers to its competitors, as corroborated by FE-6, FE-3, FE-7, FE-13, and FE-9. *See* Section IV.D.2.

266. Defendant Donnelly continued: "***At the same time, we're also seeing continued revenue growth from our efforts to drive greater performance through AI-driven ad stack improvements and automation***, along with deeper actionability through our lower funnel ad formats" and further touted that "***[t]he compounding effects of these initiatives, combined with our consistent execution, has resulted in a more resilient business than ever before, and there's certainly more to go as we continue to execute on our strategy***."

267. Defendant Donnelly's statement that Pinterest was seeing "revenue growth" from its AI products is false and misleading and runs in direct contradiction to the fact that Pinterest's subpar AI products was actually causing advertisers to reduce their ad spend with the Company. *See* Section IV.D.2. Additionally, Donnelly's statement touting the resilience of the Company was also false and misleading, as evidenced by former employee reports that advertisers reduced their ad spend on Pinterest because the Company failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on

Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

268. Later in the call, Eric Sheridan ("Sheridan"), an analyst with Goldman Sachs, asked Defendants about the broader macro environment and demand for ads: "…there's been a lot of volatility year-to-date in the broader macro environment. How would you characterize the current demand state for digital ads broadly? And how are you thinking about the potential for volatility in either direction or nuance around budgets as we progress deeper into the year?" Defendant Ready responded: "Just broadly speaking, I'd say, as you look at our over-delivery on revenue in Q2, ***we saw a bit more constructive environment than what we had expected and many others expected at the time of our last call***."

269. When responding to an analyst question about how the broader macro environment affected demand for digital ads, and speaking on the macro environment, Defendant Ready failed to disclose material facts, including that:

(a) According to former employees, specifically FE-5 and FE-1, retailers—the cohort from which Pinterest derived the overwhelming majority of its revenue—began reducing advertising spend in approximately Q1 2025, coinciding with the introduction of tariffs, and the reduction in spend among Pinterest's top five advertisers was "widely known" among Pinterest's sales personnel. *Supra* ¶88. According to FE-1, Temu, previously one of Pinterest's largest advertising clients, reduced spend with Pinterest and characterized it as a significant pullback to very low levels of spending over a very short period. *Supra* ¶85. Indeed, it was an abrupt cut the sales team attributed directly to tariffs. *See also supra* ¶87 (FE-5 explaining, among other things, that Pinterest was an "easy target" for advertisers to reduce spending with because it did not provide the same value as other platforms such as Google, TikTok, and Meta).

(b) According to FE-12, as soon as the tariffs were announced in early 2025, he began to hear from advertisers about pulling back their ad spending, and recalled that advertisers specifically said they were reducing their advertising spending because of the tariffs. FE-12 described how a co-worker brought up those concerns at an early-2025 meeting attended by

Pinterest executives and were "brushed off," with executives comparing tariffs to the COVID-19 pandemic and stating they were not concerned. *Supra* ¶¶115, 117.

(c) According to former employees, specifically FE-6, Pinterest circulated internal reports on tariffs and their impact on advertiser spending, prepared by a specialized task force within the sales organization dedicated to monitoring tariff-related issues. *Supra* ¶101. Former employees also reported receiving directives on how to handle advertisers seeking to reduce spend because of tariffs. *See supra* ¶¶92, 111.

(d) According to FE-11, tariffs were a "very big conversation" at the Company (*supra* ¶110) and, according to FE-10, "everyone knew the tariffs were affecting business." *Supra* ¶108.

270. Defendant Donnelly also addressed Sheridan's question, first by downplaying the significant effects that tariffs were having on Pinterest's business at the time, stating that: "[W]hile the tariff impact was certainly smaller than we anticipated in Q2, we did still see some impact affecting our UCAN region. For example, Asia-based e-commerce retailers pulled back spend in the US tied to the change in the de minimis exemption."

271. Defendant Donnelly continued to project confidence about the "macro environment" going forward, specifically referencing communications with advertisers as the basis for her view, and emphasizing that the announced guidance reflected Defendants' view that "the consistency of our revenue growth year-to-date really highlights the resilience of our business":

> [A]s we talk to advertisers about Q3, we do hear that some of that tariff-related and broader market uncertainty has continued into how they're thinking about spend for Q3, though this varies by advertiser. And again, ***it's definitely a relatively more constructive environment*** than feared. So, we're trying to provide an outlook for Q3 that is responsive to that overall environment and we'll have to see how the broader market backdrop plays out. Stepping back, though, we're guiding to a revenue range that is similar to the 17% growth we just delivered in Q2. ***So we think the consistency of our revenue growth year-to-date really highlights the resilience of our business and, more importantly, the durability of our many revenue growth drivers as we're continuing to execute on our strategy***.

272. Defendant Donnelly's statements about the "resilience" of Pinterest's business and the "durability" of its revenue growth were false and misleading for the reasons listed below.

Additionally, Donnelly's statement claiming a "constructive environment" surrounding "tariff-related and broad market uncertainty" was false and misleading and constitutes a material omission as it failed to disclose that:

(a) According to former employees, specifically FE-5 and FE-1, retailers—the cohort from which Pinterest derived the overwhelming majority of its revenue—began reducing advertising spend in approximately Q1 2025, coinciding with the introduction of tariffs, and the reduction in spend among Pinterest's top five advertisers was "widely known" among Pinterest's sales personnel. *Supra* ¶88. According to FE-1, Temu, previously one of Pinterest's largest advertising clients, reduced spend with Pinterest and characterized it as a significant pullback to very low levels of spending over a very short period. *Supra* ¶85. Indeed, it was an abrupt cut the sales team attributed directly to tariffs. *See also supra* ¶87 (FE-5 explaining, among other things, that Pinterest was an "easy target" for advertisers to reduce spending with because it did not provide the same value as other platforms such as Google, TikTok, and Meta).

(b) According to FE-12, as soon as the tariffs were announced in early 2025, he began to hear from advertisers about pulling back their ad spending, and recalled that advertisers specifically said they were reducing their advertising spending because of the tariffs. FE-12 described how a co-worker brought up those concerns at an early-2025 meeting attended by Pinterest executives and were "brushed off," with executives comparing tariffs to the COVID-19 pandemic and stating they were not concerned. *Supra* ¶¶115, 117.

(c) According to former employees, specifically FE-6, Pinterest circulated internal reports on tariffs and their impact on advertiser spending, prepared by a specialized task force within the sales organization dedicated to monitoring tariff-related issues. *Supra* ¶101. Former employees also reported receiving directives on how to handle advertisers seeking to reduce spend because of tariffs. *See supra* ¶¶92, 111.

(d) According to FE-11, tariffs were a "very big conversation" at the Company (*supra* ¶110) and, according to FE-10, "everyone knew the tariffs were affecting business." *Supra* ¶108.

273. Later in the call, Doug Anmuth, an analyst with JPMorgan, asked Defendants "about Performance+ adoption." Defendant Ready responded that "***We're really pleased with what we're seeing on the rollout of Performance+***. So, we've seen notable early adoption from mid-market advertisers. Since the end of last year, the percentage of lower funnel revenue flowing through Pinterest Performance+ campaigns has more than doubled. ***And so, we've consistently talked about how we see that as a multi-quarter, multi-year cycle, but we feel really good about the adoption and the performance there***. And we're continuing to bring the best offerings for bidding, targeting, budgeting, and creative to advertisers."

274. Defendant Ready's statement touting Pinterest's "rollout of Performance+" was false and misleading when made. At this point, as explained by former employees of Pinterest and Accenture, Pinterest was not seeing the value of Performance+ internally:

(a) Pinterest had built AI into its advertising platform in October 2024 and, in a rush to reach market ahead of competitors, had carelessly rolled out a "sloppy" product, with salespeople selling a product they knew very little about. For example, FE-14 states that he began seeing a decline in his sales and in user engagement in February 2025—the same month this statement was made. FE-14 also explained that the decline was connected to the AI-related features and led to advertisers going elsewhere because AI was growing and becoming available on other platforms. *See supra* ¶143; *see also supra* Section IV.D.2.

(b) According to FE-15, Pinterest rolled out Performance+ in approximately early 2025 and "a lot" of clients were not happy with it. FE-15 explained that there were drops in return on investment for advertisers when comparing Performance+ campaigns to campaigns run previously without it. FE-15 added that lack of return on investment was the primary theme amongst advertisers and "a lot" were moving to competitors as a result.

(c) Within Pinterest's Food vertical, at the beginning of 2025, the use of Performance+ was being pushed by the Company and for the Food segment this was stopped very quickly in the first half of 2025 as the Company was not happy with the performance of these campaigns, as described by FE-4. *Supra* ¶147.

(d) As described by FE-7, Pinterest's AI offerings were internally referred to as "AI slop," and Performance+ campaigns removed customization options and was a "set it and forget it" campaign, and was "not good at all." *Supra* ¶144.

275. Several analysts parroted Defendant Ready and Donnelly's comments about "driving significant lower funnel performance." On August 8, 2025, J.P. Morgan recited that "PINS has effectively diversified into a full-funnel advertising platform & is capturing a greater share of ad spending among the next tranche of advertisers ($1B-$30B in sales)," while RBC stated, "[t]he era of value capture seems increasingly upon us." In response to comments about "taking share," TD stated in its investment thesis: "we expect Pinterest to be a share gainer in the global digital ad market as we forecast rev to grow from $4.2BN in '25E to $7.8BN in '30E." Barclays remarked that "PINS is doing a solid job of growing faster than the digital ad industry."

276. Later in the call, Brian Nowak, an analyst with Morgan Stanley, asked Defendants about Pinterest's "forward advertising growth," and whether there are "constraint[s]" to how much Pinterest can accelerate "ad revenue" growth. Defendant Ready responded:

> ***We've really turned the platform into a performance advertising platform over the last few years and have increasingly broken into those always-on performance budgets, really taking share***, growing above the rate of the market overall. ***And we have continued to consistently deliver on that very much in line with the expectations we set at our Investor Day***, delivering above the high end of our guidance range.
>
> ***And so, we feel really good about the way that we're delivering there. And we don't see any structural limitations to that***. ***We're a small player in the market, but we're*** a small player in the market that's growing faster than the market and ***increasingly relevant in more use cases with more advertisers as we work our way from the largest advertisers down to sort of the mid-market on down***. And I think there's a lot of room for growth ahead.

277. Defendant Ready's above statement touting (1) Pinterest as a "performance advertising platform" that is breaking into advertiser budgets, "taking share," and becoming "increasingly relevant" to advertisers; (2) that Pinterest was delivering the growth expectations the Company set at its 2023 Investor Day; and (3) that the Company isn't seeing any structural limitations to its growth were false and misleading when made. Directly contradicting each of these statements was the fact that Pinterest was seeing advertisers consistently pull back ad spend on its

platform because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

278. Analysts also recited Defendants' statements regarding Performance+ and mid-market adoption. Barclays wrote: "Performance+ is driving a doubling of ad revenue among mid-sized and smaller accounts," while J.P. Morgan credited "The percentage of lower funnel revenue flowing through Performance+ Campaigns has more than doubled since the end of 2024, w/particular strength from mid-sized enterprises." Bank of America similarly remarked that "Pinterest's AI enhancements (such as ROAS bidding) are still in the early stages, with significant potential to grow shopping usage, improve ad platform efficiency, and boost monetization over a multi-year period" and Raymond James remarked "The percentage of lower-funnel revenue flowing through Performance+ has more than doubled since launch with early adoption from mid-market advertisers."

279. In response, the market largely maintained or raised their price targets, reflecting continued reliance on Defendants' representations. For example, Wolfe Research raised its price target from $40 to $43; Bank of America raised its price target from $41 to $44; HSBC raised its target from $38 to $44.30; TD raised its target from $43 to $44; and Rosenblatt raised its target from $48 to $49, while other analysts like Evercore, Goldman Sachs, RBC Capital, and Deutsche Bank maintained their ratings.

### H. Goldman Sachs' Communacopia + Technology Conference (September 9, 2025)

280. On September 9, 2025, analyst Eric Sheridan interviewed Defendant Ready during the Goldman Sachs' Communacopia + Technology Conference. During the interview, Sheridan asked Ready about the advertising environment: "Switching to the advertising environment. What are the key messages you guys are receiving as a company broadly from advertisers about the

operating environment today? And how is Pinterest's role in that environment, whether measured by brand spend or performance marketing spend, continuing to evolve?"

281. Defendant Ready responded by touting Pinterest's AI-based products: "***We're able to drive performance increasingly through AI-enabled tools like Pinterest Performance+ that's making it so that we cut their campaign creation time in half, make it easier for them to come on board, those things are working well***."

282. Defendant Ready's statements touting Pinterest's AI tools were false and misleading when made because:

(a) Pinterest had built AI into its advertising platform in October 2024 and, in a rush to reach market ahead of competitors, had carelessly rolled out a "sloppy" product, with salespeople selling a product they knew very little about. For example, FE-14 states that he began seeing a decline in his sales and in user engagement in February 2025—the same month this statement was made. FE-14 also explained that the decline was connected to the AI-related features and led to advertisers going elsewhere because AI was growing and becoming available on other platforms. *See supra* ¶143; *see also supra* Section IV.D.2.

(b) According to FE-15, Pinterest rolled out Performance+ in approximately early 2025 and "a lot" of clients were not happy with it. FE-15 explained that there were drops in return on investment for advertisers when comparing Performance+ campaigns to campaigns run previously without it. FE-15 added that lack of return on investment was the primary theme amongst advertisers and "a lot" were moving to competitors as a result.

(c) Within Pinterest's Food vertical, at the beginning of 2025, the use of Performance+ was being pushed by the Company and for the Food segment this was stopped very quickly in the first half of 2025 as the Company was not happy with the performance of these campaigns, as described by FE-4. *Supra* ¶147.

(d) As described by FE-7, Pinterest's AI offerings were internally referred to as "AI slop," and Performance+ campaigns removed customization options and was a "set it and forget it" campaign, and was "not good at all." *Supra* ¶144.

283. Also in response to Sheridan's question about the advertising environment, Defendant Ready championed Pinterest's supposed success even in the face of "peak tariff uncertainty":

> And then I think some of what was embedded in your question also was just you talked about the operating environment, sort of the macro and those things. And my comments here will be very consistent with what Julia and I talked about on our most recent earnings call, which is, ***I think, the macro, particularly for advertising is more constructive than it was at sort of peak tariff uncertainty***… And I think one of the things that we've continued to demonstrate back to that consistent mid- to high teens growth is that we laid out at our Investor Day multiple ways to win. ***And so when we did face a bit of tariff uncertainty last quarter, you saw us play through that, I think, quite well coming in ahead of top of our guidance ahead of expectations or at least the analyst expectations anyway it doesn't mean everybody's expectations***. ***And a big part of that was because we have multiple levers there, where even with a little bit of pressure in the US from tariffs, we saw advertisers redistributing spend to international and international really picking up steam for us***.

284. Here, Defendant Ready attempted to downplay the true extent of the impact of tariffs on Pinterest's business. Defendant Ready's statement about the "constructive" nature of advertisers during tariffs was false and misleading when made for the reasons listed below. Additionally, his statement also constitutes a material omission as it failed to disclose:

285. However, in speaking on "tariff uncertainty," Defendant Ready failed to disclose that:

(a) According to former employees, specifically FE-5 and FE-1, retailers—the cohort from which Pinterest derived the overwhelming majority of its revenue—began reducing advertising spend in approximately Q1 2025, coinciding with the introduction of tariffs, and the reduction in spend among Pinterest's top five advertisers was "widely known" among Pinterest's sales personnel. *Supra* ¶88. According to FE-1, Temu, previously one of Pinterest's largest advertising clients, reduced spend with Pinterest and characterized it as a significant pullback to very low levels of spending over a very short period. *Supra* ¶85. Indeed, it was an abrupt cut the sales team attributed directly to tariffs. *See also supra* ¶87 (FE-5 explaining, among other things, that Pinterest was an "easy target" for advertisers to reduce spending with because it did not provide the same value as other platforms such as Google, TikTok, and Meta).

(b) According to FE-12, as soon as the tariffs were announced in early 2025, he began to hear from advertisers about pulling back their ad spending, and recalled that advertisers specifically said they were reducing their advertising spending because of the tariffs. FE-12 described how a co-worker brought up those concerns at an early-2025 meeting attended by Pinterest executives and were "brushed off," with executives comparing tariffs to the COVID-19 pandemic and stating they were not concerned. *Supra* ¶¶115, 117.

(c) According to former employees, specifically FE-6, Pinterest circulated internal reports on tariffs and their impact on advertiser spending, prepared by a specialized task force within the sales organization dedicated to monitoring tariff-related issues. *Supra* ¶101. Former employees also reported receiving directives on how to handle advertisers seeking to reduce spend because of tariffs. *See supra* ¶¶92, 111.

(d) According to FE-11, tariffs were a "very big conversation" at the Company (*supra* ¶110) and, according to FE-10, "everyone knew the tariffs were affecting business." *Supra* ¶108.

286. In the Goldman Sachs Conference Takeaway report issued that same day analysts directly recited Defendant Ready's statements, writing that "Pinterest is seeing early success around Performance+, its AI-driven ad automation product" and that despite the macro environment and tariffs, Pinterest "is creating more operating durability absent different macro environments."

### I. Pinterest Press Release (November 4, 2025)

287. On November 4, 2025, Pinterest published a press release titled, "Pinterest Announces Third Quarter 2025 Results, Delivers 17% Revenue Growth and Record Users." The press release quoted Defendant Ready as saying: "Our investments in AI and product innovation are paying off. We've become a leader in visual search and have effectively turned our platform into an AI-powered shopping assistant for 600 million consumers. In turn, ***global advertisers are increasingly counting on Pinterest as a go-to search platform to reach their customers and drive sales***."

288. Defendant Ready's claim that "global advertisers are increasingly counting on Pinterest" runs counter to the reality that, throughout the Class Period, and at the time this statement was made, Pinterest's advertisers were steadily reducing its ad spend with the Company and even outright canceling campaigns because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

289. Analysts parroted the theme that due to AI, global advertisers were "increasingly counting on Pinterest." On November 5, 2025, BofA Global Research recited that Pinterest was "growing advertiser traction" while Goldman Sachs commented that "Performance+ continues to gain adoption."

**J. Q3 2025 Earnings Call (November 4, 2025)**

290. Also on November 4, 2025, after the market closed, Pinterest held its Q3 2025 earnings call. During the earnings call, Defendant Ready told investors: "***In an evolving competitive environment, Pinterest continues to distinguish itself as a destination for our users and a vital partner for our advertisers.***"

291. Defendant Ready's statement championing Pinterest as a "vital partner for our advertisers" in an "evolving competitive environment" was false and misleading when made. Instead, advertisers were abandoning the platform for its competitors and withdrawing their advertising spend because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

292. Later in the call, analyst Sheridan with Goldman Sachs asked about the broader ad environment:

> Q: Thanks so much for taking the question. Maybe building on that answer, just Bill, can you characterize more broadly the digital ad environment that you find yourself operating in, representing Q3 and what you just reported and sort of the building blocks of Q4? And Julia gave some really good color there with respect to UCAN. Can you characterize what you're seeing in UCAN relative to the rest of your operations globally against that broader ad environment? Thanks so much.
>
> A(Ready): ***[I]t's also important to note that we grew 17% despite operating in an environment where some of our largest retailers in UCAN pulled back spend across the industry, not specific to us, but pulled pullback across the industry as they navigated tariff-related margin pressure***. And we think that's disproportionately impacting large retailers. But that is a segment that we have more exposure to than other platforms given our focus on shopping, though ***we continue to grow in other verticals and segments of the market in addition to those***.

293. Defendant Ready's statement that advertiser pullback was "not specific to us" was false and misleading when made because, as former employees confirm, advertisers were cutting ad spend on Pinterest's platform not just because of tariffs but because the Company failed to demonstrate sufficient value and return to justify continued advertising spend, making Pinterest an increasingly difficult platform for advertisers to prioritize, especially during a time when budgets were already under pressure. Indeed, as FE-5 explained, Pinterest was an "easy target" for advertisers to reduce spending with because it did not provide the same value as other platforms such as Google, TikTok, and Meta. In sum, advertisers were pulling back ad spend because Pinterest failed to deliver sufficient value compared with competing platforms (*see supra* Section IV.D.2); its inferior AI products undermined advertiser performance and failed to retain budgets (*see id.*); and tariffs placed additional pressure on Pinterest's concentrated retail and CPG base, all of which caused Pinterest's advertisers to cut back significantly on ad spend (*see supra* Section IV.D.1).

294. Additionally, while Defendant Ready touted Pinterest's growth, he failed to disclose the full extent of tariff headwinds that was actively causing Pinterest's growth to decelerate. Specifically, Defendant Ready failed to disclose:

(a) According to former employees, specifically FE-5 and FE-1, retailers—the cohort from which Pinterest derived the overwhelming majority of its revenue—began reducing advertising spend in approximately Q1 2025, coinciding with the introduction of tariffs, and the

reduction in spend among Pinterest's top five advertisers was "widely known" among Pinterest's sales personnel. *Supra* ¶88. According to FE-1, Temu, previously one of Pinterest's largest advertising clients, reduced spend with Pinterest and characterized it as a significant pullback to very low levels of spending over a very short period. *Supra* ¶85. Indeed, it was an abrupt cut the sales team attributed directly to tariffs. *See also supra* ¶87 (FE-5 explaining, among other things, that Pinterest was an "easy target" for advertisers to reduce spending with because it did not provide the same value as other platforms such as Google, TikTok, and Meta).

(b) According to FE-12, as soon as the tariffs were announced in early 2025, he began to hear from advertisers about pulling back their ad spending, and recalled that advertisers specifically said they were reducing their advertising spending because of the tariffs. FE-12 described how a co-worker brought up those concerns at an early-2025 meeting attended by Pinterest executives and were "brushed off," with executives comparing tariffs to the COVID-19 pandemic and stating they were not concerned. *Supra* ¶¶115, 117.

(c) According to former employees, specifically FE-6, Pinterest circulated internal reports on tariffs and their impact on advertiser spending, prepared by a specialized task force within the sales organization dedicated to monitoring tariff-related issues. *Supra* ¶101. Former employees also reported receiving directives on how to handle advertisers seeking to reduce spend because of tariffs. *See supra* ¶¶92, 111.

(d) According to FE-11, tariffs were a "very big conversation" at the Company (*supra* ¶110) and, according to FE-10, "everyone knew the tariffs were affecting business." *Supra* ¶108.

295. Later in the call, analyst Mark Kelley with Stifel asked Defendants about customer concentration and Performance+:

> Great. Thanks very much for taking my questions. Bill, I appreciate the extra caller on Performance+ tonight. I was hoping maybe we could drill into the SMB and kind of mid-market opportunity just a little bit more. I know you threw out that stat, the 24% higher conversion rate, is that pretty like standard whether you're a smaller advertiser versus a more sophisticated and larger brand? And a second maybe just to clarify, that 10% to 15% of revenue running through P+, was that just an SMB and mid-market stat and where might that go over time? Thank you.

> A (Ready): ***The expansion into the full catalog with the largest retailers driven by more granular bidding, like ROAS bidding from Performance+. And so, we've got good results with that.*** We're just a couple of quarters in. A lot more to do there that can get us deeper into the catalogs of largest retailers. ***And then, secondly, it's mid-market and SMB driven by Performance+.*** We're just getting started in that segment of the market, but ***seeing really good, promising early results***.

296. Defendant Ready's statements touting "really good, promising early results" for Performance+ were demonstrably false when made. Instead of seeing "good results," former employees explain that:

(a) Pinterest had built AI into its advertising platform in October 2024 and, in a rush to reach market ahead of competitors, had carelessly rolled out a "sloppy" product, with salespeople selling a product they knew very little about. For example, FE-14 states that he began seeing a decline in his sales and in user engagement in February 2025—the same month this statement was made. FE-14 also explained that the decline was connected to the AI-related features and led to advertisers going elsewhere because AI was growing and becoming available on other platforms. *See supra* ¶143; *see generally supra* Section IV.D.2.

(b) According to FE-15, Pinterest rolled out Performance+ in approximately early 2025 and "a lot" of clients were not happy with it. FE-15 explained that there were drops in return on investment for advertisers when comparing Performance+ campaigns to campaigns run previously without it. FE-15 added that lack of return on investment was the primary theme amongst advertisers and "a lot" were moving to competitors as a result.

(c) Within Pinterest's Food vertical, at the beginning of 2025, the use of Performance+ was being pushed by the Company and for the Food segment this was stopped very quickly in the first half of 2025 as the Company was not happy with the performance of these campaigns, as described by FE-4. *Supra* ¶147.

(d) As described by FE-7, Pinterest's AI offerings were internally referred to as "AI slop," and Performance+ campaigns removed customization options and was a "set it and forget it" campaign, and was "not good at all." *Supra* ¶144.

297. Contemporaneous analyst reports confirm that Pinterest partially revealed the truth regarding Pinterest's actual demand, AI capabilities, and ability to withstand tariffs. Accordingly, following the Q3 2025 Earnings Call, there was a broad wave of price target reductions across analyst firms. For example, Goldman Sachs reduced its price target from $43 to $36; Deutsche Bank reduced its target from $42 to $36; BofA Global Research reduced its target from $44 to $39; and Citi reduced its target from $50 to $38. Yet, Pinterest's strongly-worded denial of serious impact prevented the market from fully digesting the truth, so that these firms, and many others, retained a "BUY" rating and continued to parrot Defendants' misleading statements about the expansion of wallet share and success of Performance+. On November 5, 2025, Morgan Stanley directly quoted Defendant Ready's statements that Pinterest has "broken into performance budgets, including achieving 5% to 10% share of total ad spend for some of the world's largest, most sophisticated advertisers." In response to Defendant Ready's statement "***[t]hrough continued product innovation, we see meaningful runway to expand our share of wallet,"*** on November 5, 2025, Mizuho paraphrased that "Product and ad innovation are rampant. Performance+ is driving increasing spend from adopters."

298. On tariff impact, Bank of America reflected Defendant Ready's statements regarding withstanding the tariff storm, such that "3Q US revenue growth at 9% was a disappointment in the quarter, reflecting tariff related ad cuts by large-retailers, and Pinterest's higher vertical concentration," yet this only amounted to "near-term revenue drag, but underlying usage intact." Deutsche Bank similarly remarked on November 5, 2025, that "despite these near-term headwinds, we believe investor concerns are overblown given Pinterest's demonstrable progress in driving advertiser performance and deepening commercial intent."

**K. Pinterest's False And Misleading Risk Factor Disclosures**

299. Pinterest issued the same materially false and misleading risk factor in the three Class Period quarterly SEC filings: (a) Form 10-Q filed May 8, 2025 (for the fiscal quarter ended March 31, 2025); (b) Form 10-Q filed August 7, 2025 (for the fiscal quarter ended June 30, 2025); and (c) Form 10-Q filed November 4, 2025 (for the fiscal quarter ended September 30, 2025).

300. In each of these filings, beneath a heading titled "***Risks Related to Our Business Strategy and Growth***," Pinterest warned investors of the following risks:

> ***We generate substantially all of our revenue from advertising. The failure to attract new advertisers, the loss of advertisers or a reduction in how much they spend could harm our business, revenue and financial results***. Substantially all of our revenue is generated from third-party advertising. However, we may not be able to continue to grow and scale this revenue model. Our growth strategy depends on, among other things, attracting more advertisers (including expanding our sales efforts to reach advertisers in international markets), retaining and scaling our business with existing advertisers and expanding our advertising product offerings.
>
> As is common in our industry, most of our advertisers do not have long-term advertising commitments with us. Many of our advertisers spend a relatively small portion of their overall advertising budget with us. To increase the number of advertisers and increase the portion of the advertising budget that our existing advertisers spend with us, we must invest in new tools and technology and/or expand our sales force, and there can be no assurance that those efforts will be successful. The insights on user behavior we provide to advertisers ***may not yield effective results for the advertisers and as a result, they may reduce or stop their spend on our platform***. In addition, unless we improve existing and develop new measurement tools that better showcase our platform's effectiveness, some advertisers may view our products or platform as experimental and may devote less advertising spend on our platform. In addition, many advertisers do not have advertising creative content in a format that would be successful on our platform and may be unable or unwilling to devote the technical or financial resources required to develop content for our platform. Further, we may not always be able to develop tools that effectively and efficiently meet the needs of advertisers. Advertisers will not do business with us if they do not believe that advertisements on our platform are effective in meeting their campaign goals, if we cannot measure the effectiveness of our advertising products or if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives.
>
> A substantial portion of our revenue is derived from a small number of advertisers and is currently concentrated in certain verticals, particularly CPG and retail. We either contract directly with advertisers or with advertising agencies on behalf of advertisers, many of which are owned by large media corporations that exercise varying degrees of control over the agencies. Our business, revenue and financial results could be harmed by the loss of, or a deterioration in our relationship with, any of our largest advertisers or with any advertising agencies or the large media corporations that control them.
>
> […]
>
> Our advertising revenue ***could be harmed*** by many other factors, including, but not limited to:
>
> […]
>
> - the macroeconomic conditions and the status of the advertising industry, such as fear of recession, inflation, the impact of tariffs and related

> retaliatory actions and other trade protection measures, supply chain issues and inventory and labor shortages, which could cause businesses to spend less on advertising and/or direct their advertising spend to larger companies that offer more traditional and widely accepted advertising products;

> […]

> These and other factors could reduce the amount that advertisers spend on our platform, or cause advertisers to stop advertising with us altogether.

301. In these risk disclosure statements, Pinterest represented to investors that each of the following conditions remained a contingent future possibility rather than a present reality:

(a) that Pinterest "***may not be able to continue to grow and scale this revenue model***";

(b) that ***"[t]he insights on user behavior we provide to advertisers may not yield effective results for the advertisers and as a result, they may reduce or stop their spend on our platform***";

(c) that, because "***most of our advertisers do not have long-term advertising commitments with us***," advertisers were free to curtail spend;

(d) that "***some advertisers may view our products or platform as experimental and may devote less advertising spend on our platform***";

(e) that, although "[a] substantial portion of our revenue is derived from a small number of advertisers and is currently concentrated in certain verticals, particularly CPG and retail," Pinterest's "***business, revenue and financial results could be harmed by the loss of, or a deterioration in our relationship with, any of our largest advertisers***"; and

(f) that Pinterest's "advertising revenue *could be harmed* by" "the macroeconomic conditions and the status of the advertising industry… the impact of tariffs and related retaliatory actions and other trade protection measures … which could cause businesses to spend less on advertising and/or direct their advertising spend to larger companies that offer more traditional and widely accepted advertising products."

302. Each of these disclosures was framed in the conditional and prospective—"may," "could," "there can be no assurance"—and each represented to investors that the risk described had not yet come to pass.

303. Critically, Defendants did not merely make these conditional representations once. The Company re-published them, in materially identical form, in each of three consecutive periodic filings spanning more than six months of the Class Period. The operative language—that advertiser insights "may not yield effective results for the advertisers and[,] as a result, they may reduce or stop their spend on our platform"; that "some advertisers may view our products or platform as experimental and may devote less advertising spend on our platform"; that Pinterest's results "could be harmed by the loss of, or a deterioration in our relationship with, any of our largest advertisers"; and that Pinterest's "advertising revenue could be harmed by" "the impact of tariffs"—appears verbatim or near-verbatim in each of the May 8, August 7, and November 4, 2025 Forms 10-Q.

304. Because Pinterest set out its risk factors in full in each quarterly report rather than incorporating them by reference, each filing constituted a fresh, affirmative representation to investors that the enumerated risks remained prospective contingencies as of that filing date. Each such representation is independently actionable.

305. That repetition is not a neutral artifact of routine disclosure practice. Pinterest had three separate opportunities to conform its risk disclosures to the reality its internal systems were tracking in real time, and it failed to take any of them. With each successive filing, the gap between Pinterest's static disclosure and its actual condition widened, and the disclosure became correspondingly more misleading.

306. Those representations were false and misleading when made on May 8, 2025, August 7, 2025, and November 4, 2025, because on each of those dates, the warned-of risks were not contingent possibilities. They had already materialized, and Pinterest's largest advertisers had already begun reducing spend on the platform.

307. FE-14, a Partner Manager employed through Accenture who worked as a contractor for Pinterest from December 2023 until April 2025 and who managed an established book of United States business, states that he *began seeing a decline in his sales and in user engagement in February 2025*—the very month the Form 10-K was filed and the Class Period began. FE-14 attributed that decline to Pinterest's AI-related features and to advertisers going elsewhere because comparable AI capabilities were becoming available on competing platforms. *Supra* ¶143. FE-14 further recounts that, during this same period, selling advertising became measurably more difficult, inbound leads declined, lower-funnel demand as measured by closed deals was low, and customers ultimately went to a competitor. *Supra* ¶143.

308. FE-5, a senior member of the sales team responsible for a selection of advertisers that were responsible for millions of dollars in revenue, confirms that the pullback was under way in the same period and was not confined to any single account or vertical. According to FE-5, retailers began reducing advertising spend in approximately the first quarter of 2025, coinciding with the introduction of tariffs, with Temu particularly affected. *Supra* ¶87. FE-5 further states that reductions in spend extended beyond his own cohort and that the reduction in spend among Pinterest's top five advertisers—the very "small number of advertisers" from which the Form 10-K acknowledged Pinterest derived "[a] substantial portion of our revenue"—was "widely known" among Pinterest's sales personnel. *Supra* ¶88. FE-5 identifies Pinterest's top five advertisers as concentrated entirely in the retail sector, including Temu, Amazon, Walmart, and Target. *Supra* ¶50.

309. These FE accounts are corroborated by the tariff timeline itself. The Executive Orders imposing a 25% tariff on imports from Canada and Mexico and a 10% tariff on all goods from China took effect on February 4, 2025—two days before the Form 10-K was filed—and CPG advertisers had already begun curtailing advertising spend both in anticipation of and in the wake of those measures. *See* Section IV.D.1. Additional FE accounts confirm that advertisers began reducing spend as soon as the tariffs were announced in early 2025. *Supra* ¶115.

310. Accordingly, at the moment Pinterest told investors that advertisers "may reduce or stop their spend," that advertisers "may view our products or platform as experimental," and that Pinterest's results "could be harmed by the loss of, or a deterioration in our relationship with, any of our largest advertisers," advertisers—including advertisers within Pinterest's top five accounts—were *already* reducing spend, *were* already treating the platform as failing to deliver measurable return, and *had* already begun reallocating budgets to Meta, Google, TikTok, and YouTube. *See* Section IV.D.2.

311. Defendants knew, or were severely reckless in not knowing, that the risks disclosed in the conditional had already materialized as of each filing date, and that the extent of their materialization grew more pronounced with each successive quarter.

312. First, Defendants have admitted that they were in direct and recurring communication with the most senior executives of Pinterest's largest advertisers about those advertisers' spend: Defendant Ready has stated that he had "countless discussions . . . directly with the CEOs and CMOs of our top advertisers," and Defendant Donnelly has stated that Pinterest's revenue outlook reflected "what we are hearing from our advertising partners directly about their spend expectations." *Infra* ¶¶320-21.

313. Second, the internal reporting structure carried advertiser-spend information directly to Defendant Ready: FE-7 explains that teams were arranged into "pods" for the various advertiser groups, that pod managers determined each account's expected spend based on their conversations with advertisers and brought those figures to leadership, and that Defendant Ready himself set the annual revenue target and determined how it was allocated among the pods. *Supra* ¶¶150–51.

314. Third, by the time of the statement, Pinterest was already operating in the recurring "code red war rooms" convened to close revenue gaps—meetings that, according to FE-1, consumed approximately two of every three months of each quarter beginning in approximately October 2024, occurred often daily, involved the Chief Technology Officer and Chief Revenue Officer, and generated spreadsheets, slide decks, agendas, and notes accessible to Pinterest's VP-

level executives. *See Supra* ¶¶155–59. The particularized allegations establishing Defendants' knowledge are set forth in Sections IV and VI and are incorporated here by reference.

315. A risk disclosure is materially misleading where the issuer warns that a risk "could" or "may" occur when the risk has already come to pass. Pinterest did not merely fail to predict a downturn; it described as hypothetical a deterioration in its relationships with its largest advertisers that was already occurring and simultaneously represented that no material change in its risk profile had taken place. Once a risk is known to a company, a statement that no material changes have occurred is misleading.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

316. At all relevant times, Defendants acted with scienter. The facts alleged herein support that the Individual Defendants either had actual knowledge of the truthful facts that they omitted to disclose and which contradicted their false or misleading statements or acted with reckless disregard for the truth or falsity of those statements and omissions. Pinterest has the scienter of its management-level employees, including both of the Individual Defendants.

### A. Defendants Knew Advertisers Were Pulling Back Ad Spend And Pinterest's Growth Was Decelerating

317. Numerous allegations set forth above and below give rise to the strong inference that, at all relevant times, the Defendants had knowledge of or were reckless in disregarding information that showed its advertising clients were pulling back their ad spend with the Company. Specifically, Defendants knew that: (1) Pinterest experienced a sharp pullback in client advertising spend in response to tariffs; (2) the Company's advertising offerings, including its AI-driven products, failed to deliver the lower-funnel capabilities needed to drive durable advertising spend and to retain customers.

#### 1. Defendants Knew, Or Had Access To Information, Contradicting Their Statements About Tariff Resiliency

318. Defendants knew that the tariffs would result in significant ad spend pull-back by its clients, yet continuously misrepresented and downplayed this reality. Defendants' knowledge

is evidenced by: (1) Defendants' own statements describing their interactions with their advertising clients about tariffs; (2) the accounts of numerous FEs corroborating that Defendants were on notice about the impact of tariffs; (3) Defendants' access to and awareness of reports and information about the impact of tariffs on advertiser spend; (4) tariffs were so pervasive that Pinterest had directives for how employees should handle discussing them; and (5) analysts' frequent interest in and questions about tariffs. This strongly supports an inference of scienter, and that Defendant Pinterest and the Individual Defendants had actual knowledge of—or were severely reckless in not knowing—that the impact of tariffs, which precipitated a material reduction of advertising spend that undermined Pinterest's growth narrative.

**a. Defendants Spoke Directly To Their Advertisers**

319. Throughout the Class Period, Defendants Ready and Donnelly repeatedly emphasized their direct, personal communications with Pinterest's advertising clients—including regular engagement with C-suite executives at major advertisers. Given the depth and frequency of these communications, Defendants were uniquely positioned to know that tariffs were materially impacting their clients' businesses and that, as a direct consequence, those clients were curtailing their advertising spend on Pinterest's platform.

320. During the Q1 2025 earnings call, held on May 8, 2025, Defendant Donnelly told investors that Pinterest's second-quarter revenue outlook was shaped not merely by observed trends, but by "***what we are hearing from our advertising partners directly*** about their spend expectations for the remainder of the quarter as of today." Donnelly's deliberate use of the word "directly" demonstrated that Donnelly herself received first-hand information from advertisers about their advertising spend.

321. Further, on the Q2 2025 earnings call held on August 7, 2025, Defendant Ready stated that, "[t]hrough ***countless discussions that I have had directly with the CEOs and CMOs of our top advertisers***, I am more convinced than ever that Pinterest is offering unique value as a platform within the ads ecosystem." As such, Defendant Ready personally met with the most senior

executives at Pinterest's largest advertising clients, meaning that he was necessarily privy to the tariff-driven ad spend reduction that these executives were confronting in real time.

322. On that same call, Defendant Donnelly made it clear that she was discussing tariffs with advertisers: "***[A]s we talk to advertisers about Q3***, we do hear that some of that tariff-related and broader market uncertainty has continued into how they're thinking about spend for Q3, though this varies by advertiser." Yet in the same breath, Donnelly sought to downplay the severity of what Defendants were hearing from advertisers, reassuring investors that "it's definitely a relatively more constructive environment than feared." Here, Donnelly acknowledged that Pinterest's own advertising partners were telling Pinterest that tariff uncertainty was causing them to rethink and reduce their advertising expenditures. However, rather than candidly disclosing the scope and gravity of this pullback, Donnelly chose to minimize it.

323. Taken together, these statements establish that Defendants were active participants in ongoing, high-level dialogues with the advertisers whose spending decisions would negatively impact Pinterest's revenue and financial performance. As such, Defendants were either aware, or severely reckless in not knowing, of the falsity of their statements.

#### b. FEs Confirmed That Information About The Substantial Negative Impact Of Tariffs On Advertiser Spend Was Reported To Leadership

324. Additionally, former employees provide consistent and compelling accounts demonstrating that Defendants knew how the tariffs that were enacted leading up to and during the Class Period affected advertiser spend. Their accounts trace a clear progression: advertisers attributed reductions in spending to tariffs; Pinterest monitored and discussed those reductions internally; and information concerning the resulting decline in advertiser spend reached management and senior leadership.

325. The adverse impact became apparent as soon as the tariffs were announced. For example, according to FE-12, as soon as the tariffs were announced in early 2025, he began to hear from advertisers about pulling back their ad spending. FE-12 recalled that the advertisers specifically said they were reducing their advertising spending because of the tariffs. He recalled

giving feedback to Pinterest through his direct report at Accenture about this being an issue, but according to FE-12, it was not taken seriously. He also recalled attending a meeting in early 2025 where a co-worker brought up concerns about the tariffs impacting advertiser spend. According to FE-12, the concern was "brushed off" and Pinterest executives tried to downplay the potential impact. FE-12 recalled that Heather Haney was in attendance along with other executives from Pinterest.

326. FE-6 recalled that advertisers often expressed concerns about tariffs, and many reduced advertising budgets because of tariff-related business conditions. FE-6 stated that Pinterest regularly circulated internal reports on tariffs discussing their impact on advertiser spending and the broader business environment. The adverse effects of tariffs were so significant to Defendants that they even created a specialized task force to address the issue. Indeed, FE-6 believed these reports were prepared by a specialized task force within the sales organization dedicated to monitoring tariff-related issues.

327. FE-10 noted that he heard information about tariffs around the office that "trickled down from the top." He further explained that Pinterest executives would meet and discuss the issues. According to FE-10, "everyone knew the tariffs were affecting business."

328. Regarding tariffs, FE-7 explained he was aware of the impact for advertisers such as Samsung and Apple. FE-7 recalled that Bath & Body Works was another advertiser impacted by tariffs and through conversations with colleagues he learned that Sephora and Ulta were additionally impacted. FE-7 noted that essentially any company that sold a product with components from overseas was impacted by the tariffs. FE-7 recalled that this was then reported to leadership and increased emphasis was placed on tariffs when reasons for declining spend were discussed internally. FE-7 further explained that managers determined expected advertising spend by each account based on conversations with advertisers and brought that figure to leadership.

329. FE-13 explained that agencies and advertisers informed him that they were seeing better results elsewhere. FE-13 continued to say that this was brought up to leadership.

330. The decline in advertiser spending was the subject of meetings attended by senior Pinterest personnel with direct access to the C-Suite. According to FE-3, there was a decline in ad spending happening in 2025 because of the tariffs and the overall economy. FE-3 recalled having meetings about the decline in ad spending and according to FE-3, "management definitely knew" about the issue. FE-3 recalled Katie Porter, former Senior Industry Manager, US Enterprise, Travel and Jenny Callen, Managing Director, US Enterprise Sales, Travel being present during the meetings. According to FE-3, Callen reported directly to the C-Suite.

331. Taken together, these accounts show that the tariff-related decline in advertiser spending was repeatedly communicated within Pinterest through employee feedback, internal reports, and meetings, and in turn, shared with leadership. These facts demonstrate that Defendants were either aware, or severely reckless in not knowing, of the falsity of their statements.

**c. Reports, Reporting Platforms, And Meetings Addressed The Impact Of Tariffs**

332. Scienter is further evidenced by former employee accounts that Defendants took part in meetings where the impact of tariffs were discussed. As detailed below, these discussions occurred through regular company-wide meetings, escalating crisis-level war rooms, and a web of internal reporting tools—all of which ensured that Defendants had continuous, real-time visibility into the tariff headwinds confronting Pinterest's advertising business.

333. ***Quarterly And All-Hands Meetings***. Multiple former employees confirmed that the impact of tariffs was a recurring topic at significant internal meetings. FE-8 was employed by Pinterest from March 2021 through March 2024 as Product Designer I, Growth, and from March 2024 through December 2025 as Product Designer II, Growth. According to FE-8, the tariffs were discussed during quarterly meetings that all employees were required to attend. He recalled a meeting in Q1 or Q2 2025 led by CEO Bill Ready where tariffs were discussed.

334. FE-5 similarly recalled All Hands Meetings for Pinterest's sales personnel. FE-5 noted that these meetings occurred once or twice per quarter and there was a global version led by former Chief Revenue Officer Bill Watkins and a U.S. version led by VP, North America

Enterprise Sales Katie Hamill. FE-5 added that tariffs were discussed at both meetings given how important the U.S. market was to Pinterest.

335. FE-7 explained that he attended an All-Hands meeting approximately February or March 2026 in which a new leadership hire stated that it was "so concerning" that the Company's approximate top 10 advertisers were responsible for a disproportionate portion of the Company's advertising revenue, potentially as high as 90%.

336. FE-12 described a quarterly meeting in early 2025, where top performers were recognized for the quarter. According to FE-12, a co-worker brought up concerns about tariffs and advertisers pulling back. In his opinion, the concerns were dismissed and the directive was to "just go and do your job."

337. ***Code Red War Rooms***. Beyond standing quarterly meetings, the tariff crisis prompted an even more urgent internal response. FE-1 explained that: During his last nine to twelve months of employment (approximately October 2024 – October 2025) the company spent approximately two out of three months every quarter operating in what he described as "code red war rooms." FE-1 stated that these meetings became more and more dire and were looked at as a perpetual thing that never went away.

338. FE-1 further explained that these meetings often occurred daily and involved the Chief Technology Officer ("CTO") and Chief Revenue Officer("CRO"). FE-1 stated that related materials—including spreadsheets, slide decks, meeting agendas and notes—were created and maintained. He further stated that these materials were accessible to VP level executives and managers, including himself.

339. ***Reports and Reporting Programs***. By way of additional reports and reporting platforms, Defendants were made aware, or should have been aware, of the impact of tariffs and reduction in ad spend.

340. Chief among these was Pathmatics, a third-party platform that tracked where advertisers were spending their marketing budgets. According to FE-7, Pinterest wanted to know where these advertisers were spending their budgets and that was available through Pathmatics.

FE-7 recalled that when an account reduced or pulled spending that leadership reviewed the advertisers spending in Pathmatics. According to FE-7, the use of Pathmatics was a "big push" by leadership. To that end, RBC Capital issued a report on November 4, 2025, that highlighted data from third-party sources, such as Pathmatics, that suggested that larger retailers "meaningfully reduced ad spending since 'Liberation Day.'"

341. Internal tracking tools painted a similarly granular picture. FE-4 recalled that employees had access to a Google Doc which included employees in CPG and how close they were to goal. FE-4 explained that this document was available to employees. According to FE-4, beginning in early 2026 a document was made available to employees to see the performance across all verticals in North America.

342. FE-14 recalled that he used *Salesforce* to document his sales and had the same types of credentials that direct Pinterest hires had.

343. According to FE-13, internally Pinterest used Tableau as their database for insights and benchmarks to report to advertisers or prospective advertisers.

344. In sum, via meetings, reports, reporting programs, and internal communications attended by or accessible to Defendants, Defendants had access to information that directly contradicted their public statements, supporting a strong inference that Defendants were either aware, or severely reckless in not knowing, of the falsity of their statements. Defendants were informed of the impact of tariffs by—or should have had ample opportunity to review—the various programs and reports made available to them, including Pathmatics, Tableau, and widely circulated Google Docs, as well as meeting spreadsheets, slide decks, agendas, and notes.

#### d. Tariffs Were So Pervasive That Pinterest Had Directives For How Employees Should Handle Discussing Them

345. Based on Defendants' knowledge regarding the extreme impact that tariffs would have on advertiser spend, Pinterest took active steps to direct employees on how to deal with the issue. Former employees recall Pinterest circulating communications, presentation materials, and specific directives instructing sales personnel on how to handle advertiser conversations about

tariffs and how to push clients to maintain or increase their advertising spend despite tariff-driven budget pressures.

346. According to FE-11, he recalled a presentation deck being sent to all the employees by either Molly McLeod or Rob Turcic. FE-11 recalled the deck providing information about how to handle conversations with clients about the tariffs. FE-11 explained that while the information was sent by his managers at Accenture, all materials and directives came from Pinterest and was the same information that direct employees of Pinterest received.

347. FE-3 recalled having meetings about the decline in ad spending and according to FE-3, "management definitely knew" about the issue. FE-3 recalled Katie Porter, former Senior Industry Manager, US Enterprise, Travel and Jenny Callen, Managing Director, US Enterprise Sales, Travel being present during the meetings. According to FE-3, Callen reported directly to the C-Suite. FE-3 recalled directives from Porter about how to handle conversations with clients about ad spending and how to push clients to continue spending.

348. FE-8 recalled a directive from senior leadership to work on strategic projects to drive growth as a way to combat the impact of the tariffs.

349. Taken together, these accounts demonstrate that Pinterest's response to the tariff crisis was not passive—the Company actively managed its messaging and directives to sales employees in the face of known and significant tariff headwinds.

**e. Analysts' Frequent Interest In, And Questions About, The Impact Of Tariffs Meant That Defendants Were Informed**

350. Analysts frequently asked Defendants about the impact of tariffs on Pinterest's business. Given the frequency and importance of these questions, Defendants were prepared to, and did, answer questions on earnings and conference calls, misleading the market as to Pinterest's ability to withstand tariffs. As part of their preparation, Defendants were obligated to investigate the potential impact of tariffs and knew—or were severely reckless in not knowing—that, in fact, Pinterest relied heavily on a small cohort of large advertisers that reduced spend because of tariffs.

351. On March 6, 2025, during the Morgan Stanley TMT Conference, an unidentified analyst at Morgan Stanley asked Defendant Ready, "are there areas either from a micro execution perspective or from a macro perspective, whether it's trade tariffs, name your latest macro sources of uncertainty that are sort of behind where you thought they'd be or holding back growth." As demonstrated here, analysts regarded tariffs as a significant macroeconomic risk.

352. On the Q1 2025 earnings call held on May 8, 2025, Barclays analyst Ross Sandler asked: "[J]ust curious what you're seeing in the pipeline, and are any of the kind of high tariff exposed categories in retail and CPG showing any softness thus far? How do you see this playing out throughout the year?"

353. On the same call, TD Securities Analyst John Blackledge asked: "Just any further color on the broader macro volatility impacting ad spend, particularly with the more brand-oriented advertisers?"

354. On the Q3 2025 earnings call held on November 4, 2025, Citigroup analyst Ronald Josey asked Defendant Donnelly: "Julia, I think you mentioned some pockets to growth in UK and – given tariffs. Wondering if this continued or if things have normalized since then."

355. In preparing for repeated and expected questions from analysts about the impact of tariffs on advertiser spend and Pinterest's revenue, the Individual Defendants would have discovered—or would have been severely reckless in not discovering—that Pinterest's top advertisers, including at least one of Pinterest's largest advertisers, were significantly pulling ad spend in response to tariffs.

**2. Defendants Knew, Or Had Access To, Information Contradicting Their Statements About Their Lower-Funnel And AI-Driven Capabilities, And Resulting Advertiser Demand**

356. Defendants' lower-funnel and AI-driven capabilities repeatedly failed to deliver the performance that Defendants' customers expected, causing advertisers to reduce their advertising spend, and in many instances, leave Pinterest's platform all together for competing platforms. This underperformance extended to Defendants' AI-driven advertising products, including Performance+, which Defendants had represented as capable of "delivering great return for

advertisers" by way of its bidding, budgeting, targeting, and creative optimization tools designed to simplify campaign creation and improve advertiser returns. In practice, however, those AI-driven products failed to deliver the promised results, further contributing to advertiser dissatisfaction, reduced spend, and client attrition.

357. Defendants knew, or were severely reckless in not knowing, that their representations did not reflect advertisers' actual experience. That knowledge is demonstrated by, among other things: (1) the accounts of numerous FEs corroborating that advertising clients were dissatisfied with Pinterest's offerings and moving their business elsewhere; (2) Defendants' access to reports and reporting platforms tracking AI adoption and internal ad spend, and (3) consistent analyst questioning about Pinterest's AI offerings.

**a. FEs Corroborate That Management Knew That Advertisers Were Dissatisfied With Pinterest's AI Offerings**

358. Multiple former employees described the same underlying conditions: that Pinterest's AI products underperformed, advertisers communicated their dissatisfaction directly to Pinterest personnel, significant customer complaints were escalated to senior leadership, and management became increasingly concerned as advertiser dissatisfaction intensified.

359. FE-14 recounted that management seemed stressed, became stricter about sales targets, and the office environment "became more panicked" as time went on, "likely due to leadership realizing that AI was negatively impacting the Company." He added that Account Managers were getting negative feedback from customers about the AI features that were being rolled out.

360. FE-4 further explained that at the beginning of 2025, the use of Performance+, a suite of tools for AI campaigns, was being pushed by the Company. According to FE-4, for the Food segment this was stopped very quickly in the first half of 2025 as the Company was not happy with the performance of these campaigns.

361. These concerns were not confined to particular advertiser segments. Former employees also described material limitations that prevented Performance+ and Pinterest's automated-bidding tools from satisfying advertisers' campaign-specific needs.

362. FE-12 explained that he received feedback that Performance+ couldn't handle highly specific types of advertising campaigns, like a worldwide campaign, and was better for generic campaigns, leaving many customers dissatisfied. He added that other social media platforms like Meta, Google, Instagram, TikTok, would outperform Pinterest. Advertising clients were making more money from those platforms. He reported this to Heather Haney at Pinterest at a Round Table meeting in early 2025.

363. FE-2, who worked at Pinterest from September 2023 through February 2026 as a lead data scientist on the ads delivery pipeline, responsible for ad-ranking models, and worked with the marketplace team, which balanced the number of ads shown with user and advertiser considerations, stated that it was difficult to make a blanket assurance to advertisers that using automatic bidding would necessarily result in better campaign performance. He described two broad campaign approaches: cost-based bidding, in which an advertiser establishes a bid or cost control, and automatic bidding, in which the advertiser provides a budget and Pinterest's algorithms determine how to bid. He further stated that advertisers often complained about automated bidding performance and that data science teams and engineers conducted continual investigations based on advertiser feedback. Investigations included studies, root-cause analyses, campaign migrations, or restructuring. FE-2 recalled a specific instance involving Wayfair, where the company considered leaving due to automatic bidding issues. He believes this occurred in the fourth quarter of 2024 or 2025, and that Wayfair had multiple issues that were escalated within Pinterest. FE-2 also recalled that, during this period, a principal engineer was assessing similar escalations for the client, Walmart. He clarified that advertiser investigations were relatively continuous. He recalled that this occurred at the beginning of 2025.

364. FE-2 stated that the issues with automatic bidding were communicated to engineering directors, product-management directors, and sales leadership. He stated that these

investigations were discussed in team meetings and war rooms. He recalled that Pinterest eventually established a dedicated team, known as advertiser experience or advertiser performance, focused on supporting these complaints. He could not recall the precise date but stated about a year and a half ago [approximately Spring 2025].

365. Several former employees recalled clients specifically leaving Pinterest and taking their business elsewhere due to the underperforming AI. For example, according to FE-15, Pinterest rolled out Performance+ in approximately early 2025 and "a lot" of clients were not happy with it. FE-13 explained that agencies and advertisers informed him that they were seeing better results elsewhere. FE-13 continued to say that this was brought up to leadership.

366. Similarly, FE-6 reported receiving frequent feedback that advertisers were reallocating budgets from Pinterest to competing platforms because those platforms produced stronger measurable results. Using a specific consumer electronic advertiser as an example, FE-6 explained that Pinterest could not demonstrate successful last-click conversions, while platforms such as Instagram and TikTok were reportedly able to show measurable purchases resulting directly from advertising campaigns. According to FE-6, this occurred not only with the consumer electronic advertiser, but with numerous other advertiser accounts.

367. FE-3 recalled his client, *IHG* leaving Pinterest completely in 2026 and *Delta Airlines* significantly pulling back on ad spending. FE-3 further recalled that Delta pulled back to move to other platforms that were outperforming Pinterest. FE-3 explained that advertisers were more interested in lower funnel solutions, which FE-3 described as a user being able to click on an ad and make a purchase, rather than upper funnel solutions, which FE-3 described as an ad like a video that just promotes awareness without the ability to make a purchase. According to FE-3, clients prefer lower funnel solutions to be able to "prove their ROI" and platforms like TikTok, Google, and Meta performed much better when it came to lower funnel solutions. In his opinion, Pinterest was "struggling to stay on par" with competitors in terms of performance.

**b. Reports And Reporting Platforms Addressed Concerns About Pinterest's Underperforming AI, Performance+, And Its Impact On Advertiser Spend**

368. Defendants had ample access to, and were made aware of, various reports, reporting platforms, and meetings discussing that advertisers were dissatisfied with Performance+ and that clients would shift their spend to other social media platforms with stronger offerings. Defendants had access to Pathmatics, Tableau, and Google documents, which represented advertiser spend and utilization of AI.

369. FE-7 explained that [sales] meetings were tracked through Salesforce and employees' calendars and were one of employees' OKRs,[12] which impacted their compensation. FE-7 continued to say that OKRs around this same time shifted from revenue focus to also including objectives related to meetings, use of *CAPI*, and the percentage of campaigns that were using AI. This shows that Defendants had ample access to view the percentage of advertisers utilizing AI.

370. FE-15 added that Salesforce included budget information and Ads Manager included actual spend information and data from those sources needed to be input into Google Sheets, and then a dashboard was generated from there. Since Performance+ is an AI powered campaign product, it would have been available to Defendants via Ads Manager and the Google Sheets dashboard.

371. FE-7 recalled that when an account reduced or pulled spending, that leadership reviewed the advertisers' spending in Pathmatics, a third-party platform that tracked where advertisers were spending their marketing budgets. According to FE-7, the use of Pathmatics was a "big push" by leadership.

372. FE-4 recalled that employees had access to a Google Doc which included employees in CPG and how close they were to goal. According to FE-4, beginning in early 2026 a document was made available to employees to see the performance across all verticals in North America.

---

[12] OKRs stands for Objective and Key Results.

373. According to FE-13, internally Pinterest used Tableau as their database for insights and benchmarks to report to advertisers or prospective advertisers.

374. According to FE-2 issues with automatic bidding were communicated to engineering directors, product-management directors, and sales leadership. He stated that these investigations were discussed in team meetings and war rooms.

375. These FEs' accounts demonstrate that Pinterest was closely tracking how many advertising campaigns were adopting Pinterest's AI programs and that Defendants had ample access to, and were made aware of, this information. Indeed, this tracking was a "big push" by leadership.

**c. Analysts' Frequent Interest In, And Questions About, Performance+ and Customer Adoption Meant That Defendants Were Informed That Pinterest's AI Was Incompatible with Advertisers' Needs And That Advertisers Were Leaving Pinterest For Other Social Media Platforms**

376. Analysts frequently asked Defendants about Pinterest's AI programs, including Performance+. Given the frequency and import of these questions, the Individual Defendants were prepared to—and did—answer these questions during earnings and conference calls.

377. For example, on the Q1 2025 earnings call, held on May 8, 2025, Citigroup analyst Ronald Josey asked Defendant Donnelly:

> Julia, you highlighted in your comments, 25% of code is generated by AI. That's up 10 points in a quarter, I think you said. But would love to hear your comments on the benefits here. Is it product velocity … but benefits around product velocity, time to market, but also cost savings as well.

378. On the same call Morgan Stanley analyst Brian Nowak asked:

> The first one on Performance+, you've made a lot of progress driving adoption of that product with some of your larger advertisers. Is there any way you can talk with us about how to think about a rough percentage lift in same advertiser spend as you sort of rolled that tool out so far?

379. The next quarter, on the Q2 2025 Earnings Call held on August 7, 2025, JP Morgan analyst Doug Anmuth asked Defendant Ready:

> Bill, I wanted to ask about Performance+ adoption. You rolled out ROAS bidding in GA in March and then also gave advertisers ability to bring in audience data in

> 2Q. Can you just talk about how those initiatives are trending so far and then what else may be in the pipeline for Performance+?

380. On that same call, Baird analyst Colin Sebastian asked:

> The new visual search tool works really well from what we can tell. And I guess, I'd be curious how you envision that functionality ultimately contributing to broader user engagement and monetization? And how this helps position you against some of the other visual surfaces that we see cropping up on other AI-oriented apps?

381. On the Q3 2025 earnings call, held on November 4, 2025, Stifel analyst Mark Kelley asked: "I was hoping maybe we could drill into the SMB and kind of mid-market opportunity just a little bit more. … that 10% to 15% of revenue running through P+, was that just an SMB and mid-market stat and where might that go over time?"

382. On the same call Citigroup analyst Ronald Josey asked: "[O]n the future of e-commerce, I would love to get your thoughts on agentic e-commerce, agentic search, and how everything's evolving here, and specifically, Pinterest opportunity and strategy, given this evolving landscape, and then clearly with the launch of *Pinterest Assist*."

383. On the Morgan Stanley Conference Call held on March 6, 2025, an unidentified analyst asked:

> It could be helpful to sort of talk about the rollout of Performance+ operationally to some of those smaller advertisers.… maybe to sort of walk us through some of the key execution hurdles you have to clear over this year, just to get those next 10,000, 20,000 small, medium-size businesses using Performance+ and really spending more.

384. On the Q1 2026 earnings call, held on May 3, 2026, Oppenheimer analyst Jason Helfstein asked: "How are you viewing the impact from AI chatbots with respect to the competitive landscape and emerging visual discovery?"

385. In preparing for repeated and expected questions from analysts about Pinterest's AI including Performance+, the Individual Defendants would have discovered—or would have been severely reckless in not discovering—that the AI was underperforming compared to client needs, and clients were reducing their spend and shifting it to competitors with stronger, more compatible programs.

### 3. The Fraud Concerned The Company's Core Operations

386. Advertising was not merely important to Pinterest; it was the Company's lifeblood and primary revenue generator. A handful of advertisers constituted the vast majority of Pinterest's revenue, and the Company's entire business model depended on their continued spend. This spend was core to Pinterest's entire operation. As such, it would be absurd to believe that Defendants did not know that its advertisers were pulling back ad spend because (1) of tariff-related headwinds and (2) Pinterest's advertising offerings, including its AI-products, were underperforming and failing to attract and retain advertisers.

387. Defendants themselves frequently discussed that advertising was core to Pinterest's revenue and success. For example, Pinterest's 2024 Form 10-K states: "We generate substantially all of our revenue from advertising." This, or nearly identical language, is repeated in other of Pinterest's SEC filings, including its 2024, 2025 and 2026 Form 10-Qs, and its 2025 Form 10-K.

388. Former employee accounts confirm the centrality of advertising to Pinterest's operations and revenue throughout the Class Period. For example, FE-7 added that the Company's revenue "continues to almost exclusively come from advertising." FE-6 stated that advertising sales represented Pinterest's primary source of revenue and that sales employees were viewed as the Company's "principal revenue generators."

389. The reduction in ad spend was widely discussed throughout the Company, bolstering that Defendant's knew about the extent of pull-back and vulnerability of relying on a small cohort of advertisers to generate substantially all of Pinterest's revenue. For example, FE-5 recalled observing tariff-related cuts to advertiser spending, including amongst Pinterest's top 5 advertisers, which was "widely known" amongst the sales team. According to FE-11, the tariffs were a "very big conversation" at the Company. FE-7 explained that he attended an All-Hands meeting in approximately February or March 2026 in which a new leadership hire stated that it was "so concerning" that the Company's approximate top 10 advertisers were responsible for a disproportionate portion of the Company's advertising revenue, potentially as high as 90%. FE-10 recalled how the subject of advertisers pulling back their ad spending due to the tariffs was "talked

about a lot around the office." FE-10 heard information about tariffs around the office that "trickled down from the top." According to FE-10, "everyone knew the tariffs were affecting business."

390. The FE accounts establish that advertising revenue was the core—indeed, the near-exclusive—driver of Pinterest's business. The Company's top advertisers were pulling back spend at material rates due to tariff disruption and underperformance of Pinterest's advertising offerings, and these facts were widely known across the organization, from senior executives to front-line sales personnel. Given the existential significance of advertising revenue to Pinterest and the pervasive internal awareness that the Company's largest customers were reducing spend at accelerating rates, Defendants either knew, or were severely reckless in not knowing that their public statements were materially false and misleading

#### 4. Defendants' Sarbanes-Oxley Certifications Corroborate That The Information Tracked By Pinterest's Reporting Infrastructure Was Made Known To Them

391. Throughout the Class Period, Defendants Ready and Donnelly each personally signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 and Exchange Act Rules 13a-14(a) and 15d-14(a), which were filed as Exhibits 31.1 and 31.2 to each of Pinterest's annual and quarterly reports. In those certifications, Defendants Ready and Donnelly did not merely attest to the accuracy of Pinterest's financial statements, they affirmatively represented that they had personally designed, or caused to be designed under their supervision, the very systems by which information about Pinterest's business was collected and routed to them—and that those systems were operating for the purpose of ensuring that material information reached them.

392. On February 6, 2025, Pinterest filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2024. Defendant Ready signed the certification, filed as Exhibit 31.1 to that Form 10-K, in which he certified, in relevant part:

> I, William Ready, certify that:
>
> 1. I have reviewed this Annual Report on Form 10-K of Pinterest, Inc.;
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements

> were made, not misleading with respect to the period covered by this report;
>
> . . .
>
> 3. The registrant's other certifying officer and I ***are responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) **and internal control over financial reporting** (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;
>
> . . .
>
> c) ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*** . . . .
>
> (Emphasis added.)

393. Defendant Donnelly signed a materially identical certification, filed as Exhibit 31.2 to the same Form 10-K, likewise dated February 6, 2025. Defendant Donnelly certified, in identical terms that she was "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting," and that she had "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, **to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**." *(Emphasis added.)*

394. Defendants Ready and Donnelly each executed substantively identical Section 302 certifications, in the same form and containing the same "made known to us" representation, in connection with each of the following periodic reports filed during the Class Period:

| Filing | Period Covered | Filing Date | Certifying Officers |
|---|---|---|---|
| Form 10-K (FY 2024) | Year ended Dec. 31, 2024 | February 6, 2025 | Ready (Ex. 31.1); Donnelly (Ex. 31.2) |

| Filing | Period Covered | Filing Date | Certifying Officers |
|---|---|---|---|
| Form 10-Q (Q1 2025) | Quarter ended Mar. 31, 2025 | May 8, 2025 | Ready (Ex. 31.1); Donnelly (Ex. 31.2) |
| Form 10-Q (Q2 2025) | Quarter ended June 30, 2025 | May 7, 2025 | Ready (Ex.31.1); Donnelly Ex. 31.2) |
| Form 10-Q (Q3 2025) | Quarter ended Sept. 30, 2025 | November 4, 2025 | Ready (Ex. 31.1); Donnelly (Ex. 31.2) |
| Form 10-K (FY 2025) | Year ended Dec. 31, 2025 | February 12, 2026 | Ready (Ex.31.1); Donnelly (Ex. 31.2) |

395. Defendants Ready and Donnelly also certified, in the Form 10-K itself, that they had personally participated in evaluating the operation of these controls. Pinterest's 2024 Form 10-K states under Item 9A that "[o]ur management, with the participation of our chief executive officer ('CEO') and chief financial officer ('CFO'), has evaluated the effectiveness of our disclosure controls and procedures," and that "our CEO and CFO have concluded that as of December 31, 2024, our disclosure controls and procedures were effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the [SEC], and that ***such information is accumulated and communicated to our management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure***." *(Emphasis added.)* Pinterest repeated substantially identical language in each periodic report filed during the Class Period.

396. The impact of tariffs on Pinterest's advertising revenue was not a surprise sprung on management overnight. It was a known trend that Pinterest tracked, escalated, and managed internally for months before and throughout the Class Period, and that Item 303 of Regulation S-K therefore obligated Defendants to disclose.

397. Item 303 requires management to describe any "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). The obligation is triggered by management's own knowledge, not by public speculation. Here, Pinterest

possessed company-specific, non-public evidence that the trend had already materialized well before each relevant filing date:

(a) **Code Red War Rooms**. Beginning in approximately October 2024—before the Class Period began—and continuing through October 2025, Pinterest management convened recurring "code red war rooms" dedicated to extracting additional advertiser revenue before quarter-end. *Supra* ¶¶155–59.

(b) **The Dedicated Tariff Task Force And Its Internal Reports**. Pinterest regularly circulated internal reports analyzing tariffs and their impact on advertiser spending and the broader business environment. Those reports were prepared by a specialized task force within the sales organization dedicated to monitoring tariff-related issues. *See supra* ¶101. A company does not staff a standing task force to monitor a risk it regards as hypothetical.

(c) **Scripted Directives To Sales Personnel**. Pinterest issued Company-wide directives, presentation materials, and specific instructions to sales personnel—both direct employees and Accenture contractors—on how to handle advertiser conversations about tariffs and how to press advertisers to maintain or increase spend notwithstanding tariff-driven budget pressure. *Supra* ¶¶92, 111. Those directives are irreconcilable with a good-faith belief that tariffs posed only a prospective risk to Pinterest's revenue.

(d) **Real-Time Advertiser-Spend Tracking**. Pinterest monitored, through Pathmatics, Tableau, Salesforce, Ads Manager dashboards, and internally circulated Google documents, which advertisers were reducing spend, by how much, and for what stated reasons. *See, e.g.,* ¶¶98, 129, 134, 341, 370.

(e) **Direct Executive Contact With The Affected Advertisers**. Defendant Ready stated that he had "countless discussions . . . directly with the CEOs and CMOs of our top advertisers," and Defendant Donnelly has stated that Pinterest's revenue outlook reflected "what we are hearing from our advertising partners directly about their spend expectations." *See* ¶¶ 320–21.

398. Contemporaneous public reporting corroborates that the trend Pinterest was tracking internally was real and material, though it is Pinterest's own internal record—not the public record—that establishes Defendants' knowledge. As early as February 2025, the *Wall Street Journal* reported that President Trump's tariffs on China, including the suspension of the *de minimis* exemption for shipments under $800, would force major advertisers to reduce spend and consumer-facing companies to raise prices, with analysts projecting a steep decline in advertising spending.[13] Similar reporting appeared across major financial outlets, with Bank of America, Truist Financial, and AlixPartners all warning of material effects on discretionary spending.[14] That external commentary confirms the materiality of the trend; Pinterest's war rooms, tariff task force, sales directives, and advertiser spend tracking establish that Pinterest knew the trend had already begun to reduce its own revenue.

399. Defendants' Item 303 obligation and their Sarbanes-Oxley certifications operate in tandem. Defendants Ready and Donnelly each certified, in every periodic report filed during the Class Period, that they had designed, or caused to be designed disclosure controls "to ensure that material information relating to the registrant . . . is made known to" them, and that they had evaluated those controls and concluded they were effective. The systems described above are the very systems those certifications describe. Having certified that material information about Pinterest's sole material revenue stream reached them, Defendants cannot maintain that a trend their own task force was formed to monitor, their own war rooms were convened to counteract, and their own sales directives were drafted to manage somehow escaped their notice. Their failure to disclose that known trend, while simultaneously certifying compliance with their disclosure obligations, supports a strong inference of scienter.

---

[13] *See* Patrick Coffee, *Trump Tariffs Loom Over Ad Industry, From Brands to Digital Sellers*, WALL ST. J. (updated Feb. 4, 2025 2:22pm ET), https://www.wsj.com/articles/trump-tariffs-loom-over-ad-industry-from-brands-to-digital-sellers-58af3116.

[14] *Id.*

**a. The Certified Controls Were The Same Systems That Tracked Advertiser Pullback, Performance+ Adoption, And Tariff Impact In Real Time**

400. The disclosure controls that Defendants Ready and Donnelly certified they had designed, maintained, and evaluated were not abstractions. As pled above, Pinterest operated an extensive apparatus for collecting, aggregating, and escalating precisely the categories of information at issue in this action—advertiser spend, advertiser attrition, Performance+ adoption and performance, and tariff-driven budget reductions:

401. ***The Sales Reporting Chain***. As described by FE-7, teams at Pinterest were arranged into "pods" for the various advertiser groups and each pod consisted of account managers and client partners reporting to a pod manager. FE-7 further explained that Pod managers determined each account's expected advertising spend by each account based on conversations with advertisers and brought those figures to leadership. Pod managers reported to an industry manager, who reported to a managing director overseeing multiple pods; managing directors reported to a Vice President; who then reported to Chief Business Officer Lee Brown; and Lee Brown reported to Defendant Ready. Defendant Ready personally set Pinterest's annual revenue target and personally determined how that target was allocated among the pods. *Supra* ¶¶150–51.

402. ***Pathmatics***. Per FE-7, Pinterest licensed Pathmatics, a third-party platform tracking where advertisers allocated their marketing budgets across competing platforms. When an account reduced or pulled spending, leadership reviewed that advertiser's spending in Pathmatics. According to FE-7 the use of Pathmatics was a "big push" by Pinterest leadership. *Supra* ¶129.

403. ***Tableau***. Pinterest maintained Tableau as its internal database for insights and benchmarks, according to FE-13. *Supra* ¶134.

404. ***Salesforce And The Ads Manager Dashboards***. According to FE-7, Advertiser meetings were tracked through Salesforce and employee calendars and were incorporated into employee OKRs affecting compensation, with those OKRs expanding to include the percentage of campaigns using AI. *Supra* ¶369. According to FE-15, Salesforce contained budget information

and Ads Manager contained actual spend information, and data from those sources needed to be input into Google Sheets, and then a dashboard was generated from there. *Supra* ¶370.

405. ***Code Red War Rooms***. FE-1 described how Pinterest management convened recurring meetings dedicated to identifying ways to increase advertiser spend before quarter-end, meetings which gradually increased in duration and intensity. Beginning in approximately October 2024 and continuing through October 2025, Pinterest spent approximately two of every three months of each quarter operating in these "code red war rooms." The meetings often occurred daily, involved the Chief Technology Officer and Chief Revenue Officer, and generated spreadsheets, slide decks, meeting agendas, and notes that were created, maintained, and accessible to Pinterest's VP-level executives. *Supra* ¶¶155–59.

406. ***Dedicated Tariff Reporting***. FE-6 described how Pinterest circulated internal reports on tariffs and their impact on advertiser spending, prepared by a specialized task force within the sales organization dedicated to monitoring tariff-related issues. *Supra* ¶101. Former employees also reported receiving directives on how to handle advertisers seeking to reduce spend because of tariffs. *See supra* ¶¶92, 111.

407. Each of these systems existed to do exactly what Defendants Ready and Donnelly certified their disclosure controls were designed to do: ensure "that material information relating to the registrant . . . is made known to us by others within those entities." The information those systems tracked—which advertisers were reducing spend, by how much, for what stated reasons, and whether Performance+ campaigns were retaining or losing budget—was material information about Pinterest's sole material revenue stream. Pinterest itself has stated that it "generate[s] substantially all of [its] revenue from advertising." *Supra* ¶47.

**b. The Certifications Corroborate Defendants' Knowledge, Supporting a Strong Inference Of Scienter**

408. Defendants Ready and Donnelly quarterly certified that they were personally responsible for establishing and maintaining these controls, that they had designed the controls or caused them to be designed under their supervision for the express purpose of ensuring that material

information was made known to them, and that they had personally evaluated and concluded that the controls were effective. Taken together with the reporting infrastructure pled above, those certifications support a strong inference that Defendants Ready and Donnelly in fact received and reviewed the material information those systems generated—including information about advertiser pullback among Pinterest's concentrated base of large retail advertisers, the underperformance of Performance+, and the tariff-driven reduction in advertiser budgets—and therefore knew, when they made the statements alleged in Section VI, that those statements were false and misleading.

409. Defendants' own public statements confirm that this is not a matter of inference alone. Defendant Ready stated that he had "countless discussions that I have had ***directly with the CEOs and CMOs of our top advertisers***," and Defendant Donnelly stated that Pinterest's forward revenue outlook incorporated "***what we are hearing from our advertising partners directly*** about their spend expectations." *Supra* ¶¶320–21. Defendants thus described themselves as personally receiving the very information their certified controls were designed to surface. Having certified that they designed and supervised systems to ensure that material information about Pinterest's business was made known to them, and having independently described themselves as in direct and recurring contact with the executives of the advertisers whose spend was declining, Defendants Ready and Donnelly cannot plausibly disclaim awareness of the advertiser trends those systems tracked in real time.

410. The inference is strengthened by the subject matter. The information at issue was not a peripheral operational detail. Advertising was Pinterest's near-exclusive revenue source and approximately 85% of that revenue derived from Pinterest's largest advertiser accounts. *See supra* ¶47. According to, for example, FE-5, reductions in spend by that cohort—including among Pinterest's top five advertisers—were "widely known" among Pinterest's sales personnel. *Supra* ¶88. A CEO and CFO who certify quarterly that they have designed controls to ensure material information reaches them cannot simultaneously maintain that the single most material category of information about the company's only revenue stream failed to reach them.

### B. While Pinterest's Stock Price Was Artificially Inflated Due To Undisclosed Deterioration In Advertising Demand, Company Insiders Unloaded Their Pinterest Stock For Nearly $96 Million in Proceeds.[15]

411. At the same time that Defendants' material misrepresentations and omissions regarding a deceleration in demand for Pinterest ads caused the Company's stock to trade at artificially inflated values, Company executives and insiders, including Defendant Donnelly, unloaded 2.81 million shares of common stock, pocketing proceeds of nearly $96 million.

412. During the Class Period, Defendant Donnelly cashed out 82.9% of her Pinterest holdings, generating proceeds of more than $4.7 million.[16] She sold 143,449 shares at prices as high as $34.85 per share when she knew, or deliberately disregarded the truth surrounding demand for advertising on Pinterest. Besides being lucrative, Donnelly's trades were suspiciously timed. Indeed, just one day after the Morgan Stanley Technology, Media & Telecom Conference on March 6, 2025, during which Defendant Ready misleadingly assured investors that Pinterest's advertising demand could withstand the macroeconomic environment, Donnelly sold 38,596 shares at $34.27 per share, generating over $1.3 million. *See supra* Section VI.B. Donnelly's base salary in 2025 was $625,000, a fraction of the proceeds she made from her Class Period stock sales.

413. Benjamin Silbermann, Pinterest's co-founder and former CEO, who then transitioned to executive chairman in 2022, pocketed an astounding $84.5 million in proceeds from selling Pinterest stock during the Class Period. In total, he sold 2.45 million shares at prices as high

---

[15] The magnitude of Pinterest's insider sales during the Class Period are relevant to the Court's holistic scienter analysis; Lead Plaintiffs do not contend that these stock sales by themselves create an inference of scienter.

[16] The percent of shares Defendant Donnelly sold during the Class Period was calculated by taking the sum of open market sales reported on Donnelly's Form 4s filed with the SEC during the Class Period ("Donnelly's Class Period Sales"), divided by the sum of Donnelly's Class Period Sales and the number of shares that Donnelly beneficially owned at the end of the class period, as reported on Pinterest's 2026 Proxy Statement filed with the SEC. Although the Proxy Statement reports shares held as of March 27, 2026, this figure represents Donnelly's end of Class Period holdings, because no trades were made in the intervening time. Donnelly sold 54.7% of her total holdings, including RSUs subject to vesting after 60 days, if calculated by dividing Donnelly's Class Period Sales by the number of shares reportedly held on Donnelly's December 20, 2024 Form 4, the final Form 4 filed in her name before the Class Period.

as $37.95 per share, constituting a disposal of 6.2% of his Class A and Class B holdings. In contrast, Silbermann sold zero shares in the preceding 12 months.[17]

414. Other corporate insiders also unloaded shares during the Class Period while the stock price was artificially inflated. Chief Legal and Business Affairs Officer Wanjiku Juanita Walcott disposed of 104,500 shares, or 46.6% of her holdings, pocketing over $3 million. She sold her shares at prices as high as $35.68 per share. In contrast, she sold only 46,708 shares in the year before the Class Period.

415. Board member Jeremy Levine sold 56,809 shares, or approximately 4.7% of his holdings, pocketing approximately $1.93 million at prices as high as $34.33 per share. He executed a majority of his trades on March 7, 2025, one day after Defendant Ready's misleading statements at the Morgan Stanley conference (*see supra* Section VI.B); all of his trades were executed before the November 4, 2025 partial corrective disclosure. In contrast, Levine sold no shares in the year before the Class Period.

416. Chief Product and Technology Officer Matthew Madrigal sold 20,000 shares, or 7.5% of his holdings on July 21, 2025, at $38.58 per share, for total proceeds of $771,680. He had sold no shares during the preceding 12 months.

417. Finally, Chief Accounting Officer Andrea Acosta sold 18,885 shares, or 12.14 % of her holdings, pocketing more than $623,000. She sold her shares at prices as high as $37.46 per share, and made more than 80% of her Class Period sales before the November 4, 2025 partial corrective disclosure when share prices fell precipitously.

[17] While Donnelly, Silbermann, Madrigal, and Acosta's Class Period trades were made pursuant to Rule 10b5-1 trading plans, they adopted their plans between November 20, 2024 and December 13, 2024, a time when the prospect of tariffs was already known to the public, and Pinterest insiders would have understood the vulnerability of the Company's ad revenue if such tariffs were implemented. Walcott also made three trades pursuant to a Rule 10b5-1 trading plan adopted in August 2024, selling 30,453 shares. However, she adopted a new plan on August 12, 2025, and thereafter executed just one additional sale in the Class Period on November 11, 2025—the soonest possible trading date after adopting her new plan given the SEC's 90-day cool off period—cashing out over 70,047 shares and generating nearly $2 million in proceeds before any further revelations of truth were disclosed to the market.

### C. Defendant Donnelly's Unexpected Departure Further Supports Scienter

418. When Pinterest first announced Defendant Donnelly as the Company's CFO, she remarked that she was "thrilled to join the team and help drive Pinterest's next phase of growth." In less than three years since starting as CFO, Donnelly oversaw anything but a phase of growth: Pinterest shares plummeted approximately ***62%*** from its intraday Class Period high of $40.90 per share on February 7, 2025 to $15.42 per share on February 13, 2026.

419. About six months after Pinterest stock was in a three-month free-fall—as the truth gradually emerged between November 2025 and February 2026—and in the wake of admitting to headwinds like "pullback on ad spend from larger advertisers" which Donnelly disclosed "will continue" and "may become slightly more pronounced" in future quarters, Pinterest made a surprising announcement.

420. According to a Form 8-K filed by Pinterest on August 28, 2026, Defendant Donnelly resigned on August 26, 2026 "to pursue another opportunity" but would remain with the Company until October 30, 2026. In its Form 8-K, Pinterest stated that "Ms. Donnelly's departure is not the result of any disagreement with the Company on any matter relating to the Company's operations, policies, or practices, including accounting principles and practices." Nonetheless, Pinterest's stock fell 3% on this news, with outlets like *Yahoo Finance* describing the update as "a surprise finance chief departure" and *CFODive* remarking that Donnelly's departure "puts a spotlight on Pinterest's future growth." Other news outlets like *24/7 Wall St* reported that "Pinterest stock is sliding" after news of Donnelly's resignation came to light, noting "the reaction looks isolated" with "one direct rival ticking higher on the same session."

421. The proximity of Defendant Donnelly's unexpected resignation to the Class Period disclosures which caused the price of Pinterest common stock to nosedive strongly supports an inference of scienter.

## VIII. LOSS CAUSATION

422. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions which created false impressions concerning the durability

and resilience of advertiser demand for Pinterest's platform, the diversification of Pinterest's advertiser base, the performance of Pinterest's AI-powered advertising products, including Performance+, and Pinterest's exposure to tariff-driven reductions in advertiser spend. *See* ¶¶[False Statements]. These material misrepresentations and omissions caused Pinterest's stock price to trade at artificially inflated prices throughout the Class Period.

423. The facts concerning Defendants' false and misleading statements and omissions were revealed to the market through a series of partial disclosures, causing the price of Pinterest common stock to decline significantly and thereby causing investors to suffer losses. *See, e.g., Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018). Throughout the disclosure period, Defendants mitigated declines in Pinterest's stock price by making additional false assurances regarding the alleged fraud, as described herein, until the final disclosure on February 12, 2026.

424. As a result of the disclosures described herein on November 4, 2025, January 27, 2026, and February 12, 2026, Pinterest common stock declined from a Class Period high of $40.90 per share on February 7, 2025, to a closing price of $15.42 per share after the final corrective disclosure on February 13, 2026, a decline of 62.3%. Each of these disclosures was associated with a statistically significant "abnormal" decline, meaning that it cannot be explained by broader market or industry price declines, as described in more detail in Section V above.

425. The chart below summarizes each partial disclosure, the impact of such disclosure on Pinterest's stock price, as well as that which each statement revealed about Pinterest:

| **Date of Disclosure** | **Disclosure(s)** | **Resultant Decrease in Stock Price** | **Corrective Disclosure Revelation** |
|---|---|---|---|
| November 4, 2025 | • Pinterest's 4Q financial forecast below consensus estimates and signal revenue deceleration 1-3 percentage points.<br>• On Pinterest's 3Q 2025 Earnings | Pinterest's stock price decreased from **$32.91** per share at market close on November 4, 2025, to **$25.75** per share at market close on November 5, 2025, a **21.76% decline** on | Pinterest's projected decline in revenue growth, along with disclosures regarding a pull-back in ad spend by large retailers facing tariff headwinds and that Pinterest was |

| **Date of Disclosure** | **Disclosure(s)** | **Resultant Decrease in Stock Price** | **Corrective Disclosure Revelation** |
|---|---|---|---|
| | Call, Defendants Ready and Donnelly admitted that there was "moderating ad spend" that disproportionately impacted Pinterest because of its advertiser concentration in large retail, while smaller and mid-market advertisers represented only 15% of Pinterest's revenue. | unusually high trading volume of nearly 75.5 million shares. | disproportionately exposed to such large retailers amongst its peers, indicated that Pinterest's revenue was not "resilient" to macroeconomic pressures, as Defendants had previously assured investors. |
| January 27, 2026 | • Pinterest's Form 8-K announced a global restructuring plan, including the elimination of up to 15% of its workforce to fund AI initiatives. | Pinterest's stock price declined from **$25.90** per share at market close on January 26, 2026, to **$23.41** per share at market close on January 27, 2026, a **9.61% decline** on unusually high trading volume of more than 39 million shares. | Pinterest's announcement signaled further revenue deceleration and that the Company's AI initiatives, including Performance +, were underperforming expectations and falling behind competitors. |
| February 12, 2026 | • Pinterest announced Q4 2025 revenue of $1.319 billion, missing analyst consensus, and representing 14% revenue growth, falling at the low end of guidance.<br>• Pinterest issued guidance for Q1 2026 that signaled | Pinterest's stock price declined from **$18.54** per share at market close on February 12, 2026, to **$15.42** at market close on February 13, 2026, a **16.83% decline** on unusually high trading volume of more than 69 million shares. | Pinterest's announcement revealed that despite the Company's assurances of resilient revenue growth, Pinterest's revenue growth was in fact decelerating because of structural inadequacies, including advertiser concentration that |

| Date of Disclosure | Disclosure(s) | Resultant Decrease in Stock Price | Corrective Disclosure Revelation |
|---|---|---|---|
| | further revenue deceleration, forecasting revenue growth in the range of 11%-14%. The range represented a marked departure from Pinterest's class period representations of growth in the mid-to-high teens.<br>• On Pinterest's Q4 2025 Earnings Call, Defendant Ready admitted that Pinterest was unable to maintain growth rates amidst tariffs, especially given the Company's advertiser concentration in large retail. Ready further admitted that Pinterest was unable to grow its other advertising segments, including SMB, enough to offset the tariff headwinds. Finally, Ready disclosed various shortcomings with ad sales, in particular with Performance +, | | rendered the Company more susceptible to tariff headwinds; and weaknesses in Pinterest's AI-powered advertising tools. Specifically, despite Pinterest's assurances that Performance + was allowing Pinterest to expand its "share of wallet," among advertisers, in fact Performance+ did not provide sufficient measurement capabilities to its advertisers and thus Pinterest was losing ad spend to its competitors. |

| Date of Disclosure | Disclosure(s) | Resultant Decrease in Stock Price | Corrective Disclosure Revelation |
|---|---|---|---|
| | identifying a "quite significant" gap between monetization and user engagement, requiring the need to "move faster" to improve measurement, as Pinterest's competitors have become "more aggressive in claiming credit for [advertising] outcomes." | | |

426. It was entirely foreseeable that Defendants' materially false and misleading statements and omissions and scheme to defraud investors discussed herein would artificially inflate or maintain the existing artificial inflation of the price of Pinterest common stock. It was also foreseeable to Defendants that the disclosures described above would cause the price of Company stock to fall as the artificial inflation caused and maintained by Defendants' misstatements and omissions was removed. Thus, Defendants' materially false and misleading statements and omissions directly and proximately caused the stock price declines described above.

## IX. THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

427. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein.

428. None of the statements alleged herein to be false or misleading are forward-looking statements. Such statements addressed facts and conditions existing at the time the statements were made. Furthermore, none of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future

economic performance, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

429. To the extent certain of the statements alleged to be false may be characterized as forward-looking, they were neither identified as "forward-looking statements" when made nor accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Any purported cautionary language warned only of theoretical future risks at times when the risks were not merely hypothetical. Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance. In addition, Defendants are liable for any forward-looking statements because at the time each statement was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Pinterest who had actual knowledge that the statement was materially false or misleading.

## X. THE PRESUMPTION OF RELIANCE

430. Lead Plaintiffs and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine established in *Basic v. Levinson*, 485 U.S. 224 (1998). Such a presumption is appropriate because, among other things:

(a) During the Class Period, Defendants made public misrepresentations that contained untrue statements of material fact or failed to disclose material facts necessary to make the statements that were made not misleading;

(b) the misrepresentations and/or omissions were material;

(c) Pinterest's common stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Pinterest common stock; and

(e) Lead Plaintiffs and other members of the Class purchased Pinterest common stock between the time Defendants misrepresented or failed to disclose material facts necessary to

make the statements that were made not misleading and the time the true facts were disclosed, without knowledge of the misrepresented and/or omitted facts.

431. At all relevant times, the market for Pinterest common stock was efficient for the following reasons, among others:

(a) Pinterest common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) throughout the Class Period, Pinterest common stock was highly liquid, with an average daily trading volume of 12.86 million shares;

(c) as a regulated issuer, Pinterest filed periodic public reports with the SEC;

(d) Pinterest regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) Pinterest was followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to those brokerage firms' sales force and certain customers and that were publicly available and entered the public marketplace; and

(f) unexpected material news about Pinterest was reflected in and incorporated into the Company's stock price during the Class Period.

432. As a result of the foregoing, the market for Pinterest common stock promptly digested current information regarding Pinterest from publicly available sources and reflected such information in the price of Pinterest common stock. All persons and entities who or which purchased or otherwise acquired Pinterest common stock during the Class Period suffered similar injuries through their purchase of Pinterest common stock at artificially inflated prices, and thus, the presumption of reliance applies.

433. A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S.

128 (1972), to the extent the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## XI. CLASS ACTION ALLEGATIONS

434. Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Pinterest during the period from after market close on February 6, 2025 until market close on February 12, 2026, both dates inclusive, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director or control person of Pinterest during the Class Period and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) the subsidiaries and affiliates of Pinterest; (vi) Pinterest's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vii) the legal representatives, heirs, successors-in-interest, or assigns of any such excluded person, in their capacities as such.

435. Pinterest common stock trades in an efficient market.

436. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to class members. Pinterest had 584,866,000 shares of Class A common stock issued and outstanding as of December 31, 2025. the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Pinterest shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Pinterest or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

437. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether Defendants omitted and misrepresented material facts; (c) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (d) whether the price of Pinterest's securities was artificially inflated; (e) whether Defendants' conduct caused the members of the Class to sustain damages; and (f) the extent of damages sustained by Class members and the appropriate measure of damages.

438. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

439. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

440. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

### For Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(b) Against Defendants Pinterest, Ready, And Donnelly

441. This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiffs and the Class, against the Defendants.

442. During the Class Period, Defendant Pinterest and Defendants Ready and Donnelly made, disseminated or approved the materially false or misleading statements alleged herein, all of which were about Pinterest and its common stock, which they knew or, at minimum, were severely reckless in not knowing, were misleading in that they contained misrepresentations and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

443. Defendant Pinterest and Defendants Ready and Donnelly violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material fact and/or disseminated and/or approved and/or omitted to state material facts necessary to make the false or misleading statements specified above not misleading.

444. During the Class Period, Defendant Pinterest and Defendants Ready and Donnelly individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and made the above statements and omissions intentionally or with severe recklessness.

445. Defendant Pinterest is liable for all materially false or misleading statements made the Class Period, as alleged above.

446. Defendants Ready and Donnelly are liable for the false or misleading statements they made and for which they were responsible, as alleged above.

447. As alleged above, Defendants Pinterest, Ready and Donnelly acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with reckless disregard for the truth. The material misrepresentations and omissions of material facts alleged herein, which presented a danger of misleading buyers and sellers of Pinterest common stock, were either known to Defendants Pinterest, Ready and Donnelly or were so obvious that the Defendants should have been aware of them.

448. The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Pinterest, establish a strong inference that Defendants Pinterest, Ready and Donnelly acted with scienter in making the materially false or misleading statements alleged above during the Class Period.

449. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Pinterest common stock and were harmed when the truth about Pinterest negatively impacted the price of those securities. Lead Plaintiffs and the Class would not have purchased Pinterest common stock at the prices they paid, or at all, had they been aware of the truth about Pinterest.

450. As a direct and proximate result of wrongful conduct by Defendants Pinterest, Ready, and Donnelly, Lead Plaintiffs and other members of the Class suffered harm in connection with their respective purchases of the Company's common stock during the Class Period.

## COUNT II

### For Violation Of Section 20(a) Of The Exchange Act Against Defendants Ready And Donnelly

451. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

452. This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiffs and the Class, against Defendants Ready and Donnelly (the "Control Person Defendants").

453. As set forth above, each of the Control Person Defendants were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. The Control Person Defendants acted as controlling persons of Pinterest within the meaning of Section 20(a) of the Exchange Act by virtue of their executive positions and their culpable participation, as alleged above. The Control Person Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend were false and misleading, as

well as the fraudulent course of conduct and scheme alleged herein. The Control Person Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

454. In particular, the Control Person Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance and had the power and ability to control public statements about Pinterest and the actions of Pinterest and its employees. The Control Person Defendants were each directly involved in providing false information and certifying and/or approving the materially false or misleading statements disseminated by Pinterest during the Class Period. Moreover, each of the Control Person Defendants were directly involved in or orchestrated the undisclosed fraudulent scheme alleged herein. As a result of the foregoing, the Control Person Defendants each were controlling persons of Pinterest within the meaning of Section 20(a) of the Exchange Act.

455. As alleged above, Pinterest violated Section 10(b) of the Exchange Act by its material misrepresentations and omissions, and undisclosed fraudulent scheme, as alleged in this Complaint. By virtue of their positions as controlling persons of Pinterest and as a result of their own aforementioned conduct, the Control Person Defendants are each liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act of Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Pinterest common stock. Moreover, as alleged above, during the respective times that the Control Person Defendants served as officers or high-level executives of Pinterest or spoke directly to Pinterest investors during analyst conference calls, each of the Control Person Defendants culpably participated in the material misstatements and omissions made by Pinterest, as set forth above.

456. As a direct and proximate result of the wrongful conduct by the Control Person Defendants, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of Pinterest common stock during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

(a) Determining that this action is a proper class action, certifying Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiffs' counsel as Lead Counsel for the Class;

(b) Awarding Lead Plaintiffs and the Class compensatory damages and equitable relief, including all damages and relief provided for under the Exchange Act and the Securities Act, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## XIV. JURY DEMAND

457. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiffs demand a trial by jury of all issues so triable.

Dated: September 18, 2026

**LABATON KELLER SUCHAROW LLP**

*/s/ Lauren A. Ormsbee*
Lauren A. Ormsbee (*pro hac vice*)
Jesse L. Jensen (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
140 Broadway
New York, NY 10005

Tel: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
jjensen@labaton.com
aforgione@labaton.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Kenneth J. Black (Bar No. 291871)
Snehee Khandeshi (Bar No. 342654)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Tel.: (415) 288-4545
kennyb@rgrdlaw.com
skhandeshi@rgrdlaw.com

*Liaison Counsel for Lead Plaintiffs and the Class*